**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ELISA NILI CIRILO PERES BEN-RAFAEL, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 1:06-CV-00721 (ESH)** |
| **ISLAMIC REPUBLIC OF IRAN, *et al.,*** | |
| **Defendants.** | |

**PLAINTIFFS' PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs, by and through their undersigned counsel, hereby submit the following

proposed Findings of Fact and Conclusions of Law based on the evidence submitted to

the Court in this matter in support of the entry of a default judgment in this action.

A.     **Introduction**

This is an action brought by the duly appointed Israeli Executor of the Estate of

David Ben-Rafael and the immediate family members of the late David Ben-Rafael

stemming from the May 19, 1992 bombing of the Embassy of the State of Israel in

Buenos Aires, Argentina, during which the Decedent, a duly accredited Israeli diplomat

serving in Argentina, was killed in a terrorist attack by Hezbollah terrorists trained,

sponsored, supported and materially assisted by the Defendants the Islamic Republic of

Iran ("Iran") and the Ministry of Information and Security of Iran ("MOIS"). As sponsors

of an extrajudicial killing, defendants Iran and MOIS are subject to suit under the Foreign

Sovereign Immunities Act's ("FSIA") "state-sponsored terrorism" exception, 28 U.S.C.

section 1605(a)(7).

On April 21, 2006 the Plaintiffs filed their original complaint in this Court seeking, inter alia, compensation for their pecuniary losses, intentional infliction of emotional distress and punitive damages under FSIA. (Docket No. 1) After unsuccessfully attempting service on Defendants pursuant to 28 U.S.C. § 1608(a)(3) when the Defendants refused to accept delivery of a copy of the Summons, Complaint and Notice of Suit, together with a Farsi translation of each, in a package prepared by the Clerk of the Court via international mail, return receipt requested, the Plaintiffs, in accordance with 28 U.S.C. § 1608(a)(4), successfully executed service through diplomatic channels, on April 22, 2007. By June 21, 2007, Defendants had neither entered an appearance nor filed any responsive pleading and the Plaintiffs submitted an affidavit for default on July 5, 2007 (Docket No. 7). The Clerk of the Court entered default on July 6, 2007. (Docket No. 8). After the Plaintiffs moved for judgment by default on August 10, 2007 (Docket No. 9), this Court, mindful of its obligation under FSIA to inquire further before entering judgment against Iran and MOIS, requested that the Plaintiffs submit evidence that "establishes [the plaintiffs'] claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e).

**B.    The Plaintiffs**

1.    David Ben-Rafael ("Decedent") was a citizen and domiciliary of the State of Israel on March 17, 1992, when he was killed in a massive explosion which rocked the building which housed Israel's Embassy in Buenos Aires, Argentina ("Embassy Bombing"). Affidavit of Elisa Nili Cirilo-Peres Ben-Rafael ("Elisa Aff.") at passim. At the time, the Decedent served as the Deputy Chief of Mission, Minister-Counselor Plenipotentiary to the Israeli Embassy in Buenos Aires, Argentina. *Id* at ¶ 8. *See also* Expert Report of Dov Weinstein (David's work history). The Decedent was born a citizen

of the United States in the State of New Jersey on September 30, 1948 as David

Goldman. He retained United States citizenship continuously until June 9, 1986 when he

voluntarily surrendered such citizenship upon being posted by the Israeli Foreign

Ministry to the United States. *Id.* at ¶ 3

2.      The Plaintiff Elisa Nili Cirilo-Peres Ben-Rafael ("Elisa") was born a

citizen of the United States and has been continuously and uninterruptedly a citizen of the

United States.  Elisa was the lawful wife of the Decedent.  She is a Plaintiff in this action

in her (i) individual capacity as the wife of the Decedent (ii) in her capacity as the party

duly to be appointed as Israeli executor of the Decedent's estate under the laws of the

State of Israel and (iii) as the natural mother and next of kin of the minor children (at the

time of the Embassy Bombing) of the Decedent Yonatan Mishael Ben-Rafael and Noa

Ruth Ben-Rafael.  At all times relevant to this action, Elisa has been domiciled in Israel.

Elisa Aff.. at ¶¶ 2-4, p. 32.

3.      The minor Yonatan Mishael Ben-Rafael ("Yonatan") was born a citizen of

the United States on June 16, 1991.  He is the natural child of the Decedent and of Elisa.

He has been continuously from birth a citizen of the United States.  At all times relevant

to this action Yonatan has been domiciled in Israel. Elisa Aff. at ¶ 4; Affidavit of Yonatan

Mishael Ben-Rafael ("Yonatan Aff.").

4.      A minor at the time of the Embassy Bombing,  Noa Ruth Ben Rafael

("Noa") was born a citizen of the United States on November 20, 1988.  She is the

natural child of the Decedent and of Elisa.  She has been continuously form birth a citizen

of the United States.  At all times relevant to this action, Noa has been domiciled in

Israel. Elisa Aff. at ¶ 4; Affidavit of Noa Ruth Ben Rafael ("Noa Aff.").

5.    Plaintiff Ralph I. Goldman ( R. Goldman) is the natural father of the Decedent.  He is a naturalized citizen of the United States as well as of the State of Israel. At all times relevant to this action, Plaintiff Ralph I. Goldman (R. Goldman) was a domiciliary of the State of New York. Affidavit of Ralph I. Goldman ("Goldman Aff.").

6.    In addition to bringing this action individually, Plaintiff R. Goldman brings this action in his legal capacity as the duly appointed Executor of the Israeli estate of Helen Goldman.  Helen Goldman was the mother of the Decedent.  At all times relevant to this action, Helen Goldman was a citizen of the United States and of Israel and a domiciliary of the State of New York. Goldman Aff at ¶4.

7.    The Plaintiff Judith Goldman Baumgold ("Baumgold") was born a citizen of the United States on October 15, 1944.  She has maintained continuous and uninterrupted United States citizenship from birth.  At all times relevant to this action, Baumgold has been a domiciliary of Israel.  Baumgold is the natural child of the Plaintiff R. Goldman and of the late Helen Goldman and the sister of the Decedent. Affidavit of Judith Goldman Baumgold ("Baumgold Aff.") at ¶2-3.

8.    The Plaintiff Naomi L. Goldman ("Naomi") was born a citizen of the United States on April 1, 1955.  She has maintained continuous and uninterrupted United States citizenship and is a domiciliary of the State of New York.  Naomi is the natural child of Plaintiff R. Goldman and of the late Helen Goldman and is the sister of the Decedent. Goldman Aff. ¶ 4.

**C.    The Defendants**

9.    Defendant Islamic Republic of Iran ("Iran") is a foreign state which has been designated since January 19, 1984 as a state sponsor of terrorism pursuant to

Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), and

Section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371. *See generally*

Affidavit of Patrick Clawson (attached hereto as Record Exhibit 1);.[1] *see also Amir Reza*

*Oveissi v. The Islamic Republic of Iran*, 2007 U.S. Dist. LEXIS 56170 (Iran is state

sponsor of terrorism). *Weinstein v. Islamic Republic of Iran*, 184 F.Supp. 2d 13, 20

(D.D.C. 2002) (same); *Bodoff v. Islamic Republic of Iran,* 424 F.Supp. 2d 74, 79 (D.D.C.

2006) (same); *Mousa v. Islamic Republic of Iran,* 238 F.Supp. 2d 1, 4 (D.D.C. 2001)

(same); *Eisenfeld v. Republic of Iran*, 172 F.Supp. 2d 1, 5 (D.D.C. 2000) (same).[2]  Iran

routinely provides material support and resources to Hezbollah, a politico-paramilitary

terrorist organization operating in the Middle East and in other parts of the world,

---

[1] Dr. Patrick Clawson is the deputy director of the Washington Institute for Near East Policy and has been recognized by many judges of this Court on numerous occasions as a "widely renowned expert on Iranian affairs over the past 25 years," including Iran's state sponsorship of terrorism. <u>See</u>, Clawson Affidavit at ¶ 10(listing cases in which he has qualified as an expert witness). See also Estate of Michael Heiser v. Islamic Republic of Iran, 466 F.Supp. 2d 229, 265 (D.D.C. 2006) ("Dr. Clawson has repeatedly provided this Court with reliable and credible testimony regarding the involvement of Iran, MOIS and IRGC in sponsoring and organizing acts of terrorism carried out against citizens of the United States."). His expert report, discussed in more detail below, opines, based on a reasonable certainty (see Clawson Affidavit at ¶ 15) that:

(1) Iran has since the 1980s provided material support and resources to Hezbollah for carrying out terrorist attacks in the Middle East and in other parts of the world, including but not limited to Argentina;

(2) Iran's Ministry of Information and Security (MOIS) operates as an intelligence service and conduit for terrorism both within and beyond Iran's territory; specifically, it acts as a conduit for Iran's provision of funds, training, direction and material assistance to Hezbollah

(3) Absent the material, financial and technical support of Iran and MOIS, Hezbollah could not have carried out the bombing of the Israeli embassy in Buenos Aires; that absent the express approval of Iran and MOIS, that bombing would not have been carried out; and that Iran and the MOIS were responsible for Hezbollah's bombing of the Israeli embassy in Buenos Aires.

