# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELISA NILI CIRILO PERES BEN-RAFAEL et. al., <br><br> Plaintiffs, <br><br> v. <br><br> THE ISLAMIC REPUBLIC OF IRAN, et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 1:06-CV-00721 (ESH) <br> ) <br> ) <br> ) <br> ) |

## EXPERT REPORT OF PATRICK L. CLAWSON

I, Patrick L. Clawson, PhD., hereby depose and state as follows:

1.  I have extensively studied and researched and am an expert on the Islamic Republic of Iran ("Iran"), its sponsorship of terrorism, its economy, its politics and its use and support of terrorism as a political and military tactic. This affidavit is submitted to provide the Court with facts and evidence concerning Iran's support for terrorism, especially as it relates to the 1992 bombing of the Israeli embassy in Buenos Aires.

**Qualifications of the Witness**

2.  I am an adult citizen of the District of Columbia.

3.  Most of my professional life has been spent studying the Middle East, and particularly Iran. My first scholarly article on the Middle East was published thirty years ago, and the first work I did on the region for the Central Intelligence Agency was twenty years ago.
I have done contract consulting work about Iran for several U.S. government agencies over the last twenty-five years, including the Central Intelligence Agency, the Defense Department, the State Department Bureau of Intelligence and Research, and, through various contractors, the National Security Agency and the Defense Intelligence Agency. While at the National Defense University, I worked closely with officials from a wide range of U.S. government agencies on the issue of Iran and Iranian support for terrorism, including close work with the Central Command (the U.S. military command responsible for the Middle East) and its subordinate commands and with the staff of the Joint Chiefs of Staff.

1

3.  For the past two years I have been the Deputy Director for Research at the Washington Institute for Near East Policy ("WINEP"), a think tank focusing on contemporary issues of the Middle East. In this capacity, I, inter alia, supervise a staff of about eighteen senior researchers who study Middle East politics and terrorism, with considerable focus on Iran. I also brief and receive briefings from senior United States military officials and senior Israeli defense officials, about the threats from Iran, Iranian support of terrorism and Iranian strategy regarding Palestinian Islamic terrorism. A true copy of my resume is attached hereto as Exhibit A.

4.  I am also currently a senior editor of the Middle East Quarterly, a journal of Middle Eastern affairs, which publishes regularly on Iranian politics and Iran's foreign policy.

5.  I have written or edited 24 books and monographs, mostly focusing on the Middle East. Eight have specifically focused on Iran, four of these were published in 2005-06. I have also written more than 60 articles in professional journals and books, most of which deal with Iran.

6.  I have also chaired panels and made presentations in Persian concerning Iranian issues, including interviews for the British Broadcasting Corporation (BBC) Persian Service and at the Fourth European Congress on Iranian studies in September of 2000. I have made presentations about Iranian foreign and economic policy, including its support for terrorism, and about U.S. policy towards Iran at conferences sponsored by, among other organizations, the Iranian Foreign Ministry's Institute for Political and International Studies in Tehran, the Royal Institute for International Affairs in London, the Royal United Services Institute in London, the Japanese Foreign Ministry in Tokyo, the Institute for Defence Studies and Analysis in New Delhi, the Shanghai Institute for International Studies in Shanghai, the Jaffee Center of Tel Aviv University, the Council for Foreign Relations in New York and Washington, the Nixon Center (part of the Nixon Presidential Library) in Washington, the Carnegie Endowment for International Peace in Washington, the Asia Society in New York, and a great many universities.

7.  I have a PhD in economics from the New School for Social Research, which I received in 1978, and a BA in economics from Oberlin College, which I received in 1973.

8.  In addition to speaking English, I speak fluent Farsi (Persian), French and Hebrew. I regularly read articles in Persian-language newspapers and internet sites and daily read many articles translated from the Iranian press.

9.  I have testified often about Iran, Iranian terrorism, and the use of economic measures to discourage Iran from supporting terrorism before the House International Relations, National Security, and Banking and Financial Services Committees and the Senate Foreign Relations and Banking Committees.

10. I have previously qualified as an expert witness in this Court on issues relating to Iran, Iran's support for terrorism, its economy and other issues, and have given live or written testimony in various cases brought against Iran for its sponsorship of terror, including Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 8-9 (D.D.C. 1998); Anderson v. Islamic Republic of Iran, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000); Eisenfeld v. Islamic Republic of Iran, 172 F.

Supp. 2d 1, 5 (D.D.C. 2000); Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 19 (D.D.C. 2002); Mousa v. Islamic Republic of Iran, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001); Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91, 93 (D.D.C. 2002); Stern v. Islamic Republic of Iran, 271 F. Supp. 2d 286, 288 (D.D.C. 2003); Rieger v. Islamic Republic of Iran, 281 F. Supp. 2d 87, 90 (D.D.C. 2003); Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 262 (D.D.C. 2003); and Greenbaum v. Islamic Republic of Iran, No. 02-2148, 2006 WL 2374241 at *3 (D.D.C. Aug. 10, 2006).