(4) Civil suits such as this have influenced Iranian officials in their consideration about whether to continue providing material and financial support for terrorist activities, and the award of damages has been a major factor in the debates inside Iran about the wisdom of such support.  On is submitted to provide the Court with the facts concerning Iran's support for the Embassy Bombing in Buenos Aires, Argentina.

[2] The court "may take judicial notice of related proceedings in cases before the same court." *Heiser v. Islamic Republic of Iran*, 466 F.Supp. 2d 229, 263 (D.D.C. 2006) (*quoting Salazar v. Islamic Republic of Iran*, 370 F.Supp. 2d 105, 109, n. 6 (D.D.C. 2005)).

including but not limited to Argentina.  Clawson Aff. at ¶ 16-21; s*ee also Peterson v. Islamic Republic of Iran,* 264 F.Supp. 2d 46, 50-53 (D.D.C. 2003)

10.    Defendant Ministry of Information and Security of Iran ("MOIS") operates, *inter alia*, as an intelligence service and a conduit for terrorism, and functions both within and beyond Iran's territory. Clawson Aff. at ¶¶ 22-29.  MOIS is an "agency or instrumentality" of Iran.  At all times relevant to this action, MOIS, acted as an agent of the Islamic Republic of Iran and performed certain acts within the scope of its agency, within the meaning of 28 U.S.C. § 1605(a)(7). Id.  Specifically, MOIS acted as a conduit for the Islamic Republic of Iran's provision of funds, training  direction and material assistance to Hezbollah for its terrorist activities in Lebanon, Argentina, Israel and elsewhere, including the actions relating to the Embassy Bombing. Clawson Aff. at ¶¶22-29, 33, 40; s*ee also Peterson v. Islamic Republic of Iran,* 264 F.Supp. 2d 46, 53 (D.D.C. 2003).

### D.    The Defendants' Terrorism Infrastructure

11.    Iran was refounded as an Islamic Republic in 1979 when revolutionaries espousing an extremist theocratic ideology deposed the ruling Shah of Iran. *Oveissi v. The Islamic Republic of Iran*, 2007 U.S. Dist. LEXIS 56170 * 5-6. One of Iran's most important objectives has been to establish itself as the global leader of radical Islam. Clawson Aff. at ¶ 16.  For years after the 1979 revolution, Iran found little success, especially in the Arab heartland of Islam, in achieving this objective. *Id*. In the mid-eighties, however, Iran found that an effective means for advancing its role as the leader of radical Islam was to oppose Israel, a nation whose very existence Iranian leaders deemed an insult to Islam. *Id*.  Iran quickly concluded that working with the radical

forces in the war-torn republic of Lebanon, particularly the Shia community with whom

Iran had deep historical and cultural ties, would serve both goals. Id. at ¶ 17-18; *Peterson*

264 F.Supp. at 51 .

12.    Beginning in the early 1980's Iran encouraged, if not directed, those

members of the Lebanese Shiite community sympathetic to the Iranian revolution to form

a political organization known as Hezbollah, or Party of God. Clawson Aff. at 18-20;

*Peterson v. Islamic Republic of Iran,* 264 F.Supp. 2d 46, 51 (D.D.C. 2003); *Oveissi v.*

*The Islamic Republic of Iran*, 2007 U.S. Dist. LEXIS 56170 * 6-7. Iran then provided

Hezbollah with political, material and financial assistance in excess of $25 million a year

(sometimes reaching $100 million year) between 1985 and 2005 and continues to provide

substantial support  today. Clawson Aff at ¶¶ 20-21.

13.    The primary agency through which the Iranian government both

established and exercised operational control over Hezbollah was the Iranian Ministry of

Information and Security ("MOIS"). Clawson Aff at ¶28-29; *Peterson ,* 264 F.Supp. 2d at

53 ; *Oveissi* 2007 U.S. Dist. LEXIS 56170 * 7.(MOIS) was the successor to the Shah's

Organization for Information and Security (known by its initials in Persian, SAVAK).

From the early days of the Islamic Republic after the 1979 revolution, MOIS (and its

predecessor agencies before the Ministry was formally established in 1984) took great

pains to demonstrate that it could be useful and loyal to the new authorities. SAVAK was

renowned for its craftwork in the intelligence business: it knew how to surveil targets,

how to avoid detection, and how to hold prisoners clandestinely. SAVAK was the most

respected intelligence agency in the Middle East outside of the Israeli agencies. MOIS

was entrusted with some of the most politically delicate tasks for the new government,

such as suppressing dissidents both at home and abroad, and assisting with schemes to overthrow neighboring governments. The MOIS minister is a member of a "council for special operations" which must approve terrorist activities. Clawson Aff. at ¶¶ 22-29.

14.    With approximately 30,000 employees, MOIS is the largest intelligence agency in the Middle East. Credible and authoritative reports in the last decade, including those from Iranian government investigators looking into assassinations of dissidents inside Iran by MOIS, have estimated its annual budget to be approximately between $100 and $400 million. *Id* at ¶ 24.

15.    MOIS' role in support of terror has been highlighted in various reports from the U.S. government, including the authoritative *Patterns of Global Terrorism 1990*, published annually by the State Department from the late 1980's to the early 2000s. Because of its authoritative nature, each word was carefully weighed in its writing, and it has served as a much respected source among researchers in the field. *Patterns of Global Terrorism* has consistently concluded that Iranian intelligence services facilitate and direct terrorist attacks. In 1990, for example, the State Department, perhaps foreshadowing the Embassy Bombing in Argentina, wrote that "Iran has used its intelligence services extensively to facilitate and conduct terrorist attacks…. Intelligence officers in embassies have used the diplomatic pouch for conveyance of weapons and finances for terrorist groups." Clawson Aff. at ¶¶ 25-27.

16.    A similar conclusion was reached in 1997 by a German court in the so-called *Mykonos* Case involving the 1992 murder of Iranian dissidents in a Berlin restaurant. In a detailed, 395 page ruling, the German court found that MOIS support for terrorism is conducted with the approval of the highest levels of the Iranian regime. In his

8

verdict, Judge Frithjof Kubsch specifically cited the Iranian president and Supreme Religious Leader (who, under the Iranian constitution, is the commander-in-chief and has the authority to override any decision of the president or legislature) as ordering the murders in question. A former MOIS operative who defected and testified at the trial, under a pseudonym ("Witness C"), provided detailed information about MOIS' role in support of foreign terrorist operations. Clawson Aff at ¶¶ 26.

17.    A few years later, the U.S. State Department explained again that, "Iran remained the most active state sponsor of terrorism in 2000. Its Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved in the planning and the execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals…Iran has long provided Lebanese Hezballah…with varying amounts of funding, safehaven, training, and weapons." (*Patterns of Global Terrorism 2000*). *Id* at ¶ 27.

18.    Indeed, a major part of MOIS' responsibilities from the early 1980s was to help organize Iranian government support to Hezbollah. MOIS played a key role in support of Hezbollah's role in holding American and other Western hostages in Lebanon in the 1980s and early 1990s. MOIS provided the technical expertise which allowed Hezbollah to hide the kidnapped Westerners for years from a concerted effort by several Western intelligence agencies to identify their location. In addition, "MOIS acted as a conduit for the Islamic Republic of Iran's provision of funds to Hezbollah, provided explosives to Hezbollah and . . .exercised operational control over Hezbollah," in Hezbollah's successful state-sponsored terrorist attach on the Marine barracks in Beirut, Lebanon in 1983. Id. at ¶ 28; s*ee also Peterson,* 264 F.Supp. at  53.

19.    As noted by Dr. Clawson, "there can be little doubt that MOIS acted as a conduit for Iran's provision of funds, training, direction and material assistance to Hezbollah and that in return for such provision of funds, training, direction and material Hezbollah acted as an agent for both Iran and MOIS to perpetrate terrorist activities around the world." Clawson Aff. ¶ 29.

**The Defendants' Responsibility for the 1992 Bombing of the Israeli Embassy in Buenos Aries, Argentina**.

20.    In 1991-92, immediately following the Gulf War, the Middle East peace process between Israel and her neighboring Arab states appeared to be moving rapidly forward with the announcement of the Madrid Conference. Consistent with its objective of promoting radical Islam and rejecting Israel,  Iran actively urged terrorist acts against Israel and Israeli interests as an effective means of damaging any peace process. At the time of 1991 Madrid Conference, Iran sponsored a major international gathering of radicals and terrorists to orchestrate attacks that it hoped  would derail Israeli-Arab peace. *Clawson Aff.* ¶ 30.

21.    Indeed, Iran was accused by the U.S. government of urging Hezbollah attacks timed to disrupt rounds of negotiations between Israel and Syria, even though Hezbollah was dependent on Syria's good will to permit Iranian material support to flow through Syria to reach Hezbollah. In 1992, Hezbollah was eager to help Iran, both because of its general animus towards Israel and more immediately because Israel had on February 16, 1992 killed Hezbollah Secretary General (i.e., leader) Sheik Abbas Musawi. Clawson Aff. ¶ 30.