**Information Assembled and Consulted to Form Opinions**

11. My knowledge of Iran's politics and its sponsorship of terrorism comes as a result of my routine and in-depth access to facts concerning Iran, its support of terrorism, its economy and politics, and my extensive study of Iran as outlined herein, including my professional research and publishing in this field over the course of many years. Iran is a relatively open information country in which the competing political forces frequently reveal information about the country's security apparatus and debate issues relating to terrorism; Iran still has many internet sites that publish information on these subjects. From my years studying Iranian politics and given the competing sources which can be compared, I believe that I am able to determine whether Iranian reports on these subjects are credible. Indeed, I use this information as a source to brief the U.S. and other governments. Furthermore, Iran and some of the terrorist groups it sponsors have been openly boastful about their relations, and have described and detailed their connections in print.

12. My knowledge of Iran and its sponsorship of terrorism, comes as a result of my education, my extensive professional experience studying Middle East policy and terrorism, my academic research and writing, my interaction with other experts in the field, and my regular review of up-to-date information on these subjects.

13. Since 1980, I have followed the scholarly literature and press from and about the Middle East. Most days, I read one or more newspapers from Iran. I have an archive of news articles from Iranian, U.S., European, and Arab newspapers and periodicals, with more than 10,000 items from the mid-1980s to the late 1990s. I have an extensive library of scholarly works on Iran, Lebanon and terrorism, and my research assistants at The Washington Institute regularly search for material at the Georgetown University library and on Lexis-Nexis.

14. I have attended more than fifty scholarly conferences and workshops about Iran's foreign policy, many of which analyzed its support for terror, with presentations by leading experts from the United States, Israel, Arab countries, and across Europe. I have often discussed with these experts the methods Iran used to support terror.

**Summary of Opinions**

15. It is my opinion based on a reasonable certainty that:

(1) Iran has since the 1980s provided material support and resources to Hezbollah for carrying out terrorist attacks in the Middle East and in other parts of the world, including but not limited to Argentina;

(2) Iran's Ministry of Information and Security (MOIS) operates as an intelligence service and conduit for terrorism both within and beyond Iran's territory; specifically, it acts as a conduit for Iran's provision of funds, training, direction and material assistance to Hezbollah;

(3) Absent the material, financial and technical support of Iran and MOIS, Hezbollah could not have carried out the bombing of the Israeli embassy in Buenos Aires; that absent the express approval of Iran and MOIS, that bombing would not have been carried out; and that Iran and the MOIS were responsible for Hezbollah's bombing of the Israeli embassy in Buenos Aires;

(4) civil suits such as this have influenced Iranian officials in their consideration about whether to continue providing material and financial support for terrorist activities, and the award of damages has been a major factor in the debates inside Iran about the wisdom of such support.

**Rationale for Opinions**

**(A) <u>Iranian Support for Hezbollah</u>**

16.    The Islamic Republic of Iran has as one of its most important objectives establishing itself as the leader of radical Islam on a global scale, especially in the Arab heartland of Islam. Iran had little success in achieving this objective for years after the 1979 revolution. In the mid-1980's, Iran found that focusing on opposition to Israel – whose very existence Iranian leaders found abhorent as an insult to Islam – was an important way to advance this objective.

17.    The most effective means Iran found for advancing its objectives of opposing Israel and becoming accepted as the leader of radical Islam was working with radical forces in Lebanon's Shia community – a community which has deep historical and cultural ties with Iran, the only completely Shia government in the world ( though Iraq's constitution contains many checks and balances which limit the power of the majority Shia community). Many senior Iranian and Lebanese clerics are related by marriage or common recent ancestors; many of them have studied together in seminaries in Iran, Iraq, or other centers of Shia scholarship.

18.    The center of Iran's strategy for working with Lebanese Shia has been the Hezbollah organization, which combines a terror wing with media including radio and television stations, establishment politics including successful campaigns for seats in the Lebanese Parliament and many charitable activities such as hospitals and schools. Iranian support for Hezbollah is voluminously documented in statements by Hezbollah leaders, Iranian officials, reports of other concerned governments (including the United States, Israel, and several European countries), and scholars working on Lebanon, terrorism, and Iran. Hezbollah also has had a more conventional military wing which it used to fight Israeli occupation of southern Lebanon until

Israel withdrew in 2000 and which fought Israel in a summer 2006 war started by Hezbollah kidnapping of several Israeli soldiers inside Israel. Under my supervision, WINEP has published several studies about Hezbollah's many activities, including a detailed examination of its propaganda wing and a study about its military and terror organizations and their relationship with Syria and Iran.