22.    Iran also had additional motive in attacking the Israeli Embassy in Argentina. In October 2007, Miguel Angel Toma, the director of Argentina's intelligence

agency (SIDE)  and investigator of the Embassy Bombing, asserted that Iran was angry at

a change in Argentine policy. Toma explained, "During the '80s, the government of

Argentina signed agreements with them [the Iranians] in the areas of technological

investigation with the purpose of nuclear and missile programs"

[http://www.foxnews.com/printer_friendly_story/0,3566,298300,00.html]. On assuming

office in 1989, the civilian Argentine government headed by Carlos Menem cancelled

those agreements made by the previous military junta. Toma stated, "We never thought in

Argentina this would be a factor for determining a terrorist attack. We found out that later

after the two bombs [the 1992 Embassy Bombing and the 1994 Jewish community center

bomb discussed below] exploded in Buenos Aires." Clawson Aff. ¶ 31.

        23.     It was in this context that on May 19, 1992, the Embassy of the State of

Israel in Buenos Aires, Argentina, was destroyed by a bomb, killing 29 and wounding

242. A pickup truck loaded with explosives driven by a suicide bomber drove into the

front of the Embassy, then under repair, destroying it and the nearby buildings (a Catholic

church and a school). Although most of the victims were Argentine, including many

children, David Ben Rafael was also killed  in the explosion. *Id*. at  ¶ 32.

        24.     Responsibility for the bombing was claimed by Islamic Jihad.  The listing

for Hezbollah in the State Department's 1992 report on *Patterns of Global Terrorism*,

states  "Hizballah (Party of God) aka: Islamic Jihad, Revolutionary Justice

Organization...Islamic Jihad publicly claimed responsibility for the car-bombing of

Israel's Embassy in Buenos Aires in March 1992." (*Patterns of Global Terrorism 1992*).[3]

The inclusion of such a statement indicates, in my opinion quite correctly, that the State

Department was satisfied that the public claim of responsibility for the embassy bombing

did indeed come from Hezbollah, not from distinct and separate organization called

"Islamic Jihad" (note that there is now a Palestinian organization knows as "Palestinian

Islamic Jihad," but it has never had an organization in Lebanon and in any case uses the

name "Palestinian Islamic Jihad" rather than "Islamic Jihad"). Clawson Aff ¶ 33.

      25.     Subsequent investigations of the Embassy Bombing by the Argentines was

lengthy and beset with problems. However, a breakthrough came in 1998 when Argentine

investigators spoke with Abolghassam Mesbahi, a former senior Iranian intelligence

official who had defected to Germany in 1996. Mesbahi's testimony proved central to a

Berlin court's finding that senior Iranian officials had been responsible for a 1990

terrorist assassination episode at Berlin's Mykonos restaurant. Mesbahi stated that the

planning for the Embassy Bombing was done by Mohsen Rabbani, a MOIS agent who

had been Iran's cultural attache at its embassy in Buenos Aires from 1991 to December

1997, and supervised by Hamid Naghashan, a senior MOIS official (his testimony is

summarized in Larry Rohter, "Iran Blew Up Jewish Center in Argentina, Defector Says,"

*New York Times*, July 22, 2002). Rabbani was detained in Germany in 1998, but given

his apparent diplomatic status he was allowed to return to Iran. However, the Argentine

government then expelled seven Iranian diplomats, stating that it had "convincing proof"

of Iranian involvement in the Embassy Bombing.  Clawson Aff. ¶34.

---

[3] Hezbollah militants also refer to themselves as "Islamic Jihad. *Oveissi v. The Islamic Republic of Iran*, 2007 U.S. Dist. LEXIS 56170 * 7, fn. 3 citing *Damarell v. Islamic Republic of Iran*, 404 F.Supp. 2d 261, 271-72 (D.D.C.2005).  "Hezbollah" and "Hizbollah" are variant transliterations of the same name. *Id.* citing *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp. 2d at 248 n.1 .

26.      In 1999, in connection with the Embassy Bombing, Argentina issued an arrest warrant for Imad Mugniyah, who remains elusive. According to long-time CIA agent Robert Bair, "Mugniyah is probably the most intelligent, most capable operative we've ever run across, including the KGB or anybody else... He is the master terrorist, the grail that we have been after since 1983."

(http://www.cbsnews.com/stories/2002/05/01/60II/main507784.shtml). Among other terrorist episodes, Mugniyah has been implicated in the 1983 Beirut Marine barracks bombing, the 1984 bombing of the U.S. Embassy annex in Beirut, the 1985 hijacking of TWA 847 in Lebanon,  and the kidnapping of numerous Westerners in Lebanon in the 1980s (including U.S. Army Colonel William Buckley, who was tortured to death). By some accounts, he controls Hezbollah's security apparatus, the Special Operations Command. The European Union lists him as "Senior Intelligence Officer of Hezbollah" in its Official Journal.

(http:eurex.europa.eu/LexUriServ/site/en/oj/2005/l_314/l_31420051130en00410045.pdf). In October 2001, the FBI placed Mugniyah on its list of 22 Most Wanted Terrorists, offering $5 million for information leading to his arrest; this offer is still outstanding. He remains active; he has been accused of being the mastermind behind the 2000 and 2006 abductions of Israeli soldiers near the Lebanese border as well as the kidnapping of an emissary sent to negotiate the release of the 2000 abductees. He has been variously described as living in Iran or Lebanon. He maintains a low profile; for instance, he is said to have undergone cosmetic surgery which has altered his appearance. Reports circulate of continuing efforts by the CIA and U.S. Special Operations forces, as well as the Israeli government, to kill him. Clawson Aff at ¶ 35.

27.    With an attack as spectacular and brazen as the Embassy Bombing, one would have expected serious attention from several governments and many researchers. Unfortunately, and for one simple reason, this has not been the case. The Embassy Bombing was quickly overshadowed by the July 1994 bombing of the Argentine Jewish Mutual Association (AMIA) in Buenos Aires which killed another 85 people. Critics immediately said that the failure to thoroughly investigate the Embassy Bombing led to the AMIA bombing.[4] Yet, notwithstanding this criticism, the AMIA Bombing investigation did not fare much better. *See*, Clawson Aff at ¶36 (detailing missteps in the AMIA Bombing investigation).

28.    Soon after assuming office in early 2003, Argentine President Nestor Kirchner opened up Argentine intelligence files on the AMIA case. Miguel Tomas, the new head of Argentina's intelligence services, SIDE, traveled to Israel to show officials

---

[4] While it uncovered ample evidence of Hezbollah and Iran's role in the Embassy Bombing, the Argentine investigation was unsatisfactory in many ways. No actual trial has ever been held, for example, in part because Argentina was never able to obtain the physical custody of the Iranian agents responsible for the Embassy Bombing. Additionally, senior Argentine political officials lacked the will to uncover all the circumstances about the role of Argentinians in facilitating the bombing. Allegations that "police officers on a security detail inexplicably vanished just before the explosion" (*New York Times,* Rohter, op. cit.), the impeachment and removal from office of the Supreme Court justices placed in charge of the investigation (in line with Argentine procedures in which judges head investigations), and persistent credible claims that the Iranian government covertly funneled many tens of millions of dollars to President Menem both before his 1989 election and while he was president, all colored the Argentine investigation of the Embassy Bombing. Mesbahi said in late 1992 or early 1993 Menem was paid ten million dollars into a Swiss bank account to cover up the Embassy Bombing and to allow Iran to carry out additional terrorist attacks. Menem has long been dogged by allegations of corruption; after leaving office, he spent six months under house arrest for alleged involvement in illegal arms sales to Croatia (for use in the wars wracking the former Yugoslavia) and Ecuador (for use in that country's war with Peru). He has acknowledged having a secret Swiss bank account, though he denies receiving payment from Iran for covering up terror attacks. Clawson Affidavit at ¶ 36.

there the report on the AMIA bombing, which Yossi Melman, one of the more authoritative investigative journalists on terrorism, described as "thousands of pages long" (Yossi Melman, "Argentine intelligence report details Iranian hand in Buenos Aires bombing," *Haaretz,* November 3, 2003). Melman's article adds, "The report also states, although as a footnote, that Iran and Hezbollah were behind the bombing of the Israeli Embassy in March 1992 that killed 29 people and injured scores." After a re-investigation, in October 2006 prosecutors in Buenos Aires formally accused the Iranian authorities with directing Hezbollah to carry out the AMIA attack. In November, they issued warrants for the arrest of former President of Iran Akbar Hashemi Rafsanjani and seven others, including some who still hold official positions in Iran. Clawson Aff. ¶ 37.

29.    The Embassy Bombing and the AMIA attack remain a matter of concern to the Argentine authorities. In September 2007 address to the UN General Assembly, Argentine President Kirchner denounced the lack of Iranian cooperation about the bombings. In an October 2007 interview with Fox News (op. cit.), Tomas explained,

> "The attacks in the '90s against the Jewish community center and the Israeli embassy brought up many distinct questions, because they came from many thousands of miles away and obviously were plotted from many thousands of miles away... It's a mistake to think those operations do not reach the highest levels of the Iranian government. They study them at the highest levels case by case."