19.     Scholars friendly to Hezbollah have provided detailed accounts of Iran's pre-eminent role in the creation of Hezbollah. In the early 1980's Iran encouraged – if not directed – those most sympathetic to the Iranian revolution to form a radical faction within a broad Lebanese Shiite movement known as Amal. At the direction of the Iranian government, that faction then formally split off from Amal and became the separate organization which adopted the name Hezbollah. Iran then provided Hezbollah with political, material, and financial assistance, including funding that was well in excess of $25 million a year-- by credible accounts reaching $100 million in some years during the period 1985-2005.

20.     Substantial Iranian support for Hezbollah continues to the present day. While there are varying estimates of the amount of financial support that Iran supplies to Hezbollah, it appears that support during the last year in the aftermath of the Hezbollah-Israel summer 2006 war has been as much as $200 million; an October 25, 2007 U.S. Treasury fact sheet states, "The Qods Force [which the fact sheet identifies as part of the Iranian government's Revolutionary Guard Corps] provides roughly $100 to $200 million a year in funding to Hizballah" (http://www.treasury.gov/press/releases/hp655.htm). Much of this aid has come in the form of military assistance; the Treasury fact sheet states that the Qods Force "has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701." UN Secretary-General Ban has reported to the UN Security Council about the large amount of arms Hezbollah has been importing; there is ample evidence that Iran has paid for these arms and appears to have supplied many of them.

21.     Hezbollah has not been much engaged in terror attacks outside the Middle East in recent years. From the veiled references in Hezbollah leaders' statements about these issues, it appears that a major reason for both these decisions has been the organization's fear such activity would draw retaliation. Nonetheless, Hezbollah leaders have at times threatened to resume terror activities against Americans, which largely ceased for a decade after the American hostages in Lebanon were released in the early 1990's and Hezbollah certainly retains the capability to attack American interests worldwide. In 2002, the FBI informed Congress, "FBI investigations to date continue to indicate that many Hizballah subjects based in the United States have the capability to attempt terrorist attacks here should this be a desired objective of the group.... " (*Current and Projected National Security Threats to the United States*, Senate Select Committee on Intelligence, February 6, 2002, p 339). The U.S. military has recently released information suggesting that Hezbollah, under the auspices of Iran, has become active training Iraqi Shia militias in their attacks against U.S. forces and Iraqi Sunni civilians in Iraq.

### (B) Iran's terrorism infrastructure and the role of MOIS

22.     Iran is now, and since 1985 has been continuously listed in the U.S. State Department's

list of state sponsors of terrorism, in a list provided to Congress each year as required by Title 22 of the United States Code, Section 2656f(a).

23.     Iran uses various organizations to carry out its terrorist support activities. Iran's Ministry of Information and Security (MOIS) was the successor to the Shah's Organization for Information and Security (known by its initials in Persian, SAVAK). From the early days of the Islamic Republic after the 1979 revolution, MOIS (and its predecessor agencies before the Ministry was formally established in 1984) was at great pains to demonstrate that it could be useful and loyal to the new authorities. SAVAK was renowned for its craftwork in the intelligence business: it knew how to surveil targets, how to avoid detection, and how to hold prisoners clandestinely. SAVAK was the most respected intelligence agency in the Middle East outside of the Israeli agencies. MOIS was entrusted with some of the most politically delicate tasks for the new government, such as suppressing dissidents both at home and abroad, and assisting with schemes to overthrow neighboring governments. The MOIS minister is a member of a "council for special operations" which must approve terrorist activities.

24.     With approximately 30,000 employees, MOIS is the largest intelligence agency in the Middle East. Credible and authoritative reports in the last decade, including those from Iranian government investigators looking into assassinations of dissidents inside Iran by MOIS, have estimated its annual budget to be approximately between $100 and $400 million.

25.     MOIS' role in support of terror has been highlighted in various reports from the U.S. government, including the authoritative *Patterns of Global Terrorism 1990*, published annually by the State Department from the late 1980's to the early 2000s. Because of its authoritative nature, each word was carefully weighed in its writing, and it has served as a much respected source among researchers in the field. *Patterns of Global Terrorism* has consistently concluded that Iranian intelligence services facilitate and direct terrorist attacks. In 1990, for example, the State Department wrote that "Iran has used its intelligence services extensively to facilitate and conduct terrorist attacks.... Intelligence officers in embassies have used the diplomatic pouch for conveyance of weapons and finances for terrorist groups."