Clawson Aff ¶ 38.

30.    As noted by Dr. Clawson, the Embassy Bombing's relegation to a mere footnote in the AMIA Bombing report illustrates the difficulty in providing a more detailed statement about the nature and extent of Iranian/Hezbollah responsibility for the Embassy Bombing.  For instance, according to Dr. Clawson, reports of the AMIA bombing detail evidence that the Iranian Embassy provided the actual bomb used in the

AMIA attack, going so far as to analyze the explosives used, the method for smuggling

bomb components into Argentina and the manner by which the bomb was actually

assembled. While some reports detail that the Iranian Embassy similarly provided the

actual bomb used in the Israeli Embassy Bombing, the level of detail employed in the

AMIA reports is absent from the Embassy Bombing reports. These lack of details aside,

there has never been any account suggesting that the Embassy Bombing or the AMIA

bombing differed in any significant way, including any suggestion that different parties

were responsible for the two bombings. Accordingly, and in light of all of the

surrounding facts, Dr. Clawson  opines with a reasonable degree of certainty  the actual

bomb used to destroy the Israeli Embassy in Argentina was provided by Iranian Embassy

officials. Clawson Aff ¶ 39.

        31.    As Dr. Clawson further notes, some investigators, including some in

Argentina and Israel, have argued that Hezbollah's bombing of the Israeli embassy was

supported at least as much by Syria as by Iran. This charge is potentially explosive in

Argentine politics, given President Menem's deep connections to various Syrians –

possibly acting as agents for the Syrian government – in the early 1990's (President

Menem is of Lebanese origin). The truth of this allegation is not clear. Other critics claim

that the Embassy Bombing and the AMIA bombing were aided by anti-Semitic

Argentines; allegations have been made that important Argentine police officials are

deeply anti-Semitic. As stated conclusively by Dr. Clawson, while all of these issues are

of interest, they do not undercut the fundamental role of Hezbollah and Iran. *Whatever*

*theories there may be about who may have been involved, there is no disagreement: 1*)

that Hezbollah was responsible for the Embassy Bombing; 2) that while it had a

complicated relationship with Syria – which allowed a flow of arms from Iran but which also put strict limits on Hezbollah activities in favor of the Shia group it favored, Amal – at all times relevant to 1992 Embassy Bombing, Hezbollah was a creature of the Iranian government; 3) that absent the material, financial and technical support of Iran and MOIS, Hezbollah could not have carried out the Embassy Bombing; and 4) that absent the express approval of Iran and MOIS, the Embassy Bombing would not have been carried out. Clawson Aff ¶ 40.

32.    In short, Iran was responsible for the 1992 Embassy Bombing.  Clawson Aff. ¶ 40. At all times relevant to this action, Iran sponsored Hezbollah, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605 note, by providing it with funding, direction, training and other assistance for its terrorist activities against Israel and its citizens in countries outside of the Middle East including Argentina. *Id.* Such terrorist activities were undertaken by Iran to further promote Islamic fundamentalism and Iran's state sponsored terrorism agenda. Id. at ¶ 40.

**Facts Specific to the Named Plaintiffs**

33.    The murder of David Ben Rafael in the Embassy Bombing abruptly ended a 43 year old's life who had only recently married and fathered two young children. For thirteen years with the Israeli Foreign Office, David had enjoyed a steady advance in rank, position and salary for his assignments in Israel and abroad.  See Expert Report of Dov Weinstein. Only four years earlier in Chicago, Illinois, he had married Elisa. Elisa Aff. ¶ 3 A family quickly ensued with the birth of Noa and then with Yonatan only two years later. *Id*.

34.    By all accounts, David's career with the Foreign Office was progressing nicely. His projected professional advancement anticipated successive postings to Africa, the United States and ultimately Head of Mission in Europe upon an expected retirement from the Foreign Office in 2015. Had he continued on this career path, his expected gross salary in U.S. dollars over this time period would have been approximately $_____. Expert Report of Dov Weinstein.

35.    As a result of David's death, his wife Elisa, his children Noa and Yonatan, his father Ralph Goldman and late mother Helen Goldman, and his sisters Judith Goldman Baumgold and Naomi Goldman have suffered and will continue to suffer severe mental anguish and loss of companionship and society.

36.    Most family members, have submitted affidavits describing the anguish they endured when they learned of David's murder in the attack, as well as the pain and suffering they continue to deal with today in David's absence. *See* Elisa Affidavit; Affidavit of Noa Ben Rafael; Affidavit of Yonatan Ben Rafael; Affidavit of Ralph Goldman; Affidavit of Judith Goldman Baumgold. The Baumgold Affidavit also describes Naomi's emotional paralysis since Decedent's death. *Id.* ¶18. Moreover, such affidavits lend additional support with psychiatric and physician reports further detailing the fragile emotional state of the plaintiffs.

37.    Elisa, the widowed mother of two, states that her life and the life of her children were shattered on March 17, 1992, the day of the Embassy Bombing. Elisa Aff. at ¶ 9. At the time of the Embassy Bombing her oldest child Noa was 3, and her youngest, Yonatan, only 9 months old. Her testimony details the harrowing moments of learning of the Embassy Bombing, her husband's death, her efforts to take care of her

children and attempts to find closure by visiting the Embassy Bombing site some months later. Elisa Aff. at ¶¶ 9-22. Yet, despite therapy, particularly in the first two years following David's death, she felt overwhelmed, had difficulty doing simple tasks, had trouble sleeping and could not work. *Id* at ¶ 25. Being a single parent remained a difficult task and has undoubtedly caused stress in her relationship with her daughter. *Id*. at ¶ 27. *See also* Letter of Shay Muller (attached to Elisa Aff.). To this day, some 15 years after the Embassy Bombing, she finds herself maintaining a level of deep mourning during certain times of the year and generally withdraws from family and friends. *Id*. at ¶ 30. Only recently has she even started to date again. *Id*. at ¶ 31.

38.     Noa Ruth, Elisa and David's daughter was only 3 years old at the time of the Embassy Bombing.  Elisa vividly details the difficulty of breaking the news of David's death to Noa and Noa's vow to never speak Spanish again ( Elisa Aff. at ¶ 17), as well as Noa's dreaming of David and calling out for David upon returning to their apartment in Argentina some weeks later to gather their belongings. *Id*. at ¶ 21-22.  While Noa herself has only vague memories of her father, she acknowledges being colored by sadness and emptiness because of the absence of her father, particularly at special events in school, birthdays, and especially her bat mitzvah. Noa Aff. at ¶¶ 5-6. In addition, Noa, plainly concedes that she has had difficulties with her mother, believing her mother has been overprotective in her father's absence, but also acknowledging that her teen years and maturation would likely have been very different if her father were alive. *Id*. at ¶¶ 6-7. Indeed, this view is largely shared by her mother and treating psychologist. Elisa Aff. at ¶ 27-28. *See also* Letter of Shay Mueller (attached to Elisa Aff.).

39.     Yonatan, Elisa and David's son was only nine months old at the time of the Embassy Bombing. Elisa details serious separation issues she had with Yonatan as well as Yonatan's general refusal to talk about the loss of his Dad. Elisa Aff. ¶ 29. For his part, Yonatan plainly acknowledges that he grew up without a father and that he does not like to talk about it. Yonatan Aff. at ¶ 5. Nevertheless, he also wishes he were around and that things would have been easier in his family if he had a father. Id. at ¶ 6.

40.     Judy Baumgold, David's older sister, similarly details the terrible moments following the Embassy Bombing, her frantic efforts to find out information, and the constant stream of news of the event in Israel. Baumgold Aff. at 5-6. When David's body was repatriated to Israel, her home was the center of the mourning days and Elisa and the children stayed with her until they found other accommodations after the Jewish week of mourning known as Shiva. Id. at ¶ 7. David's death has been a source of ongoing emotional distress for Judy. Id. ¶ 8. Not only did she lose a brother and friend, but she also lost a vital "family team" member to help with her parents and dysfunctional sibling, Naomi. *Id*. at ¶ 4, 9. She assumed the role of caretaker for her mother (while she was alive) and her father, as well as her sister Naomi, who has been emotionally paralyzed since David died. *Id*. at ¶ 9-10.   These added roles, and the loss of her brother have caused her to suffer anxiety, insomnia and nightmares. *Id. See also* letters of therapists Israel Charney and Ruth Seliger (attached to Baumgold Affidavit).

41.     Naomi, the younger sister of David, has been emotionally paralyzed since David's death. Baumgold Aff. at ¶ 9. Upon learning of David's death, Naomi traveled to Israel for the funeral. Goldman Aff. at ¶ 9. Following the family's return to New York, Naomi's temper tantrums became frequent and she became more dependent on Ralph and

Helen for emotional and financial support. Goldman Aff at ¶ 15.  Dealing with Naomi was particularly difficult, despite professional help to ameliorate the situation. *Id*. With Helen's death, and her father's advanced age, Judy has taken it upon herself to be helpful and supportive of Naomi. Baumgold Aff. at ¶ 9.