26.     A similar conclusion was reached in 1997 by a German court in the Mykonos involving the 1992 murder of Iranian dissidents in a Berlin restaurant. In a detailed, 395 page ruling, the German court found that MOIS support for terrorism is conducted with the approval of the highest levels of the Iranian regime. In his verdict, Judge Frithjof Kubsch specifically cited the Iranian president and Supreme Religious Leader (who, under the Iranian constitution, is the commander-in-chief and has the authority to override any decision of the president or legislature) as ordering the murders in question. A former MOIS operative who defected and testified at the trial, under a pseudonym ("witness C"), provided detailed information about MOIS' role in support of foreign terrorist operations.

27.     A few years later, the U.S. State Department explained again that, "Iran remained the most active state sponsor of terrorism in 2000. Its Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved in the planning and the execution of terrorist acts and continued to support a variety of groups that use terrorism to

pursue their goals...Iran has long provided Lebanese Hezballah...with varying amounts of funding, safehaven, training, and weapons." (*Patterns of Global Terrorism 2000*).

28. Indeed, a major part of MOIS' responsibilities from the early 1980s was to help organize Iranian government support to Hezbollah. MOIS played a key role in support of Hezbollah's role in holding American and other Western hostages in Lebanon in the 1980s and early 1990s. MOIS provided the technical expertise which allowed Hezbollah to hide the kidnapped Westerners for years from a concerted effort by several Western intelligence agencies to identify their location.

29. In short, there can be little doubt that MOIS acted as a conduit for Iran's provision of funds, training, direction and material assistance to Hezbollah and that in return for such provision of funds, training, direction and material Hezbollah acted as an agent for both Iran and MOIS to perpetrate terrorist activities around the world.

**(C) The 1992 Context and the Buenos Aires Israeli Embassy Bombing**

30. In 1991-92, Iran had an urgent desire to disrupt the Middle East peace process, which appeared to be moving forward at that time. Iran was actively urging terrorist acts against Israel and Israeli interests as an effective means of damaging the peace process begun by the October 1991 Madrid conference. At the time of that conference, Iran sponsored a major international gathering of radicals and terrorists to orchestrate attacks which would derail Israeli-Arab peace. Indeed, Iran was accused by the U.S. government of urging Hezbollah attacks timed to disrupt rounds of negotiations between Israel and Syria, even though Hezbollah was dependent on Syria's good will to permit Iranian support to flow through Syria to reach Hezbollah. In 1992, Hezbollah was eager to help Iran, both because of its general animus towards Israel and more immediately because Israel had on February 16, 1992 killed Hezbollah secretary general (i.e., leader) Sheik Abbas Musawi.

31. In addition, Miguel Angel Toma, the director of Argentina's SIDE intelligence agency in 2002-03 and investigator in the Embassy Bombing, asserted in October 2007 that Iran was angry at a change in Argentine policy. Toma explained, "During the '80s, the government of Argentina signed agreements with them [the Iranians] in the areas of technological investigation with the purpose of nuclear and missile programs" [http://www.foxnews.com/printer_friendly_story/0,3566,298300,00.html]. On assuming office in 1989, the civilian Argentine government headed by Carlos Menem cancelled those agreements made by the previous military junta. Toma stated, "We never thought in Argentina this would be a factor for determining a terrorist attack. We found out that later after the two bombs [the 1992 Embassy Bombing and the 1994 Jewish community center bomb discussed below] exploded in Buenos Aires."

32. It was in this context that on May 19, 1992, the Embassy of the State of Israel in Buenos Aires, Argentina, was destroyed by a bomb, killing 29 and wounding 242. A pickup truck loaded with explosives driven by a suicide bomber drove into the front of the Embassy, then under repair, destroying it and the nearby buildings (a Catholic church and a school). Most of the

victims were Argentine, including many children.

33. Responsibility for the bombing was claimed by Islamic Jihad. The listing for Hezbollah in the State Department's 1992 report on *Patterns of Global Terrorism*, states "Hizballah (Party of God) aka: Islamic Jihad, Revolutionary Justice Organization...Islamic Jihad publicly claimed responsibility for the car-bombing of Israel's Embassy in Buenos Aires in March 1992." (*Patterns of Global Terrorism 1992*). The inclusion of such a statement indicates, in my opinion quite correctly, that the State Department was satisfied that the public claim of responsibility for the embassy bombing did indeed come from Hezbollah, not from distinct and separate organization called "Islamic Jihad" (note that there is now a Palestinian organization knows as "Palestinian Islamic Jihad," but it has never had an organization in Lebanon and in any case uses the name "Palestinian Islamic Jihad" rather than "Islamic Jihad").