42.     For Ralph Goldman, David's father, the loss of his only son has been very painful. He enjoyed a special relationship with David. When David changed his name to be more Israeli, he changed it to Ben-Rafael, which translates as Son of Ralph. Goldman Aff. at ¶ 11. He, and David's mother to whom Ralph was married for 62 year before her death in 2005, followed David's career with great interest and both had encouraged his career in the Foreign Ministry. *Id*.  Like the other Plaintiffs, Ralph details the awful events surrounding his learning of the Embassy Bombing, his immediate trip with Helen to Buenos Aires to search for his son, and the grief and mourning that transpired upon learning of his son's death. Goldman Aff at ¶¶ 6-10.  While Ralph sough medical treatment for his sadness and depression over David's death, he  dealt with his grief by immersing himself in work and devoting his efforts to finding out who was responsible for David's murder, as well as establishing scholarships and memorials in David's name. *Id*. at ¶ 12-13.  *See also* Letter of therapist, John Winegar (attached to Goldman Affidavit). Ralph is reminded of David every day. In addition to reciting daily psalms, he also visits David's grave every time he enters and leaves the country. *Id*. at ¶ 13.  By Ralph's own testimony not a day goes by where he does not miss his son and wish he were alive. *Id*.. at ¶ 17.

43.     Two months after David's death, David's mother Helen Goldman suffered a heart attack. Goldman Aff. at ¶ 14. *See also* Lennox Hospital Reports (attached to

Goldman Affidavit).  Whereas Ralph immersed himself in work, Helen internalized her grief and anger. *Id*. Like Ralph, she felt guilt over having encouraged David to pursue a career in the Foreign Ministry. Goldman Aff. at ¶ 11. Her health continued to decline. *Id* at ¶ 14.  Helen became overprotective of her younger daughter Naomi (*Id*. at ¶ 15. *See also* Letter of therapist John Winegar (attached to Goldman Affidavit)) and focused particular attention of her youngest grandchild, David's son, Yonatan. Shortly after moving to Israel and having never recovered from the death of her only son, Helen died and Ralph was appointed her executor. Goldman Aff ¶ 16.

## E.    CONCLUSIONS OF LAW

### I.    Jurisdiction

In the United States, the Foreign Sovereign Immunities Act provides the sole basis for asserting jurisdiction over foreign sovereigns.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-34 (1989).  A party may not generally  bring an action for money damages in U.S. courts against a foreign state.  28 U.S.C. §1604.  The "state-sponsored terrorism" exception, however, removes a foreign state's immunity to suits for money damages brought in U.S. courts where plaintiffs  seek damages against the foreign state for personal injury or death caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if  such act or provision of material support is engaged by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency."  28.U.S.C. § 1605(a)(7).

In order to subject a foreign sovereign to suit under section 1605(a)(7), a plaintiff must show that: (1) the foreign sovereign was designated by the U.S. State Department as a "state sponsor of terrorism"; (2) the victim or plaintiff was a U.S. national at the time the acts took place; and (3) the foreign sovereign engaged in conduct that falls within the ambit of the statute. *Heiser,* 466 F. Supp. 2d at 305. (citing *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. 2006) (Lamberth, J.)).

Each of the requirements is met in this case. First, Defendant Iran has been designated a state sponsor of terrorism continuously since January 19, 1984, and was so designated at the time of the attack. *See* 31 C.F.R. § 596.201 (2001); *Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1,11 ¶ 19 (D.D.C. 1998) (Lamberth, J.). Second, all of the Plaintiffs were United States citizens at the time the bombing occurred. Finally, Defendant Iran's persistent financial and organizational support of an entity that committed an extrajudicial killing squarely falls within the ambit of the statute. Defendant MOIS is considered to be a division of the State of Iran, and is therefore treated as a member of the State of Iran itself. *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 234 (D.C. Cir. 2003), cert. denied, 542 U.S. 915 (2004); *see also Salazar* 370 F. Supp. 2d at,116 (analogizing the IRGC of the MOIS for purposes of liability, and concluding that both must be treated as the State of Iran itself). Therefore, the same determinations that apply to MOIS conduct apply to the conduct of Iran.

Personal jurisdiction exists over a non-immune sovereign as long as service of process has been made under section 1608 of the FSIA. *See Stern v. Islamic Republic of Iran,* 271 F. Supp. 2d 286, 298 (D.D.C. 2003) (Lamberth, J.). In this case, service of

process has been effected under that provision.  Accordingly, this Court has *in personam* jurisdiction over defendants Iran and MOIS.

## II.    Legal Standard for FSIA Default Judgment

As previously  mentioned , in an action over which subject matter jurisdiction exists by virtue of the "terrorism exception" of  28 U.S.C. § 1605(a)(7)  "[n]o judgment by default shall be entered by a court of the United States or of a state against a foreign state…unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *Roeder,* 333 F.3d at  232-33.   In default judgment cases, plaintiffs may present such  evidence in the form of affidavits.  *Bodoff ,* 424 F. Supp. 2d  at 82  (quoting *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003)). Upon evaluation, the court may accept any uncontroverted evidence presented by Plaintiffs as true.  *Heiser*, 466 F. Supp. 2d at 255 (citing *Campuzano*, 281 F. Supp. 2d at 268). This Court accepts and credits the uncontested evidence and testimony submitted by Plaintiffs as true in light of the fact that the Defendants in this action have not objected to it or even appeared in this action to contest it.

## III.    Liability

### A.    *Proper Causes of Action Under the FSIA*

The FSIA does not itself provide a cause of action, but rather "acts as a 'pass-through' to substantive causes of action against private individuals that may exist in federal, state or international law."  *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 54 (D.D.C.  2006) (Lamberth, J.) (citing *Dammarell v. Islamic Republic of Iran*, 2005 WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005) (Bates, J.) ("*Dammarell, I* ").

In this case, state law provides a basis for liability.[5]   In order to determine the state law applicable to each action,  the Court must look to the choice of law rules of the forum, in this case, those of the District of Columbia.  *See Blais,* 459 F. Supp. 2d at 54.

**B.**    <u>**Choice of Law**</u>

<u>***The Estate of Helen Goldman, Ralph Goldman And Naomi Goldman***</u>

The applicable state substantive law which applies to the Plaintiffs in this action is (i) that of New York, as to the claims of U.S. citizens and New York domiciliaries Naomi Goldman, Ralph Goldman and the late Helen Goldman and (ii) that of the District of Columbia for all other Plaintiffs in this action.  As the forum state, the District of Columbia's choice of law rules apply to determine which states' law shall govern. *Bodoff*, 424 F. Supp. 2d at 83.  District of Columbia courts apply a so-called "refined government interest analysis", pursuant to which they "evaluate the government policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review."  *Bodoff*, 424 F. Supp. 2d at 83 quoting, *Hercules & Co. v. Shama Rest. Corp.*, 566 A 2d 31, 41 (D.C. 1989); <u>see also</u>, *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 68-69 (D.D.C. 2006) (Lamberth, J.).  When this test is applied it "typically leads to the application of the law of the plaintiff's domicile, as the state  with the greatest interest in providing redress to its citizens." <u>Id</u>., 425 F. Supp. 2d at 69 citing *Dammarell, I.* 2005 U.S. Dist. LEXIS 5343 at *66-67.  In the  particular circumstances, of Naomi  and R. Goldman (individually and as Executor of Helen Goldman's Estate) the substantive law which

---

[5] Obviously, the law of the United States applies rather than the law of the place of the tort or any other foreign law because the United States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks on United States citizens.  *See Dammarell,* 2005 WL 756090, at *20, 2005 U.S. Dist. LEXIS 5343, at *63.

governs what state law causes of action each  has is that of New York. See, *Peterson v. Islamic Republic of Iran,* 2007 U.S. Dist. Lexis 65820 *15 (D.D.C. Sept. 7, 2007) (Lamberth.).

**The Other Plaintiffs**

As to each of the other Plaintiffs, none has current United States domicile. Where, as here, the victims of terrorism are United States citizens with no current domicile in the United States, the District of Columbia has "the greatest interest" for choice of law purposes and its law will be applied. *See e.g. Bodoff*, 425 F. Supp. 2d at 83-84; *Haim*, 425 F. Supp. 2d at 69.  As to Elisa, Judith, Noa and Yonatan, District of Columbia law shall apply.

**C.    Substantiative Vicarious Liability For the Torts Committed by Hezbollah.**

The substantive basis of the Defendants' liability is that they at a minimum engaged in the "provision of material support" to Hezbollah, which carried out the Embassy Bombing.  The acts of another may render a party liable "under theories of vicarious liability, such as conspiracy, aiding and abetting and inducement."  *Haim*, 425 F. Supp. 2d at 69.  The Court will examine the applicability of each of these theories, as deemed necessary.[6]

**1.    Vicarious Liability**

The asserted basis of Defendants' liability is that they provided material financial support and resources including, most notably, deadly explosives to Hezbollah, the organization whose members carried out the Embassy Bombing. Under a theory of

---

[6] Where the facts found by the Court suffice to establish only one of these bases of vicarious liability, the Court need not go further.  *See*, *Haim*, at 69.

vicarious liability, a party may be liable for the acts of another, under rubrics including conspiracy, aiding and abetting, and inducement. Accordingly, this Court finds that at a minimum, civil conspiracy provides a basis of liability in this case against Defendants Iran and MOIS, provided such a theory exists under District of Columbia law.