34. The investigation of the Embassy Bombing by the Argentines was lengthy and beset with problems. However, a breakthrough came in 1998 when Argentine investigators spoke with Abolghassam Mesbahi, a former senior Iranian intelligence official who had defected to Germany in 1996. Mesbahi's testimony proved central to a Berlin court's finding that senior Iranian officials had been responsible for a 1990 terrorist assassination episode at Berlin's Mykonos restaurant. Mesbahi stated that the planning for the Embassy Bombing was done by Mohsen Rabbani, a MOIS agent who had been Iran's cultural attache at its embassy in Buenos Aires from 1991 to December 1997, and supervised by Hamid Naghashan, a senior MOIS official (his testimony is summarized in Larry Rohter, "Iran Blew Up Jewish Center in Argentina, Defector Says," *New York Times*, July 22, 2002). Rabbani was detained in Germany in 1998, but given his apparent diplomatic status he was allowed to return to Iran. However, the Argentine government then expelled seven Iranian diplomats, stating that it had "convincing proof" of Iranian involvement in the Embassy Bombing.

35. In 1999, Argentina issued an arrest warrant for the Embassy Bombing for Imad Mugniyah. Long-time CIA agent Robert Bair has said, "Mugniyah is probably the most intelligent, most capable operative we've ever run across, including the KGB or anybody else... He is the master terrorist, the grail that we have been after since 1983" (http://www.cbsnews.com/stories/2002/05/01/60II/main507784.shtml). Mugniyah has been implicated in the 1983 Beirut Marine barracks bombing, the 1984 bombing of the U.S. Embassy annex in Beirut, the 1985 hijacking of TWA 847 in Lebanon, the kidnapping of numerous Westerners in Lebanon in the 1980s (including U.S. Army Colonel William Buckley, who was tortured to death), among other terrorist episodes. By some accounts, he controls Hezbollah's security apparatus, the Special Operations Command. The European Union lists him as "Senior Intelligence Officer of Hezbollah" in it Official Journal (http:eur-lex.europa.eu/LexUriServ/site/en/oj/2005/l_314/l_31420051130en00410045.pdf). In October 2001, the FBI placed Mugniyah on its list of 22 Most Wanted Terrorists, offering $5 million for information leading to his arrest; this offer is still outstanding. He remains active; he has been accused of being the mastermind behind the 2000 and 2006 abductions of Israeli soldiers near the Lebanese border as well as the kidnapping of an emissary sent to negotiate the release of the 2000 abductees. He has been variously described as living in Iran or Lebanon. He maintains a low profile; for instance, he is said to have undergone cosmetic surgery which has altered his

appearance. Reports circulate of continuing efforts by the CIA and U.S. Special Operations forces, as well as the Israeli government, to kill him.

36. It might seem that an attack as spectacular and brazen as the Embassy Bombing would receive much attention from several governments and many researchers, but that has not been the case. The reason is simple: the Embassy Bombing was quickly overshadowed by the July 1994 bombing of the Argentine Jewish Mutual Association (AMIA) in Buenos Aires which killed 85 people. Critics immediately said that the failure to thoroughly investigate the Embassy Bombing led to the AMIA bombing.[1] Yet, notwithstanding this criticism, the AMIA Bombing investigation did not fare much better. The man responsible for the investigation, Judge Juan José Galeano, was caught on video tape discussing a $400,000 payment he proposed making to the owner of the van used in the bombing. Eventually Judge Galeano issued warrants for the arrests of twelve Iranians, including Hade Soleimanpour, Iran's ambassador to Argentina at the time. Extradition requests to the UK (where Soleimanpour was arrested in August 2003 while pursuing a PhD) were denied because, according to the UK Home Office, there was not enough evidence presented by Judge Galeano's team to make a prima facie case for the extradition to proceed. By December 2003 Judge Galeano was removed from the case, and in 2005 he was removed from office altogether for his handling of the investigation. Judge Galeano's chief investigator, Claudio Lifschitz, wrote a stinging book entitled *Why the Investigation Was Made to Fail*.

37. Soon after assuming office in early 2003, Argentine President Nestor Kirchner opened up Argentine intelligence files on the AMIA case. Miguel Tomas, the new head of Argentina's intelligence services, SIDE, traveled to Israel to show officials there the report on the AMIA

---

[1] While it uncovered ample evidence of Hezbollah and Iran's role in the Embassy Bombing, the Argentine investigation was unsatisfactory in many ways. No actual trial has ever been held, for example, in part because Argentina was never able to obtain the physical custody of the Iranian agents responsible for the Embassy Bombing. Additionally, senior Argentine political officials lacked the will to uncover all the circumstances about the role of Argentinians in facilitating the bombing. Allegations that "police officers on a security detail inexplicably vanished just before the explosion" (*New York Times,* Rohter, op. cit.), the impeachment and removal from office of the Supreme Court justices placed in charge of the investigation (in line with Argentine procedures in which judges head investigations), and persistent credible claims that the Iranian government covertly funneled many tens of millions of dollars to President Menem both before his 1989 election and while he was president, all colored the Argentine investigation of the Embassy **Error! Main Document Only.**Bombing. Mesbahi said in late 1992 or early 1993 Menem was paid ten million dollars into a Swiss bank account to cover up the Embassy Bombing and to allow Iran to carry out additional terrorist attacks. Menem has long been dogged by allegations of corruption; after leaving office, he spent six months under house arrest for alleged involvement in illegal arms sales to Croatia (for use in the wars wracking the former Yugoslavia) and Ecuador (for use in that country's war with Peru). He has acknowledged having a secret Swiss bank account, though he denies receiving payment from Iran for covering up terror attacks.