### 2. Civil Conspiracy

Civil conspiracy is recognized under District of Columbia law as a theory for imposition of vicarious liability for civil torts. It exists when the following elements are present:(1) an agreement between two or more persons; (2) to participate in an unlawful act in an unlawful manner; (3) an injury or death caused by an unlawful overt act performed by one of the parties to the agreement and (4) pursuant to or in furtherance of the common scheme. *Griva v. Davison*, 637 A. 2d 830, 848 (D.C. 1994) (citing *Halbertstam v. Welch*, 705 F. 2d 472, 477 (D.C. Cir. 1983)).

It is axiomatic that the "agreement" element "may be inferred from conduct." *Bodoff*, 424 F. Supp. 2d at 84 citing, *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001); see also, *Haim*, 425 F. Supp. 2d at 69. The Plaintiffs have established based on the evidence submitted to this Court, most notably the Clawson Affidavit, that Iran, MOIS and Hezbollah acted in concert because they had agreed to commit high profile terrorism activities to promote Iran's brand of revolutionary Islamic ideology and to further the goal of damaging Israel and its citizens as well as United States interest whenever possible. Id. ¶ 16-30, p. 4-7. Such agreement may also be inferred from the substantial financial support and training that Iran and MOIS provided to Hezbollah. See, id., ¶ 20, p. 5. Judge Lamberth has also very succinctly and correctly opined that the

very " "sponsorship of terrorist activities inherently involves conspiracy to commit terrorist acts'." *Bodoff*, 424 F. Supp. 2d at 84 quoting *Flatow,* 999 S. Supp. at 27.

      The evidence also clearly establishes that Hezbollah carried out the Embassy Bombing which killed the Decedent.  *See*, *Clawson Aff*. ¶ 5 sub. Par 1-3, p. 4. Dr. Clawson's affidavit also demonstrates  to the satisfaction of this Court that the Embassy Bombing was carried out in "furtherance of the scheme" between Hezbollah, Iran and MOIS.  For these reasons, each of the four elements of civil conspiracy is established under District of Columbia law, with regard to the Defendants and the Hezbollah perpetrators.  *See also*, *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 108-109 (D.D.C. 2007) (Lamberth, J.) (civil conspiracy basis for vicarious liability established with respect to Iran and MOIS' provision of "material support and resources to Hezbollah" to bomb U.S. Marine barracks in Beirut).

      The same evidence also suffices to establish vicarious liability under New York law for civil conspiracy .  *See*, *Valore*, 478 F. Supp. 2d at 108-109 (the Plaintiffs in *Valore*, included specifically individuals who were New York domicilciares at the time of the Beirut bombing).[7]

    **3.**      **Other Bases of Vicarious Liability**

      Nor is there any paucity of evidence here for adjudicating Iran and MOIS as liable under vicarious liability theories which are separate and distinct from civil conspiracy.  Iran has provided initiative, approval of and likely provided the deadly explosive to carry out the terrorist attack at issue here.  *See*, *Clawson* Aff ¶ 39, p 10. As a

---

[7] Judge Lamberth expressly states in *Valore* that he had "examined the laws of each of the domiciliary states to determine whether such a basis for a cause of action may be brought in each state under a civil conspiracy theory of liability." 478 F. Supp. 2d at 108.

result of its action, through, its agent MOIS, these Defendants are also liable for aiding

and abetting as well as inducement of the deadly terrorist bombing.  See, 28 U.S.C. § 2

(a), b; s*ee also Bodoff* 424 F. Supp. 2d at 84.  In addition to conspiracy, aiding and

abetting and inducement are legal theories upon which a court may predicate vicarious

liability. *See, Halberstam,* 705 F2d at 481-486.

In conclusion, there exist multiple  legal bases for the imposition of vicarious

liability on Defendants  Iran and MOIS for the torts of Hezbollah.

D.      **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Except for Naomi Goldman the IIED claims of R. Goldman in any individual and

a representative capacity . Goldman, District of Columbia law governs as to the IIED

claims asserted by each of the other Plaintiffs.  The elements of the IIED tort under

District of Columbia law are "(1) extreme and outrageous conduct on the part of the

defendant which (2) intentionally or recklessly (3) causes the Plaintiff severe emotional

distress. *Bodoff*, 424 F. Supp. 2d at 85 citing *Howard Univ. v. Best*., 484 A 2d 958, 985

(D.C. 1984).  Based on the evidence submitted in this case, these elements are satisfied

here.  It is well established  that "a terrorist attack constitutes extreme and outrageous

conduct." *Bodoff*, 424 F. Supp. 2d at 85; *see also Stethem v. Islamic Republic of Iran*,

201 F. Supp. 2d 78, 89 (D.D.C. 2002) (Jackson, J.) ("[A]cts of terrorism are by their very

definition extreme and outrageous and intended to cause the highest degree of emotional

distress, literally terror.")  The second element of the IIED tort is also established here.

By its very nature a bombing of a civilian facility by use of high powered explosives is an

act of extreme and outrageous conduct. *See*, *e.g.*, *Dammarell v. Islamic Republic of Iran*,

404 F. Supp. 2d 261, 275 (D.D.C. 2005) (Bates, J.) (elements of District of Columbia

IIED found to be  satisfied in 1983 bombing of U.S. Embassy in Beirut); *see also Bodoff*, 424 F. Supp. at 85.

The third element of causing the plaintiff severe emotional distress is amply demonstrated here.  Each of the decedent's immediate relatives who are Plaintiffs in this action has established in detail the severe emotional distress that resulted from the Embassy Bombing and the murder of their loved one.

Finally, the Court notes that the District of Columbia's highest Court is among a number of state Supreme Courts which have yet to address the question of whether in a terrorist attack case, a plaintiff's physical presence is required to permit immediate family members to recover IIED changes.  *See*, *Peterson* 2007 U.S. Dist. LEXIS 65820 at * 21-22.   In *Heiser* the court held that even under the law of a jurisdiction which has not decided the presence issue in a terrorist attack context, presence is not required.  *Id., 466 F. Supp. 2d* at 305; *see also Peterson* at 20-21, n. 11.  *Heiser* reached this conclusion to dispense with a presence requirement "in light of the severity of [a terrorist attack] and the obvious range of potential grief and distress that directly results from such a heinous act" and because "a terrorist act" by its nature - is directed not only at the victims, but also the victims families."  466 F. Supp. at 328-29.  In conclusion, each Plaintiff whose IIED claim is governed by District of Columbia law is entitled to  recovery of damages for IIED.

Finally, there exists no material difference between New York law and District of Columbia law with respect to IIED.  New York law recognizes IIED as a tort.  *See*, *Howell v. New York Post Co.*, 81 N.Y. 2d 115, 612 N.E. 2d 699, 702 (N.Y. 1993).  The elements of the tort under New York law are substantially similar to those of the District

of Columbia. As in the District of Columbia, New York's highest court has not decided the issue of whether physical presence is required by an immediate family member in connection with a terrorist attack. *See, Peterson*, 2007 U.S. Dist. LEXIS 65820 * 21, n. 12. In *Peterson*, Judge Lamberth held that the presence element does not need to be proven in order to successfully bring a cause of action for intentional infliction of emotional distress under New York law" by victim's near relatives who were not present at the time of the attack. *Id.* at 21, 12 citing. In *Heiser,* 466 F. Supp 2d at 345-46 (applying New York law). This Court adopts the rationale of *Peterson*. It is persuaded that its analytical underpinnings are founded i.e., (i) that New York follows *The Restatement (Second) of Torts* in recognizing IIED and (ii) that the Southern District of New York has dispensed with a physical presence requirement in an action brought by victims of the September 11, 2001 terrorist attack on the World Trade Center and Pentagon. See, *In re Terrorist Attacks on September 11, 2001*, 349 F Supp. 2d 765, 829-30 (S.D. N.Y. 2005). Hence, Naomi Goldman and Ralph Goldman are s entitled to IIED recovery under New York law. R. Goldman is also entitled to recover in his capacity as Executor of his late wife, in that her death does not abate her IIED claim arising out of the Embassy Bombing. *See* § 11-3.2(b), N.Y. Est. PowersTrusts Law. ("No cause of action for injury to person or property is lost because of the death of the person in whose favor the cause of action existed.) The claim which Helen had during her lifetime is vested in her personal representative. *Id*. R. Goldman as the holder of letters of administration, albeit not from New York has the capacity to assert this claim. See, *Gregory v. Monroe County Water Authority*, 795 F. Supp. 92, 94-95 (W.D. N.Y. (1992) (applying New York law).

**E.     JURISDICTION OVER THE WRONGFUL DEATH CLAIM**

Under the jurisdictional mandate of § 1605(a)(7), a district court "shall decline to hear a claim under this paragraph of inter alia if "neither the claimant nor the victim was a national of the United States when the act upon which the claim is based occurred." 28 U.S.C. § 1605(a)(7)(B)(ii) (parenthetical omitted). Here only the victim Decedent was not a U.S. national, at the time of the Embassy Bombing. Every single one of the Plaintiffs family members was a U.S. citizen at that time and continues to be so.