bombing, which Yossi Melman, one of the more authoritative investigative journalists on terrorism, described as "thousands of pages long" (Yossi Melman, "Argentine intelligence report details Iranian hand in Buenos Aires bombing," *Haaretz,* November 3, 2003). Melman's article adds, "The report also states, although as a footnote, that Iran and Hezbollah were behind the bombing of the Israeli Embassy in March 1992 that killed 29 people and injured scores." After a re-investigation, in October 2006 prosecutors in Buenos Aires formally accused the Iranian authorities with directing Hezbollah to carry out the AMIA attack. In November, they issued warrants for the arrest of former President of Iran Akbar Hashemi Rafsanjani and seven others, including some who still hold official positions in Iran

38.     The Embassy Bombing and the AMIA attack remain a matter of concern to the Argentine authorities. In September 2007 address to the UN General Assembly, Argentine President Kirchner denounced the lack of Iranian cooperation about the bombings. In an October 2007 interview with Fox News (op. cit.), former Argentine intelligence chief Toma explained:

> The attacks in the '90s against the Jewish community center and the Israeli embassy brought up many distinct questions, because they came from many thousands of miles away and obviously were plotted from many thousands of miles away... It's a mistake to think those operations do not reach the highest levels of the Iranian government. They study them at the highest levels case by case.

39.     The Embassy Bombing's relegation to a mere footnote in the AMIA Bombing report illustrates the difficulty in providing a more detailed statement about the nature and extent of Iranian/Hezbollah responsibility for the Embassy Bombing. Many reports and analyses concentrate on the AMIA bombing, and do not explicitly discuss the evidence concerning the Embassy Bombing. For instance, there are several reports detailing evidence that the Iranian Embassy provided the bomb used in the 1994 AMIA attack, analyzing the explosives used, how the bomb components were smuggled into the country and how the bomb was assembled in Argentina. A similar level of detail is not available for Embassy Bombing. There are some reports that the Iranian Embassy provided the actual bomb used in the Embassy Bombing. To take another example, it is not clear from the reports available to me if the November 2006 warrants relate only to the AMIA attack or to the Embassy Bombing as well. Although I am concerned that some reports may have confused the details of the two separate attacks, there has never been any account suggesting that the Embassy Bombing or the AMIA bombing differed in any significant way, including any suggestion that different parties were responsible for the two bombings. While still acknowledging the lack of certainty on this detail, I can opine with a reasonable degree of certainty that there are strong reasons to suspect that the actual bomb used to destroy the Israeli Embassy in Argentina was provided by the Iranian Embassy officials.

40.     Some investigators, including some in Argentina and Israel, have argued that Hezbollah's bombing of the Israeli embassy was supported at least as much by Syria as by Iran. This charge is potentially explosive in Argentine politics, given President Menem's deep connections to various Syrians – possibly acting as agents for the Syrian government – in the early 1990's (President Menem is of Lebanese origin). The truth of this allegation is not clear. Other critics

claim that the Embassy Bombing and the AMIA bombing were aided by anti-Semitic Argentines; allegations have been made that important Argentine police officials are deeply anti-Semitic. While all of these issues are of interest, they do not undercut the fundamental role of Hezbollah and Iran. *Whatever theories there may be about who may have been involved, there is no disagreement: 1)* that Hezbollah was responsible for the Embassy Bombing; 2) that while it had a complicated relationship with Syria – which allowed a flow of arms from Iran but which also put strict limits on Hezbollah activities in favor of the Shia group it favored, Amal – at all times relevant to 1992 Embassy Bombing, Hezbollah was a creature of the Iranian government; 3) that absent the material, financial and technical support of Iran and MOIS, Hezbollah could not have carried out the Embassy Bombing; and 4) that absent the express approval of Iran and MOIS, the Embassy Bombing would not have been carried out. In short, Iran was responsible for the 1992 Embassy Bombing.