Based on this undisputed showing of U.S. citizenship, the Court will consider whether Elisa and the two children of the Defendants are eligible to obtain a wrongful death recovery under District of Columbia law. The starting point of the Court's analysis focuses on whether the District of Columbia Wrongful Death Act and case law under it specifies who the real party in interest is as to any recovery under it.

§ 16-2701 D.C. Code (2001) provides as follows:

> (a) "When, by injury done or happening within the limits of the District, the death of a person is caused by the wrongful act, neglect, or default of a person or corporation, and the act, neglect, or default is such as will, if death does not ensue, entitle the person injured, or if the person injured is married, or domestic partnered, <u>entitle the spouse</u>, or domestic partnered, <u>either separately</u> or by joining with the injured person, to maintain an action and recover damages, the person who or corporation that is liable if death does not ensue is liable to an action for damages for the death, notwithstanding the death of the person injured, even though the death is caused under circumstances that constitute a felony.

> (b) The damages shall be assessed with reference to the injury resulting from the act, neglect, or default causing the death, <u>to the spouse or domestic partner and the next of kin of the deceased person</u>; and shall include the reasonable expenses of last illness and burial. <u>Where there is a surviving spouse, or domestic partner, the jury shall allocate the portion its verdict payable to the spouse or domestic partner and next of kin, respectively</u>, according to the finding of damage to the spouse or domestic partner and next of kin. If, in a particular case, the verdict is deemed

> excessive, the trial judge or the appellate court, on appeal of the cause, may order a reduction of the verdict. An action may not be maintained pursuant to this chapter if the party injured by the wrongful act, neglect, or default has recovered damages therefor during his life. (emphasis added)

Under the express term language of this statute, the real parties in interest or ultimate economic beneficiaries are readily identifiable as Decedent's spouse and "next of kin." "Next of kin" include the Decedent's children. *See Lewis v. Lewis*, 708 A2d 249, 252 n.2. (D.D.C. 1998). The real party in interest status of these named Plaintiffs is further underscored by the jury verdict allocation language emphasized above, quoted language. Clearly, Elisa is a nominal representative party under the statute as the spouse of the Decedent, but the real beneficiaries are Elisa as a widow and the children Plaintiff's, each of whom is a United States citizen.

In light of this analysis for purposes of § 1605(a)(7)(B)(ii) the wrongful death "claimants" are these statutory beneficiary distributees in every sense of the statutory word "claimant". Nor is this interpretation of § 1605(a)(7)(b)(ii) unprecedented. *See*, *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 108 (D.D.C. 2000) (J.H. Green, J.) (The claimant who was awarded judgment, Darwish Elahi was a U.S. citizen and next of kin and personal representative of his murdered non-U.S. citizen brother).[8] In short, because the ultimate claimants are U.S. citizens, the wrongful death claim is within the FSIA subject matter jurisdiction of this Court.

---

[8] To the extent that *Oveissi* 498 F. Supp. 2d at 277-79 suggests otherwise it is clearly distinguishable from the facts of this case. In *Oveissi*, the Plaintiff was not a next to kin of the deceased non-U.S.citizen. He was a grandchild whose father was still alive. *See*, *id.* at 272. It is axiomatic that he would not be the "next of kin" when the Decedent had a living son. In addition to being factually distinguishable from this case, in *Oveissi* supplemental jurisdiction under 28.U.S. C. §1367 was apparently never raised and therefore not addressed by Judge Lamberth, as a basis for federal subject matter jurisdiction. Hence, such basis exists, as an alternative to the statutory interpretation discussed above which is supported by *Elahi*.

As an alternative basis to the real party in interest analysis , Elisa in her capacity as Executor of Decedent's estate asserts that this Court may exercise subject matter jurisdiction over the wrongful death claim on the basis of supplemental jurisdiction, pursuant to 28 U.S.C. § 1367.  The Court undertakes to determine whether this alternative basis of jurisdiction is available here.

Prelimarily, the Court notes that the issue of whether § 1367 is available to a citizen spouse, child, parent or sibling of a non-U.S. citizen victim of state sponsored terrorism so as to confer jurisdiction over a claim which is derivative through the non-citizen victim is a matter of first impression since the enactment  of § 1605(a)(7).  It is also a somewhat unsettled  question under the entire FSIA scheme of waiver of sovereign immunity as observed by a leading commentator on the FSIA.  See, Dellapenna Suing Foreign Governments And Their Corporations § 3.6 p. 145. [9]  Section 1367(b) provides that:

> " in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution"  Id. (emphasis added).

Section 1367 "contains the doctrine of pendent jurisdiction and ancillary jurisdiction under a common heading of supplemental jurisdiction."  *See City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 165 (1997).  Claims within its scope are

---

[9] Judge Lamberth's recent decision in *Oveissi* does not decide this issue, as it was apparently not raised by the Plaintiff.

deemed part of the "same case or controversy" if they "derive from a common nucleus of operative fact." *Id.* at 165 (quoting *Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

In order to exercise supplemental jurisdiction under § 1367 (a), a district court must first determine that it has original jurisdiction over the civil action within the meaning of § 1367 (a); in other words, it must have original jurisdiction over at least one claim in the complaint. *See Exxon Mobil Corp. v. Allapattah Services, Inc.* 545 U.S. 546 (2005).

The application of these principles to the facts of this case leads this Court to conclude that it may exercise ancillary jurisdiction pursuant to § 1367 over the wrongful death claim and any other claim derivative through the Decedent. It is beyond any serious dispute that this Court has original jurisdiction by virtue of 28 U.S.C. § 1605(a)(7) over at least one tort claim of each Plaintiff , i.e., intentional infliction of emotional distress, which has been discussed previously. Such claim is vested in each, in their own right as an immediate family member of the Decedent. The existence of this baseline claim establishes the foundation for the exercise of supplemental jurisdiction by this Court over any other claims asserted by any of the other Plaintiffs which "derive from a common nucleus of operative fact." See *City of Chicago*, 522 U.S. at 165. There is only a single and hence common nucleus of operative fact giving rise not only to Plaintiff's claims in their own right but also to those derivative through the Decedent, i.e., the Embassy Bombing and its facilitation through the material assistance provided by the Defendants to the Hezbollah perpetrators. In short, the operative nexus between the Decedent's direct claims and those of his family members in their own right could not be stronger. It is this  identical nucleus which underlies both sets of claims. Most

35

significantly, as already pointed out here, the ultimate beneficiaries or real parties in interest with respect to the wrongful death claims are Elisa and the Decedent's children. Each beneficiary is a U.S. citizen. Therefore, under the particular circumstances "presented" here, where the exercise of supplemental jurisdiction is for the singular benefit of statutory beneficiaries who are U.S. citizens such exercise is most appropriate, as it also clearly advances the Congressional policy underlying § 1605(a)(7) i.e., to open the doors of federal courts to aggrieved U.S. citizen, victims of terrorism, most notably widows and orphans. Hence, this Court will exercise supplemental jurisdiction over the wrongful death claim made under the District of Columbia statute.

A.    **Merits of the Wrongful Death Claim**

Elisa asserts that the Defendants are also vicariously liable for the wrongful death of the Decedent. The District of Columbia's wrongful death statute gives rise to a claim when the death of a person is caused by the wrongful act of a defendant. D.C. Code § 16-2701 (2001). A personal representative is permitted to recover "damages measured as the economic loss caused by the death of a person wrongfully killed." *Bodoff*, 424 F. Supp.2d at 85 quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n. 11 (D.D.C. 2001) (Jackson, J.). (the District of Columbia wrongful death statute was applied). The ultimate beneficiaries of a wrongful death recovery under District of Columbia law are the widowed spouse and "next of kin" which includes biological children.

The Defendants are liable to Elisa as Executor for the wrongful death of the Decedent in that they engaged in the wrongful acts of conspiring with and providing

material support to Hezbollah in furtherance of terrorist activities which proximately

caused the Embassy Bombing and the extrajudicial killing of the Decedent.

**F.      DAMAGES**

Tragically, since the enactment of § 1605(a)(7), this District has been the venue of

for numerous actions including the survivors of U.S. and non-U.S. nationals killed in

heinous terrorist attacks ranging from suicide bombings, involving civilians the

bombings of  United States embassies in Tanzania, Kenya and Lebanon, the bombings of

U.S. military facilities in Lebanon and Saudi Arabia to U.S. servicemen and civilians

killed during the course of hijacking of an airplane.  The Embassy Bombing here is only

the latest in this gruesome saga of devastated or significantly damaged lives of victims of

international terrorism.  Every Plaintiff here is a United States citizen for whose

protection Congress enacted § 1605(a)(7) by vesting United States courts with subject

matter jurisdiction over claims brought by such aggrieved United Stated citizens.

Due to the multiplicity of such cases in this District, this Court is by no means

writing on a proverbial "clean slate" in fashioning a damages remedy for each Plaintiff.