### (D) Impact of Civil Suits on Iran

41.    Iranian leaders pay close attention to civil suits about terrorism. In 2000/01, the issue became a major controversy in Iran. Iran's permanent representative to the UN, Nejad Hosseinian, went on Iranian television to complain about the suits and to answer criticisms that the Iranian government had not succeeded at stopping them. Representative Golbaz, a member of the Iranian Parliament's National Security and Foreign Policy Commission, complained, "Those American courts that make such rulings do so in the absence of the defendant as there is no Iranian representative in attendance in these courts." Former Iranian President, now chairman of the powerful Expediency Council (charged with resolving disputes among the various organs of government), Ali Akbar Hashemi Rafsanjani complained at length about the suits, as did numerous members of Iran's Parliament. They were particularly upset at the large punitive damage awards, which by their reckoning in late 2000 totalled $1.2 billion. In late 2000, the Iranian Parliament adopted a law permitting Iranians to file suit against the U.S. government for its alleged misdeeds, such as the 1953 overthrow of Iranian Prime Minister Mussadegh (the law permits suits when damage is sustained from any action by a foreign government in contravention of international law, including interference in Iran's domestic affairs, or when damage is incurred from acts of terrorist groups backed by foreign governments).

42.    Since then, the civil suits have continued to be a sore point for the Iranian government. Iranian foreign ministry spokesmen periodically denounce the suits, for instance, in July 2005. The issue has been cited by lawyers working for Iran as a major barrier to the normalization of relations between Iran and the United States.

### (E) Information Sources

43.    Detailed information I have relied on about the role of MOIS and Iran in support of Hezbollah's terrorist activities include but are not limited to:

(1) - Materials from a murder trial–known as the Mykonos case–in Berlin, Germany before Judge Frithjof Kubsch in 1993-1997, leading to an April 15, 1997 verdict of guilty against

11

Mohamad Atris, Kazem Darabi, and Abbas Hussen Rhayel for the 1992 murder of Iranian dissidents in the Berlin restaurant Mykonos. The court issued a 395-page court finding (Bundesgerichtshof Beschluss 3 StR 408/98) which makes clear the central role of Rafsanjani, Fallahian, and MOIS in all of Iran's terror activities in the late 1980s. As part of that case, German federal authorities issued an arrest warrant for Fallahian in March 1996. I have discussed this case in detail with German officials and with U.S. government officials, who left no doubt about the central role of MOIS in coordinating Iran's terrorist activities. I have dozens of news accounts from German, Iranian, and international media about the trial and in particular about the testimony of "Witness C" (identified by the Iranian government as Abol Qassem Mesbahi) who had been a high official in MOIS and who provided detailed information about the role of MOIS in organizing that attack and its methods of operations in supporting international terrorism. His testimony showed that MOIS was tasked to carry out Iranian terrorist operations abroad, and in particular in Lebanon in the mid-1980s. Mesbahi is the same person who in 1998 testimony to Argentine officials implicated Iran in the Embassy Bombing. The MOIS minister's role in the "council for special operations" was described in the 1996 testimony to the German court of former Iranian president Abolhassan Bani Sadr.

(2) The work of Wilfried Buchta, a German scholar who lived in Iran for many years in the 1990s and who speaks Persian fluently. Buchta described the interviews he had in Iran with MOIS officials and former officials. He wrote a book, *Who Rules Iran? The Structure of Power in Islamic Iran*, published by The Washington Institute for Near East Policy in 2000 in which he provides considerable detailed information about MOIS' structure, activities, and history. I have frequently spoken with Buchta about the internal maneuverings within Iran's security services. Buchta had access to the materials from the report of an investigating committee appointed by Iran's reformist president Mohammed Khatemi (elected in 1997) to investigate the Iranian intelligence services, because of suspicions those services had been involved in murdering dissidents.

(3) Newspaper accounts from Iran and Western sources which described the findings of Western intelligence services about the active role played by MOIS in terror activities. For example, the respected German newspaper "Die Welt" in a December 11, 1997 article described MOIS' world-wide reach, including in Africa and across Europe as well as in the Middle East.

(4) Statements by intelligence officials of the U.S. and Israeli government, both in public documents and in many private interviews I had with such officials. In particular, I had extensive discussion with Uri Lubrani, the Israeli official responsible for its policy in Lebanon and the former Israeli representative in pre-revolutionary Iran (in effect, its ambassador there, though the two countries did not have formal diplomatic relations). Mr. Lubrani had an extensive team of experts on Iran and Lebanon who followed in great detail terrorism in Lebanon and Iran's role in Lebanon, and we discussed the mechanisms by which Iran supports such terrorism. I also had many discussions about these issues with officials of the U.S. government. Some of my discussions were while I was doing contract work for the Central Intelligence Agency about Iran in the period 1989-1992 while I held a Secret security clearance, and others of my discussions with U.S. intelligence officials on this matter came in 1993-1997 while I was an employee of the Department of Defense holding a Top Secret security clearance. Much of my discussion with

Mr. Lubrani and his team, as well as a considerable part of my discussion with U.S. intelligence officials, was about the precise role that various Iranian agencies and institutions were playing in terrorist activities.