To the contrary, this Court is guided by remedial approaches and formulas , utilized in

similar cases.  *See e.g. Bodoff,* 424 F. Supp. 2d at 86-88 (awarding IIED damages

$2,500.000.00 to each sibling of a suicide bombing fatality and $5,000.000.00 to each

surviving parent); *Eisenfeld v. Islamic Republic of Iran* 172 F. Supp. 2d 1, 8 (D.D.C.

2000) (Lamberth, J.). (same suicide bus bombing as in *Bodoff* resulted in the same

$2,500.000.00 per sibling award and $5,000.000.00 for each parent); *Surette v. Islamic*

*Republic of Iran*, 231 F. Supp. 2d 260, 270-71 (D.D.C. 2002) (Friedman, J.) ($10 million

awarded as damages to a common-law-wife); *Greenbaum v. Islamic*, 451 F. Supp. 2d 90, 107-09 (D.D.C. 2006) (Lamberth, J.) (surviving spouse awarded $9,000.000.00 in his personal capacity); *Kerr v. Islamic Republic of Iran*, 245 F. Supp. 2d 59, 64 (D.D.C. 2003) (Jackson J.) (award of $10 million to the widow of a torture and hostage taking victim); *Salazar v. Islamic Republic*, 370 F. Supp 2d 105, 116 (D.D.C. 2005)(Bates, J.) ($10 million awarded to the widow of a bombing victim).

As to the minor children of a victim killed in a terrorist attack, awards have typically been $5 million per child. *See e.g. Peterson,* 2007 U.S. Dist. LEXIS 65820 at 45; *Heiser,* 466 F. Supp. 2d at 271-356 (award of $5 million per plaintiff for a child and parent of a decedent).

### A.    Individual IIED Damage Awards

Based upon the wealth of cases involving immediate family members of civilians an service personnel killed in terrorist attacks, this Court awards IIED damages of $10 million to Elisa, $5 million to Ralph in his personal capacity, $5 million in his representative on behalf of Helen's estate, $5 million to each of the Decedent's children and $2.5 each to Naomi and Judith.

### B.    Wrongful Death Damages Award

Under the District of Columbia Wrongful Death Act, the allowed recovery is based on pecuniary damages which "might reasonably be expected to have  received from the deceased had he lived." *Lewis*, 708 A2d at 251-252; *see also*, *Wagner*, 172 F. Supp. 2d at 135 n. 11  Here, Plaintiff's have submitted a report from forensic expert Dov Weinstein ("Weinstein Report").  The Weinstein Report bases its calculations on reasonable and well founded assumptions about the diplomatic career track of the

Decedent had he survived.  Id. p_____ 2.  It also makes conservative assumptions about

the post-retirement from government service earnings capacity of the Decedent as a

highly educated and experienced professional whose nature language was English.  See,

id., p _____.    Accordingly, based upon this forensic evidence, judgment for so-called

"loss of  accretions" to the Decedent's estate are $_____, allocable

$_____, to Elisa and the remainder to be divided equally among the two

Plaintiffs Yonatan and Noa Ben-Rafael.

>        C.    **Punitive Damages**

Punitive damages are no longer awardable against Iran and MOSI by virtue of 28

U.S.C. § 1606.

>        D.    **PREJUDGMENT INTEREST**

It is axiomatic that when a complaint filed after Ciccippio Publeo presents state

law causes of action, the issue of whether any Plaintiff may recover prejudgment interest

is one of state law.  *Compare, Ungar, Ex. Rel Strachman v. Palestinian Authority,* 304 F.

Supp. 2d 232, 237-240 (D.R.I. 2004) (prejudgment interest disallowed as to federal law

as to federal claims brought under the Anti-Terrorism Act of 1990 which provides for

treble damages).  Under District of Columbia law, the decision whether to award

prejudgment interest even in cases where there is no underlying contractual relationship

rests in the discretion of the trial court.  *See e.g., House of Wines, Inc. v. Sumter* 510 A2d

492, 499 (D.C. 1986)*; Blake Const. Co., Inc. v. C.J. Coakley Co., Inc.* 431 A2d 569, 580

(D.C.1981)*.*  The rate of interest and date from which it runs are also within the sound

discretion of the trial court. *Id.*  The allowance of prejudgment interest is compensatory in

nature.  *See Suiter v. Mitchell Motor Coach Sales Inc.*151 F3d  1275, 1289 (10th Cir.

1998).  It this goal by compensating a plaintiff "for being deprived of the monetary value of his [or her] loss from the time of the loss  to the payment of [the] judgment." *Id.* at 1288; *see also Paper Converting Mach. Co. v. Magna Graphics Corp.* 745 F 2d 11, 23 (Fed. Cir. 1984).  In *Ostenreck v. Ernst & Whinney,* 489 U.S. 169, (1989) the Supreme Court opined that prejudgment interest has been traditionally considered part of the compensator award to the Plaintiff.  *Id.* at 175.  District of Columbia law also clearly affords the trier of facts the ability to award prejudgment interest where it is necessary to compensate the Plaintiff.  *House of Wines*, 510 A2d at 499.

An award of prejudgment interest is also appropriate where, as here, punitive damages are as a mater of law unavailable to Plaintiff.  Nor are the Plaintiffs here, entitled to any treble or multiple damages.  *Compare Ungar* 304 F. Supp. 2d at 239-40. Unlike punitive damages and treble damages which are intended to punish and thus deter, prejudgment interest is purely compensatory in nature.  Moreover, the non-availability of punitive and multiple damages to the Plaintiffs eliminates the situation presented in *Ungar* where superimposing prejudgment interest, in light of the statutory treble damages, would have overcompensated plaintiffs there to the point of giving them an underserved windfall.  No such situation exists here.  Indeed, here an award of prejudgment interest is necessary to compensate Plaintiffs, as the following discussion will point out.

The application of these principles convinces the Court to exercise its discretion to award prejudgment interest computed on a simple interest basis at a percentage rate per annum which is eminently reasonable.  See Blake Construction, 431 A2d at 580.  The rationale for compensating all of the Plaintiffs here is compelling in that (i) almost

sixteen (16) years will have elapsed from the time of the fatal Embassy Bombing through the date this Court renders final judgment (ii) Plaintiffs' purchasing power had they been compensated in 1992 with 1992 dollars would have been significantly greater than their much diminished purchasing power using the cheaper dollars as of the date of judgment, let alone further diminution or devaluation by the time a final judgment satisfied in whole or in part. This significant economic erosion most notably for the widow and children of the Decedent, who depended upon his support through his considerable earning capacity can only be adequately redressed by an award of prejudgment interest. Hence, such award truly serves the goal of adequate compensation for a family left without its bread winner.

### E.    <u>OTHER CAUSES OF ACTION ASSERTED IN THE COMPLAINT</u>

In light of these Findings of Fact And Conclusions of Law, it is not necessary for the Court to address the other causes of action asserted by the Plaintiffs under Israeli law and under customary international law. As to the claims under the New York and District of Columbia survival statutes, no evidence of record has been presented to date as to any conscious pain or suffering endured by the Decedent before he died. Accordingly, no award for survival action damages is made.

**F.**    **<u>CONCLUSION</u>**

A judgment in accordance with these findings and conclusions shall issue this

date of _____, 2007.

_____
Ellen Segal Huvelle,
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELISA NILI CIRILO PERES BEN-RAFAEL,** et al., | |
| Plaintiffs, | |
| v. | **Case No. 1:06-CV-00721 (ESH)** |
| **ISLAMIC REPUBLIC OF IRAN,** *et al.,* | |
| Defendants. | |

# RECORD INDEX

| DOCUMENTS<br>AFFIDAVIT, REPORT OR CERTIFICATES | EXHIBIT NUMBER |
|---|---|
| 1. Affidavit of Dr. Patrick Clawson (Terrorism Expert) | 1 |
| 2. Affidavit of Plaintiff Ralph Goldman | 2 |
| 3. Affidavit of Plaintiff Elisa Ben-Rafael | 3 |
| 4. Affidavit of Plaintiff Judith Baumgold | 4 |
| 5. Affidavit of Plaintiff Yonatan Ben-Rafael | 5 |
| 6. Affidavit of Plaintiff Noa Ben Rafael | 6 |
| 7. Biographical Certificates (Documents Pertaining to Decedent David Ben Rafael)<br> ▪ David Ben-Rafael's University Degree in Law from the Hebrew University in Jerusalem<br> ▪ Death Certificate for David Ben-Rafael | 7 |
| 8. Hospital records of the late Helen Goldman | 8 |
| 9. Biographical Certificates (Documents Pertaining to Elisa Ben-Rafael)<br><br> ▪ U.S. Passport for Elisa Ben-Rafael<br> ▪ Marriage License for David Ben-Rafael and Isabel Cirilo-Peres<br> ▪ Marriage License showing the certified section of the document<br> ▪ Letter from Israel Ministry of Foreign Affairs regarding the | 9 |

| DOCUMENTS<br>AFFIDAVIT, REPORT OR CERTIFICATES | EXHIBIT<br>NUMBER |
|---|---|
| U.S. passports of Elisa, Noa and Yonatan Ben-Rafael | |
| 10. Forensic Expert Report of Dov Weinstein (To Be Supplied) | |

151373_1.DOC