(5) In addition, I have drawn on the extensive material in English and Spanish available the AMIA bombing, including scholarly articles and newspaper accounts. Numerous articles on the AMIA bombing make side references to the Embassy Bombing. As best as I can recall, every such reference notes the similarities in the two bombings; many of them assert that those responsible for the AMIA bombing were also responsible for the earlier Embassy Bombing.

## Compensation

I am billing Friedman Law Offices, $3,000 (three thousand dollars) for the work preparing this expert opinion.

Dated: November 6, 2007

Patrick Clawson
Deputy Director
The Washington Institute for Near East Policy
1828 L Street, N.W., Suite 1050
Washington, D.C. 20036
(202) 452-0650

**Patrick L. Clawson**
November, 2007

Dr. Clawson is Deputy Director for Research at The Washington Institute for Near East Policy. His previous positions include five years as senior research professor at the Institute for National Strategic Studies of the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund.

Dr. Clawson's books and monographs include:

*Deterring the Ayatollahs: Complications in Applying Cold War Strategy to Iran* (The Washington Institute for Near East Policy, 2007, edited with Michael Eisenstadt)

*Forcing Hard Choices on Tehran: Raising the Costs of Iran's Nuclear Program* (The Washington Institute for Near East Policy, 2006, with Michael Eisenstadt)

*Reducing Vulnerability to Middle East Energy Shocks: A Key Element in Strengthening U.S. Energy Security* (The Washington Institute for Near East Policy, 2005, with Simon Henderson)

*Eternal Iran: Contiuity and Chaos* (Palgrave, 2005, with Michael Rubin)

*Getting Ready for a Nuclear Ready Iran* (Strategic Studies Institute of the U.S. Army War College, 2005, edited with Henry Sokolski)

*Checking Iran's Nuclear Ambitions* (Strategic Studies Institute of the U.S. Army War College, 2004, edited with Henry Sokolski)

*How to Build a New Iraq After Saddam* (The Washington Institute for Near East Policy, 2002, edited)

*The Last Arab-Israeli Battlefield? Implications of an Israeli Withdrawal from Lebanon*, (The Washington Institute for Near East Policy, 2000, with others)

*Dollars and Diplomacy: The Impact of U.S. Economic Initiatives on Arab-Israeli Negotiations* (The Washington Institute for Near East Policy, 1999, with Zoe Danon Gedal)

*Iran Under Khatami* (The Washington Institute for Near East Policy, 1998, with others)

*Iraq Strategy Review* (The Washington Institute for Near East Policy, 1998, edited)

*Strategic Assessment*, the flagship annual of the Institute for National Strategic Studies, which he inaugurated and edited for three years (1995-1997)

*U.S. Sanctions on Iran* (Emirates Centre for Strategic Studies and Research, 1997)

*Business as Usual? Western Policy Options Towards Iran* (American Jewish Committee, 1995)

*Energy Security in the Twenty-First Century* (National Defense University Press, 1995, edited)

*Iran's Strategic Intentions and Capabilities* (National Defense University Press, 1994, edited)

*How Has Saddam Hussein Survived? Economic Sanctions 1990-93* (National Defense University Press, 1993)

*Iran's Challenge to the West: How, When, and Why* (The Washington Institute for Near East Policy, 1993)

Crop Substitution in the Andes, (monograph) with Rensselaer Lee (Office of National Drug Control Policy, 1993).

The Negative Economic, Political, and Social Effects of Cocaine on Latin America: Consequences of the Illegal Drug Trade, (monograph) with Rensselaer Lee (U.S. Information Agency, 1992).

*Uprooting Leninism, Cultivating Liberty* (University Press of America, 1992, with Vladimir Tismaneanu)

*Economic Consequences of Peace for Israel, Palestinians and Jordan* (The Washington Institute for Near East Policy, 1991, with Howard Rosen)

*Syria's Military Build-Up and Economic Crisis 1977-88* (The Washington Institute for Near East Policy, 1989).

Dr. Clawson has written for *The New Republic* as well as op-ed articles in *New York Times*, *Wall Street Journal*, and *Washington Post*, among other newspapers. He is the author of more than thirty scholarly articles in *Foreign Affairs, Survival, Washington Quarterly, International Journal of Middle East Studies, Middle East Journal, Les Cahiers de l'Orient*, and *Oxford Bulletin of Economics and Statistics*, among other journals. He has testified often before the House International Relations, National Security, and Banking and Financial Services Committees and the Senate Foreign Relations and Banking Committees.

Dr. Clawson is senior editor of *Middle East Quarterly*. From 1990 through 1994, he was editor of *Orbis*, a foreign policy quarterly. His Ph.D. is from the New School for Social Research and his B.A. is from Oberlin College. He speaks fluently Persian and French, as well as some Hebrew, Spanish, and German.