# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELISA NILI CIRILO PERES BEN-RAFAEL,** et al., | |
| **Plaintiffs,** | |
| **v.** | **Case No. 1:06-CV-00721 (ESH)** |
| **ISLAMIC REPUBLIC OF IRAN,** *et al.,* | |
| **Defendants.** | |

## PRAECIPE

The Plaintiffs are filing simultaneously herewith the following additional pleadings and documents to supplement the record in this action:

(1)    Plaintiffs' Amended Findings of Fact and Conclusions of Law. ("Amended Findings").  For ease of reference, the Plaintiffs are filing the Amended Findings with tracked changes, so that this Court can readily see and determine the variations between the Amended Findings and the original document filed with the Court on November 15, 2007.  The changes from the original Findings include (i) any necessary citation form changes (ii) abandonment of any reliance on *Elahi v. Islamic Republic of Iran* 124 F. Supp. 2d 97,108 (D.D.C. 2000), (iii) a fully developed discussion of the choice of law issue in connection with Plaintiffs' wrongful death claim (iv) a discussion of New York's applicable law as to allowance of prejudgment interest in connection with tort claims under New York law (v) an expanded discussion of the applicability of supplemental jurisdiction over the wrongful death claim, (vi) a discussion of applicable Israeli law as to recovery for Decedent's lost earning capacity during the so-called "lost

years" of his life, but for his untimely death and (vii) a discussion of the recoverability of non-pecuniary damages for loss of life expectancy under Israeli law.

(2)    An amended list of Plaintiffs' Exhibits with corresponding exhibits, most notably the forensic economic report of Dov Weinstein, and professional translations into English of official Israeli documents pertaining to the Decedent and his Israeli estate.


Dated:  December 14, 2007                    Respectfully submitted,


                                             /s/ Paul L. Knight
                                             Emil Hirsch (DC Bar No. 930479)
                                             Paul L. Knight (DC Bar No. 911594)
                                             O'Connor & Hannan, LLP
                                             1666 K Street, N.W., Suite 500
                                             Washington, D.C.  20006-2803
                                             Telephone:  (202) 887-1400
                                             Facsimile:  (202) 466-3215


                                             Philip Friedman
                                             Friedman Law Offices, PLLC
                                             2401 Pennsylvania Ave., N.W.,
                                             Suite 410
                                             Washington, DC 20037
                                             Telephone: (202) 293-4175
                                             Facsimile: (202) 318-0395
                                             *Attorneys for Plaintiffs*


152111_1.DOC

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELISA NILI CIRILO PERES BEN-RAFAEL,** et al., | |
| **Plaintiffs,** | |
| v. | **Case No. 1:06-CV-00721 (ESH)** |
| **ISLAMIC REPUBLIC OF IRAN,** *et al.,* | |
| **Defendants.** | |

### PLAINTIFFS' AMENDED PROPOSED FINDINGS
### OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, by and through their undersigned counsel, hereby submit the following proposed Amended Findings of Fact and Conclusions of Law based on the evidence submitted to the Court in this matter in support of the entry of a default judgment in this action.

#### A.    Introduction

This is an action brought by the duly appointed Israeli Executor of the Estate of David Ben-Rafael and the immediate family members of the late David Ben-Rafael stemming from the May 19, 1992 bombing of the Embassy of the State of Israel in Buenos Aires, Argentina, during which the Decedent, a duly accredited Israeli diplomat serving in Argentina, was killed in a terrorist attack by Hezbollah terrorists trained, sponsored, supported and materially assisted by the Defendants the Islamic Republic of Iran ("Iran") and the Ministry of Information and Security of Iran ("MOIS"). As sponsors of an extrajudicial killing, defendants Iran and MOIS are subject to suit under the Foreign Sovereign Immunities Act's ("FSIA") "state-sponsored terrorism" exception, 28 U.S.C. section 1605(a)(7).

On April 21, 2006 the Plaintiffs filed their original complaint in this Court
seeking, inter alia, compensation for their pecuniary losses, intentional infliction of
emotional distress and punitive damages under FSIA. (Docket No. 1) After
unsuccessfully attempting service on Defendants pursuant to 28 U.S.C. § 1608(a)(3)
when the Defendants refused to accept delivery of a copy of the Summons, Complaint
and Notice of Suit, together with a Farsi translation of each, in a package prepared by the
Clerk of the Court via international mail, return receipt requested, the Plaintiffs, in
accordance with 28 U.S.C. § 1608(a)(4), successfully executed service through
diplomatic channels, on April 22, 2007. By June 21, 2007, Defendants had neither
entered an appearance nor filed any responsive pleading and the Plaintiffs submitted an
affidavit for default on July 5, 2007 (Docket No. 7). The Clerk of the Court entered
default on July 6, 2007. (Docket No. 8). After the Plaintiffs moved for judgment by
default on August 10, 2007 (Docket No. 9), this Court, mindful of its obligation under
FSIA to inquire further before entering judgment against Iran and MOIS, requested that
the Plaintiffs submit  evidence that "establishes [the plaintiffs'] claim or right to relief by
evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e).

**B.      The Plaintiffs**

1.      David Ben-Rafael ("Decedent") was a citizen and domiciliary of the State
of Israel on March 17, 1992, when he was killed in a massive explosion which rocked the
building which housed Israel's Embassy in Buenos Aires, Argentina ("Embassy
Bombing"). Affidavit of  Elisa Nili Cirilo-Peres Ben-Rafael ("Elisa Aff.") at *passim*.  At
the time, the Decedent served as the Deputy Chief of Mission, Minister-Counselor
Plenipotentiary to the Israeli Embassy in Buenos Aires, Argentina.  *Id* at ¶ 8. *See also*
Expert Report of Dov Weinstein (David's work history). The Decedent was born a citizen

2

of the United States in the State of New Jersey on September 30, 1948 as David Goldman. He retained United States citizenship continuously until June 9, 1986 when he voluntarily surrendered such citizenship upon being posted by the Israeli Foreign Ministry to the United States. *Id.* at ¶ 3

2.      The Plaintiff Elisa Nili Cirilo-Peres Ben-Rafael ("Elisa") was born a citizen of the United States and has been continuously and uninterruptedly a citizen of the United States. Elisa was the lawful wife of the Decedent. She is a Plaintiff in this action in her (i) individual capacity as the wife of the Decedent (ii) in her capacity as the party duly to be appointed as Israeli executor of the Decedent's estate under the laws of the State of Israel and (iii) as the natural mother and next of kin of the minor children (at the time of the Embassy Bombing) of the Decedent Yonatan Mishael Ben-Rafael and Noa Ruth Ben-Rafael. At all times relevant to this action, Elisa has been domiciled in Israel. Elisa Aff. at ¶¶ 2-4, p. 32.

3.      The minor Yonatan Mishael Ben-Rafael ("Yonatan") was born a citizen of the United States on June 16, 1991. He is the natural child of the Decedent and of Elisa. He has been continuously from birth a citizen of the United States. At all times relevant to this action Yonatan has been domiciled in Israel. Elisa Aff. at ¶ 4; Affidavit of Yonatan Mishael Ben-Rafael ("Yonatan Aff.").

4.      A minor at the time of the Embassy Bombing, Noa Ruth Ben Rafael ("Noa") was born a citizen of the United States on November 20, 1988. She is the natural child of the Decedent and of Elisa. She has been continuously form birth a citizen of the United States. At all times relevant to this action, Noa has been domiciled in Israel. Elisa Aff. at ¶ 4; Affidavit of Noa Ruth Ben Rafael ("Noa Aff.").

5.    Plaintiff Ralph I. Goldman ( R. Goldman) is the natural father of the Decedent.  He is a naturalized citizen of the United States as well as of the State of Israel. At all times relevant to this action, Plaintiff Ralph I. Goldman (R. Goldman) was a domiciliary of the State of New York. Affidavit of Ralph I. Goldman ("Goldman Aff.").

6.    In addition to bringing this action individually, Plaintiff R. Goldman brings this action in his legal capacity as the duly appointed Executor of the Israeli estate of Helen Goldman.  See Plaintiffs' Exhibit 17. Helen Goldman was the mother of the Decedent.  At all times relevant to this action, Helen Goldman was a citizen of the United States and of Israel and a domiciliary of the State of New York. Goldman Aff at ¶4.

7.    The Plaintiff Judith Goldman Baumgold ("Baumgold") was born a citizen of the United States on October 15, 1944.  She has maintained continuous and uninterrupted United States citizenship from birth.  At all times relevant to this action, Baumgold has been a domiciliary of Israel.  Baumgold is the natural child of the Plaintiff R. Goldman and of the late Helen Goldman and the sister of the Decedent. Affidavit of Judith Goldman Baumgold ("Baumgold Aff.") at ¶2-3.

8.    The Plaintiff Naomi L. Goldman ("Naomi") was born a citizen of the United States on April 1, 1955.  She has maintained continuous and uninterrupted United States citizenship and is a domiciliary of the State of New York.  Naomi is the natural child of Plaintiff R. Goldman and of the late Helen Goldman and is the sister of the Decedent. Goldman Aff. ¶ 4.

**C.    The Defendants**

9.    Defendant Islamic Republic of Iran ("Iran") is a foreign state which has been designated since January 19, 1984 as a state sponsor of terrorism pursuant to

Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), and

Section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371. *See generally*

Affidavit of Patrick Clawson (attached hereto as Record Exhibit 1);.[1] *see also Amir Reza*

*Oveissi v. The Islamic Republic of Iran*, 2007 U.S. Dist. LEXIS 56170 (Iran is state

sponsor of terrorism);. *Weinstein v. Islamic Republic of Iran*, 184 F.Supp. 2d 13, 20

(D.D.C. 2002) (same); *Bodoff v. Islamic Republic of Iran,* 424 F.Supp. 2d 74, 79 (D.D.C.

2006) (same); *Mousa v. Islamic Republic of Iran,* 238 F.Supp. 2d 1, 4 (D.D.C. 2001)

(same); *Eisenfeld v. Republic of Iran*, 172 F.Supp. 2d 1, 5 (D.D.C. 2000) (same).[2]  Iran

routinely provides material support and resources to Hezbollah, a politico-paramilitary

terrorist organization operating in the Middle East and in other parts of the world,

---

[1] Dr. Patrick Clawson is the deputy director of the Washington Institute for Near East Policy and has been recognized by many judges of this Court on numerous occasions as a "widely renowned expert on Iranian affairs over the past 25 years," including Iran's state sponsorship of terrorism. *See,* Clawson Affidavit at ¶ 10(listing cases in which he has qualified as an expert witness). See also Estate of Michael Heiser v. Islamic Republic of Iran, 466 F.Supp. 2d 229, 265 (D.D.C. 2006) ("Dr. Clawson has repeatedly provided this Court with reliable and credible testimony regarding the involvement of Iran, MOIS and IRGC in sponsoring and organizing acts of terrorism carried out against citizens of the United States."). His expert report, discussed in more detail below, opines, based on a reasonable certainty (see Clawson Affidavit at ¶ 15) that:

(1) Iran has since the 1980s provided material support and resources to Hezbollah for carrying out terrorist attacks in the Middle East and in other parts of the world, including but not limited to Argentina;

(2) Iran's Ministry of Information and Security (MOIS) operates as an intelligence service and conduit for terrorism both within and beyond Iran's territory; specifically, it acts as a conduit for Iran's provision of funds, training, direction and material assistance to Hezbollah

(3) Absent the material, financial and technical support of Iran and MOIS, Hezbollah could not have carried out the bombing of the Israeli embassy in Buenos Aires; that absent the express approval of Iran and MOIS, that bombing would not have been carried out; and that Iran and the MOIS were responsible for Hezbollah's bombing of the Israeli embassy in Buenos Aires.

(4) Civil suits such as this have influenced Iranian officials in their consideration about whether to continue providing material and financial support for terrorist activities, and the award of damages has been a major factor in the debates inside Iran about the wisdom of such support. On is submitted to provide the Court with the facts concerning Iran's support for the Embassy Bombing in Buenos Aires, Argentina.

[2] The court "may take judicial notice of related proceedings in cases before the same court." *Heiser v. Islamic Republic of Iran*, 466 F.Supp. 2d 229, 263 (D.D.C. 2006) (*quoting Salazar v. Islamic Republic of Iran*, 370 F.Supp. 2d 105, 109, n. 6 (D.D.C. 2005)).

including but not limited to Argentina.  Clawson Aff. at ¶ 16-21; *see also Peterson v. Islamic Republic of Iran,* 264 F.Supp. 2d 46, 50-53 (D.D.C. 2003)

  10. Defendant Ministry of Information and Security of Iran ("MOIS") operates, *inter alia*, as an intelligence service and a conduit for terrorism, and functions both within and beyond Iran's territory. Clawson Aff. at ¶¶ 22-29.  MOIS is an "agency or instrumentality" of Iran.  At all times relevant to this action, MOIS, acted as an agent of the Islamic Republic of Iran and performed certain acts within the scope of its agency, within the meaning of 28 U.S.C. § 1605(a)(7). Id.  Specifically, MOIS acted as a conduit for the Islamic Republic of Iran's provision of funds, training  direction and material assistance to Hezbollah for its terrorist activities in Lebanon, Argentina, Israel and elsewhere, including the actions relating to the Embassy Bombing. Clawson Aff. at ¶¶22-29, 33, 40; *see also Peterson ~~v. Islamic Republic of Iran,~~* 264 F.Supp. at 2d ~~46,~~ 53 ~~(D.D.C. 2003)~~.

  **D.** **The Defendants' Terrorism Infrastructure**

  11. Iran was refounded as an Islamic Republic in 1979 when revolutionaries espousing an extremist theocratic ideology deposed the ruling Shah of Iran. *Oveissi ~~v. The Islamic Republic of Iran,~~* 2007 U.S. Dist. LEXIS 56170 * 5-6. One of Iran's most important objectives has been to establish itself as the global leader of radical Islam. Clawson Aff. at ¶ 16.  For years after the 1979 revolution, Iran found little success, especially in the Arab heartland of Islam, in achieving this objective. *Id.* In the mid-eighties, however, Iran found that an effective means for advancing its role as the leader of radical Islam was to oppose Israel, a nation whose very existence Iranian leaders deemed an insult to Islam. *Id.*  Iran quickly concluded that working with the radical

forces in the war-torn republic of Lebanon, particularly the Shia community with whom

Iran had deep historical and cultural ties, would serve both goals. Id. at ¶ 17-18; *Peterson*

264 F.Supp. at 51 .

      12.    Beginning in the early 1980's Iran encouraged, if not directed, those

members of the Lebanese Shiite community sympathetic to the Iranian revolution to form

a political organization known as Hezbollah, or Party of God. Clawson Aff. at 18-20;

*Peterson v. Islamic Republic of Iran,* 264 F.Supp. 2d at 46, 51 (D.D.C. 2003); *Oveissi v.*

*The Islamic Republic of Iran,* 2007 U.S. Dist. LEXIS 56170 * 6-7. Iran then provided

Hezbollah with political, material and financial assistance in excess of $25 million a year

(sometimes reaching $100 million year) between 1985 and 2005 and continues to provide

substantial support  today. Clawson Aff at ¶¶ 20-21.

      13.    The primary agency through which the Iranian government both

established and exercised operational control over Hezbollah was the Iranian Ministry of

Information and Security ("MOIS"). Clawson Aff at ¶28-29; *Peterson ,* 264 F.Supp. 2d at

53 ; *Oveissi* 2007 U.S. Dist. LEXIS 56170 * 7.(MOIS) was the successor to the Shah's

Organization for Information and Security (known by its initials in Persian, SAVAK).

From the early days of the Islamic Republic after the 1979 revolution, MOIS (and its

predecessor agencies before the Ministry was formally established in 1984) took great

pains to demonstrate that it could be useful and loyal to the new authorities. SAVAK was

renowned for its craftwork in the intelligence business: it knew how to surveil targets,

how to avoid detection, and how to hold prisoners clandestinely. SAVAK was the most

respected intelligence agency in the Middle East outside of the Israeli agencies. MOIS

was entrusted with some of the most politically delicate tasks for the new government,

such as suppressing dissidents both at home and abroad, and assisting with schemes to

overthrow neighboring governments. The MOIS minister is a member of a "council for

special operations" which must approve terrorist activities. Clawson Aff. at ¶¶ 22-29.

14.    With approximately 30,000 employees, MOIS is the largest intelligence

agency in the Middle East. Credible and authoritative reports in the last decade, including

those from Iranian government investigators looking into assassinations of dissidents

inside Iran by MOIS, have estimated its annual budget to be approximately between $100

and $400 million. *Id* at ¶ 24.

15.    MOIS' role in support of terror has been highlighted in various reports

from the U.S. government, including the authoritative *Patterns of Global Terrorism*

*1990*, published annually by the State Department from the late 1980's to the early 2000s.

Because of its authoritative nature, each word was carefully weighed in its writing, and it

has served as a much respected source among researchers in the field. *Patterns of Global*

*Terrorism* has consistently concluded that Iranian intelligence services facilitate and

direct terrorist attacks. In 1990, for example, the State Department, perhaps

foreshadowing the Embassy Bombing in Argentina, wrote that "Iran has used its

intelligence services extensively to facilitate and conduct terrorist attacks…. Intelligence

officers in embassies have used the diplomatic pouch for conveyance of weapons and

finances for terrorist groups." Clawson Aff. at ¶¶ 25-27.

16.    A similar conclusion was reached in 1997 by a German court in the so-

called *Mykonos* Case involving the 1992 murder of Iranian dissidents in a Berlin

restaurant. In a detailed, 395 page ruling, the German court found that MOIS support for

terrorism is conducted with the approval of the highest levels of the Iranian regime. In his

verdict, Judge Frithjof Kubsch specifically cited the Iranian president and Supreme

Religious Leader (who, under the Iranian constitution, is the commander-in-chief and has

the authority to override any decision of the president or legislature) as ordering the

murders in question. A former MOIS operative who defected and testified at the trial,

under a pseudonym ("Witness C"), provided detailed information about MOIS' role in

support of foreign terrorist operations. Clawson Aff at ¶¶ 26.

17.    A few years later, the U.S. State Department explained again that, "Iran

remained the most active state sponsor of terrorism in 2000. Its Revolutionary Guard

Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved

in the planning and the execution of terrorist acts and continued to support a variety of

groups that use terrorism to pursue their goals…Iran has long provided Lebanese

Hezballah…with varying amounts of funding, safehaven, training, and weapons."

(*Patterns of Global Terrorism 2000*). *Id* at ¶ 27.

18.    Indeed, a major part of MOIS' responsibilities from the early 1980s was to

help organize Iranian government support to Hezbollah. MOIS played a key role in

support of Hezbollah's role in holding American and other Western hostages in Lebanon

in the 1980s and early 1990s. MOIS provided the technical expertise which allowed

Hezbollah to hide the kidnapped Westerners for years from a concerted effort by several

Western intelligence agencies to identify their location. In addition, "MOIS acted as a

conduit for the Islamic Republic of Iran's provision of funds to Hezbollah, provided

explosives to Hezbollah and . . .exercised operational control over Hezbollah," in

Hezbollah's successful state-sponsored terrorist attach on the Marine barracks in Beirut,

Lebanon in 1983. Id. at ¶ 28; *see also Peterson,* 264 F.Supp. 2d at  53.

19.    As noted by Dr. Clawson, "there can be little doubt that MOIS acted as a conduit for Iran's provision of funds, training, direction and material assistance to Hezbollah and that in return for such provision of funds, training, direction and material Hezbollah acted as an agent for both Iran and MOIS to perpetrate terrorist activities around the world." Clawson Aff. ¶ 29.

**The Defendants' Responsibility for the 1992 Bombing of the Israeli Embassy in Buenos Aries, Argentina.**

20.    In 1991-92, immediately following the Gulf War, the Middle East peace process between Israel and her neighboring Arab states appeared to be moving rapidly forward with the announcement of the Madrid Conference. Consistent with its objective of promoting radical Islam and rejecting Israel,  Iran actively urged terrorist acts against Israel and Israeli interests as an effective means of damaging any peace process. At the time of 1991 Madrid Conference, Iran sponsored a major international gathering of radicals and terrorists to orchestrate attacks that it hoped  would derail Israeli-Arab peace. *Clawson Aff.* ¶ 30.

21.    Indeed, Iran was accused by the U.S. government of urging Hezbollah attacks timed to disrupt rounds of negotiations between Israel and Syria, even though Hezbollah was dependent on Syria's good will to permit Iranian material support to flow through Syria to reach Hezbollah. In 1992, Hezbollah was eager to help Iran, both because of its general animus towards Israel and more immediately because Israel had on February 16, 1992 killed Hezbollah Secretary General (i.e., leader) Sheik Abbas Musawi. Clawson Aff. ¶ 30.

22.    Iran also had additional motive in attacking the Israeli Embassy in Argentina. In October 2007, Miguel Angel Toma, the director of Argentina's intelligence

agency (SIDE) and investigator of the Embassy Bombing, asserted that Iran was angry at

a change in Argentine policy. Toma explained, "During the '80s, the government of

Argentina signed agreements with them [the Iranians] in the areas of technological

investigation with the purpose of nuclear and missile programs"

[http://www.foxnews.com/printer_friendly_story/0,3566,298300,00.html]. On assuming

office in 1989, the civilian Argentine government headed by Carlos Menem cancelled

those agreements made by the previous military junta. Toma stated, "We never thought in

Argentina this would be a factor for determining a terrorist attack. We found out that later

after the two bombs [the 1992 Embassy Bombing and the 1994 Jewish community center

bomb discussed below] exploded in Buenos Aires." Clawson Aff. ¶ 31.

     23.    It was in this context that on May 19, 1992, the Embassy of the State of

Israel in Buenos Aires, Argentina, was destroyed by a bomb, killing 29 and wounding

242. A pickup truck loaded with explosives driven by a suicide bomber drove into the

front of the Embassy, then under repair, destroying it and the nearby buildings (a Catholic

church and a school). Although most of the victims were Argentine, including many

children, David Ben Rafael was also killed in the explosion. *Id.* at ¶ 32.

     24.    Responsibility for the bombing was claimed by Islamic Jihad. The listing

for Hezbollah in the State Department's 1992 report on *Patterns of Global Terrorism*,

states "Hizballah (Party of God) aka: Islamic Jihad, Revolutionary Justice

Organization...Islamic Jihad publicly claimed responsibility for the car-bombing of

Israel's Embassy in Buenos Aires in March 1992." (*Patterns of Global Terrorism 1992*).[3] The inclusion of such a statement indicates, in my opinion quite correctly, that the State Department was satisfied that the public claim of responsibility for the embassy bombing did indeed come from Hezbollah, not from distinct and separate organization called "Islamic Jihad" (note that there is now a Palestinian organization knows as "Palestinian Islamic Jihad," but it has never had an organization in Lebanon and in any case uses the name "Palestinian Islamic Jihad" rather than "Islamic Jihad"). Clawson Aff ¶ 33.

25.    Subsequent investigations of the Embassy Bombing by the Argentines was lengthy and beset with problems. However, a breakthrough came in 1998 when Argentine investigators spoke with Abolghassam Mesbahi, a former senior Iranian intelligence official who had defected to Germany in 1996. Mesbahi's testimony proved central to a Berlin court's finding that senior Iranian officials had been responsible for a 1990 terrorist assassination episode at Berlin's Mykonos restaurant. Mesbahi stated that the planning for the Embassy Bombing was done by Mohsen Rabbani, a MOIS agent who had been Iran's cultural attache at its embassy in Buenos Aires from 1991 to December 1997, and supervised by Hamid Naghashan, a senior MOIS official (his testimony is summarized in Larry Rohter, "Iran Blew Up Jewish Center in Argentina, Defector Says," *New York Times*, July 22, 2002). Rabbani was detained in Germany in 1998, but given his apparent diplomatic status he was allowed to return to Iran. However, the Argentine government then expelled seven Iranian diplomats, stating that it had "convincing proof" of Iranian involvement in the Embassy Bombing.  Clawson Aff. ¶34.

---

[3] Hezbollah militants also refer to themselves as "Islamic Jihad. *Oveissi v. The Islamic Republic of Iran*, 2007 U.S. Dist. LEXIS 56170 * 7, fn. 3 citing *Damarell v. Islamic Republic of Iran*, 404 F.Supp.2d 261, 271-72 (D.D.C.2005). "Hezbollah" and "Hizbollah" are variant transliterations of the same name. *Id.* citing *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp. 2d at 248, n.1-.

26.     In 1999, in connection with the Embassy Bombing, Argentina issued an arrest warrant for Imad Mugniyah, who remains elusive. According to long-time CIA agent Robert Bair, "Mugniyah is probably the most intelligent, most capable operative we've ever run across, including the KGB or anybody else... He is the master terrorist, the grail that we have been after since 1983."

(http://www.cbsnews.com/stories/2002/05/01/60II/main507784.shtml). Among other terrorist episodes, Mugniyah has been implicated in the 1983 Beirut Marine barracks bombing, the 1984 bombing of the U.S. Embassy annex in Beirut, the 1985 hijacking of TWA 847 in Lebanon,  and the kidnapping of numerous Westerners in Lebanon in the 1980s (including U.S. Army Colonel William Buckley, who was tortured to death). By some accounts, he controls Hezbollah's security apparatus, the Special Operations Command. The European Union lists him as "Senior Intelligence Officer of Hezbollah" in its Official Journal.

(http:eurex.europa.eu/LexUriServ/site/en/oj/2005/l_314/l_31420051130en00410045.pdf). In October 2001, the FBI placed Mugniyah on its list of 22 Most Wanted Terrorists, offering $5 million for information leading to his arrest; this offer is still outstanding. He remains active; he has been accused of being the mastermind behind the 2000 and 2006 abductions of Israeli soldiers near the Lebanese border as well as the kidnapping of an emissary sent to negotiate the release of the 2000 abductees. He has been variously described as living in Iran or Lebanon. He maintains a low profile; for instance, he is said to have undergone cosmetic surgery which has altered his appearance. Reports circulate of continuing efforts by the CIA and U.S. Special Operations forces, as well as the Israeli government, to kill him. Clawson Aff at ¶ 35.

27.     With an attack as spectacular and brazen as the Embassy Bombing, one would have expected serious attention from several governments and many researchers. Unfortunately, and for one simple reason, this has not been the case. The Embassy Bombing was quickly overshadowed by the July 1994 bombing of the Argentine Jewish Mutual Association (AMIA) in Buenos Aires which killed another 85 people. Critics immediately said that the failure to thoroughly investigate the Embassy Bombing led to the AMIA bombing.[4] Yet, notwithstanding this criticism, the AMIA Bombing investigation did not fare much better. *See*, Clawson Aff at ¶36 (detailing missteps in the AMIA Bombing investigation).

28.     Soon after assuming office in early 2003, Argentine President Nestor Kirchner opened up Argentine intelligence files on the AMIA case. Miguel Tomas, the new head of Argentina's intelligence services, SIDE, traveled to Israel to show officials

---

[4] While it uncovered ample evidence of Hezbollah and Iran's role in the Embassy Bombing, the Argentine investigation was unsatisfactory in many ways. No actual trial has ever been held, for example, in part because Argentina was never able to obtain the physical custody of the Iranian agents responsible for the Embassy Bombing. Additionally, senior Argentine political officials lacked the will to uncover all the circumstances about the role of Argentinians in facilitating the bombing. Allegations that "police officers on a security detail inexplicably vanished just before the explosion" (*New York Times,* Rohter, op. cit.), the impeachment and removal from office of the Supreme Court justices placed in charge of the investigation (in line with Argentine procedures in which judges head investigations), and persistent credible claims that the Iranian government covertly funneled many tens of millions of dollars to President Menem both before his 1989 election and while he was president, all colored the Argentine investigation of the Embassy Bombing. Mesbahi said in late 1992 or early 1993 Menem was paid ten million dollars into a Swiss bank account to cover up the Embassy Bombing and to allow Iran to carry out additional terrorist attacks. Menem has long been dogged by allegations of corruption; after leaving office, he spent six months under house arrest for alleged involvement in illegal arms sales to Croatia (for use in the wars wracking the former Yugoslavia) and Ecuador (for use in that country's war with Peru). He has acknowledged having a secret Swiss bank account, though he denies receiving payment from Iran for covering up terror attacks. Clawson Affidavit at ¶ 36.

there the report on the AMIA bombing, which Yossi Melman, one of the more authoritative investigative journalists on terrorism, described as "thousands of pages long" (Yossi Melman, "Argentine intelligence report details Iranian hand in Buenos Aires bombing," *Haaretz,* November 3, 2003). Melman's article adds, "The report also states, although as a footnote, that Iran and Hezbollah were behind the bombing of the Israeli Embassy in March 1992 that killed 29 people and injured scores." After a re-investigation, in October 2006 prosecutors in Buenos Aires formally accused the Iranian authorities with directing Hezbollah to carry out the AMIA attack. In November, they issued warrants for the arrest of former President of Iran Akbar Hashemi Rafsanjani and seven others, including some who still hold official positions in Iran. Clawson Aff. ¶ 37.

29.    The Embassy Bombing and the AMIA attack remain a matter of concern to the Argentine authorities. In September 2007 address to the UN General Assembly, Argentine President Kirchner denounced the lack of Iranian cooperation about the bombings. In an October 2007 interview with Fox News (op. cit.), Tomas explained,

> "The attacks in the '90s against the Jewish community center and the Israeli embassy brought up many distinct questions, because they came from many thousands of miles away and obviously were plotted from many thousands of miles away... It's a mistake to think those operations do not reach the highest levels of the Iranian government. They study them at the highest levels case by case."

Clawson Aff ¶ 38.

30.    As noted by Dr. Clawson, the Embassy Bombing's relegation to a mere footnote in the AMIA Bombing report illustrates the difficulty in providing a more detailed statement about the nature and extent of Iranian/Hezbollah responsibility for the Embassy Bombing.  For instance, according to Dr. Clawson, reports of the AMIA bombing detail evidence that the Iranian Embassy provided the actual bomb used in the

AMIA attack, going so far as to analyze the explosives used, the method for smuggling bomb components into Argentina and the manner by which the bomb was actually assembled. While some reports detail that the Iranian Embassy similarly provided the actual bomb used in the Israeli Embassy Bombing, the level of detail employed in the AMIA reports is absent from the Embassy Bombing reports. These lack of details aside, there has never been any account suggesting that the Embassy Bombing or the AMIA bombing differed in any significant way, including any suggestion that different parties were responsible for the two bombings. Accordingly, and in light of all of the surrounding facts, Dr. Clawson opines with a reasonable degree of certainty the actual bomb used to destroy the Israeli Embassy in Argentina was provided by Iranian Embassy officials. Clawson Aff ¶ 39.

31.    As Dr. Clawson further notes, some investigators, including some in Argentina and Israel, have argued that Hezbollah's bombing of the Israeli embassy was supported at least as much by Syria as by Iran. This charge is potentially explosive in Argentine politics, given President Menem's deep connections to various Syrians – possibly acting as agents for the Syrian government – in the early 1990's (President Menem is of Lebanese origin). The truth of this allegation is not clear. Other critics claim that the Embassy Bombing and the AMIA bombing were aided by anti-Semitic Argentines; allegations have been made that important Argentine police officials are deeply anti-Semitic. As stated conclusively by Dr. Clawson, while all of these issues are of interest, they do not undercut the fundamental role of Hezbollah and Iran. *Whatever theories there may be about who may have been involved, there is no disagreement: 1)* that Hezbollah was responsible for the Embassy Bombing; 2) that while it had a

complicated relationship with Syria – which allowed a flow of arms from Iran but which also put strict limits on Hezbollah activities in favor of the Shia group it favored, Amal – at all times relevant to 1992 Embassy Bombing, Hezbollah was a creature of the Iranian government; 3) that absent the material, financial and technical support of Iran and MOIS, Hezbollah could not have carried out the Embassy Bombing; and 4) that absent the express approval of Iran and MOIS, the Embassy Bombing would not have been carried out. Clawson Aff ¶ 40.

32.    In short, Iran was responsible for the 1992 Embassy Bombing.  Clawson Aff. ¶ 40. At all times relevant to this action, Iran sponsored  Hezbollah, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605 note, by providing it with funding, direction, training and other assistance for its terrorist activities against Israel and its citizens in countries outside of the Middle East including Argentina.  *Id.* Such terrorist activities were undertaken by Iran to further promote Islamic fundamentalism and Iran's state sponsored terrorism agenda. Id. at ¶ 40.

### Facts Specific to the Named Plaintiffs

33.    The murder of David Ben Rafael in the Embassy Bombing abruptly ended a 43 year old's life who had only recently married and fathered two young children. For thirteen years with the Israeli Foreign Office, David had enjoyed a steady advance in rank, position and salary for his assignments in Israel and abroad.  See Expert Report of Dov Weinstein. Only four years earlier in Chicago, Illinois, he had married Elisa. Elisa Aff. ¶ 3 A family quickly ensued with the birth of Noa and then with Yonatan only two years later. *Id.*

34.    By all accounts, David's career with the Foreign Office was progressing nicely. His projected professional advancement anticipated successive postings to Africa, the United States and ultimately Head of Mission in Europe upon an expected retirement from the Foreign Office in 2015. Had he continued on this career path, his expected lost income~~gross salary~~ in U.S. dollars over this time period would have been (discounted to present value) $3,731,839.00  ~~approximately $_____~~. Expert Report of Dov Weinstein p. 7 (Plaintiffs' Exhibit 10).

35.    As a result of David's death, his wife Elisa, his children Noa and Yonatan, his father Ralph Goldman and late mother Helen Goldman, and his sisters Judith Goldman Baumgold and Naomi Goldman have suffered and will continue to suffer severe mental anguish and loss of companionship and society.

36.    Most family members, have submitted affidavits describing the anguish they endured when they learned of David's murder in the attack, as well as the pain and suffering they continue to deal with today in David's absence. *See* Elisa Affidavit; Affidavit of Noa Ben Rafael; Affidavit of Yonatan Ben Rafael; Affidavit of Ralph Goldman; Affidavit of Judith Goldman Baumgold.  The Baumgold Affidavit also describes Naomi's emotional paralysis since Decedent's death. *Id.* ¶18.  Moreover, such affidavits lend additional support with psychiatric and physician reports further detailing the fragile emotional state of the plaintiffs.

37.    Elisa, the widowed mother of two, states that her life and the life of her children were shattered on March 17, 1992, the day of the Embassy Bombing. Elisa Aff. at ¶ 9. At the time of the Embassy Bombing her oldest child Noa was 3, and her youngest, Yonatan, only 9 months old.  Her testimony details the harrowing moments of

learning of the Embassy Bombing, her husband's death, her efforts to take care of her children and attempts to find closure by visiting the Embassy Bombing site some months later. Elisa Aff. at ¶¶ 9-22. Yet, despite therapy, particularly in the first two years following David's death, she felt overwhelmed, had difficulty doing simple tasks, had trouble sleeping and could not work. *Id* at ¶ 25. Being a single parent remained a difficult task and has undoubtedly caused stress in her relationship with her daughter. *Id.* at ¶ 27. *See also* Letter of Shay Muller (attached to Elisa Aff.). To this day, some 15 years after the Embassy Bombing, she finds herself maintaining a level of deep mourning during certain times of the year and generally withdraws from family and friends. *Id.* at ¶ 30. Only recently has she even started to date again. *Id.* at ¶ 31.

38.    Noa Ruth, Elisa and David's daughter was only 3 years old at the time of the Embassy Bombing. Elisa vividly details the difficulty of breaking the news of David's death to Noa and Noa's vow to never speak Spanish again ( Elisa Aff. at ¶ 17), as well as Noa's dreaming of David and calling out for David upon returning to their apartment in Argentina some weeks later to gather their belongings. *Id.* at ¶ 21-22. While Noa herself has only vague memories of her father, she acknowledges being colored by sadness and emptiness because of the absence of her father, particularly at special events in school, birthdays, and especially her bat mitzvah. Noa Aff. at ¶¶ 5-6. In addition, Noa, plainly concedes that she has had difficulties with her mother, believing her mother has been overprotective in her father's absence, but also acknowledging that her teen years and maturation would likely have been very different if her father were alive. *Id.* at ¶¶ 6-7. Indeed, this view is largely shared by her mother and treating psychologist. Elisa Aff. at ¶ 27-28. *See also* Letter of Shay Mueller (attached to Elisa Aff.).

39.     Yonatan, Elisa and David's son was only nine months old at the time of the Embassy Bombing. Elisa details serious separation issues she had with Yonatan as well as Yonatan's general refusal to talk about the loss of his Dad. Elisa Aff. ¶ 29. For his part, Yonatan plainly acknowledges that he grew up without a father and that he does not like to talk about it. Yonatan Aff. at ¶ 5. Nevertheless, he also wishes he were around and that things would have been easier in his family if he had a father. Id. at ¶ 6.

40.     Judy Baumgold, David's older sister, similarly details the terrible moments following the Embassy Bombing, her frantic efforts to find out information, and the constant stream of news of the event in Israel. Baumgold Aff. at 5-6. When David's body was repatriated to Israel, her home was the center of the mourning days and Elisa and the children stayed with her until they found other accommodations after the Jewish week of mourning known as Shiva. Id. at ¶ 7. David's death has been a source of ongoing emotional distress for Judy. Id. ¶ 8. Not only did she lose a brother and friend, but she also lost a vital "family team" member to help with her parents and dysfunctional sibling, Naomi. *Id.* at ¶ 4, 9. She assumed the role of caretaker for her mother (while she was alive) and her father, as well as her sister Naomi, who has been emotionally paralyzed since David died. *Id.* at ¶ 9-10.  These added roles, and the loss of her brother have caused her to suffer anxiety, insomnia and nightmares. *Id. See also* letters of therapists Israel Charney and Ruth Seliger (attached to Baumgold Affidavit).

41.     Naomi, the younger sister of David, has been emotionally paralyzed since David's death. Baumgold Aff. at ¶ 9. Upon learning of David's death, Naomi traveled to Israel for the funeral. Goldman Aff. at ¶ 9. Following the family's return to New York, Naomi's temper tantrums became frequent and she became more dependent on Ralph and

Helen for emotional and financial support. Goldman Aff at ¶ 15. Dealing with Naomi was particularly difficult, despite professional help to ameliorate the situation. *Id.* With Helen's death, and her father's advanced age, Judy has taken it upon herself to be helpful and supportive of Naomi. Baumgold Aff. at ¶ 9.

      42.     For Ralph Goldman, David's father, the loss of his only son has been very painful. He enjoyed a special relationship with David. When David changed his name to be more Israeli, he changed it to Ben-Rafael, which translates as Son of Ralph. Goldman Aff. at ¶ 11. He, and David's mother to whom Ralph was married for 62 year before her death in 2005, followed David's career with great interest and both had encouraged his career in the Foreign Ministry. *Id.* Like the other Plaintiffs, Ralph details the awful events surrounding his learning of the Embassy Bombing, his immediate trip with Helen to Buenos Aires to search for his son, and the grief and mourning that transpired upon learning of his son's death. Goldman Aff at ¶¶ 6-10. While Ralph sough medical treatment for his sadness and depression over David's death, he  dealt with his grief by immersing himself in work and devoting his efforts to finding out who was responsible for David's murder, as well as establishing scholarships and memorials in David's name. *Id.* at ¶ 12-13. *See also* Letter of therapist, John Winegar (attached to Goldman Affidavit). Ralph is reminded of David every day. In addition to reciting daily psalms, he also visits David's grave every time he enters and leaves the country. *Id.* at ¶ 13. By Ralph's own testimony not a day goes by where he does not miss his son and wish he were alive. *Id..* at ¶ 17.

      43.     Two months after David's death, David's mother Helen Goldman suffered a heart attack. Goldman Aff. at ¶ 14. *See also* Lennox Hospital Reports (attached to

Goldman Affidavit). Whereas Ralph immersed himself in work, Helen internalized her grief and anger. *Id*. Like Ralph, she felt guilt over having encouraged David to pursue a career in the Foreign Ministry. Goldman Aff. at ¶ 11. Her health continued to decline. *Id* at ¶ 14. Helen became overprotective of her younger daughter Naomi (*Id*. at ¶ 15. *See also* Letter of therapist John Winegar (attached to Goldman Affidavit)) and focused particular attention of her youngest grandchild, David's son, Yonatan. Shortly after moving to Israel and having never recovered from the death of her only son, Helen died and Ralph was appointed her executor. Goldman Aff ¶ 16.

44. Elisa is the duly appointed Executor of the Decedent's Israeli estate. *See, Plaintiff's Exhibit 13. The Decedent died testate. See, Plaintiff's Exhibit 14. Pursuant to the Decedent's will, Elisa is the sole testamentary beneficiary therein, having survived the Decedent. See, id.*

E.    **Conclusions of Law**

I.    **Jurisdiction**

In the United States, the Foreign Sovereign Immunities Act provides the sole basis for asserting jurisdiction over foreign sovereigns. *Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 434-34 (1989). A party may not generally bring an action for money damages in U.S. courts against a foreign state. 28 U.S.C. §1604. The "state-sponsored terrorism" exception, however, removes a foreign state's immunity to suits for money damages brought in U.S. courts where plaintiffs seek damages against the foreign state for personal injury or death caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of

material support is engaged by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency." 28.U.S.C. § 1605(a)(7).

In order to subject a foreign sovereign to suit under section 1605(a)(7), a plaintiff must show that: (1) the foreign sovereign was designated by the U.S. State Department as a "state sponsor of terrorism"; (2) the victim or plaintiff was a U.S. national at the time the acts took place; and (3) the foreign sovereign engaged in conduct that falls within the ambit of the statute. *Heiser,* 466 F. Supp. 2d at 305. (citing *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. 2006) (Lamberth, J.)).

Each of the requirements is met in this case. First, Defendant Iran has been designated a state sponsor of terrorism continuously since January 19, 1984, and was so designated at the time of the attack. <u>*See*</u> 31 C.F.R. § 596.201 (2001); *Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1,11 ¶ 19 (D.D.C. 1998) (Lamberth, J.). Second, all of the Plaintiffs were United States citizens at the time the bombing occurred. Finally, Defendant Iran's persistent financial and organizational support of an entity that committed an extrajudicial killing squarely falls within the ambit of the statute. Defendant MOIS is considered to be a division of the State of Iran, and is therefore treated as a member of the State of Iran itself. *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 234 (D.C. Cir. 2003), <u>cert</u>. <u>denied</u>, 542 U.S. 915 (2004); *see also Salazar* 370 F. Supp. 2d at,116 (analogizing the IRGC of the MOIS for purposes of liability, and concluding that both must be treated as the State of Iran itself). Therefore, the same determinations that apply to MOIS conduct apply to the conduct of Iran.

Personal jurisdiction exists over a non-immune sovereign as long as service of process has been made under section 1608 of the FSIA. *See Stern v. Islamic Republic of Iran,* 271 F. Supp. 2d 286, 298 (D.D.C. 2003) (Lamberth, J.). In this case, service of process has been effected under that provision. Accordingly, this Court has *in personam* jurisdiction over defendants Iran and MOIS.

## II.     Legal Standard for FSIA Default Judgment

As previously mentioned , in an action over which subject matter jurisdiction exists by virtue of the "terrorism exception" of 28 U.S.C. § 1605(a)(7) "[n]o judgment by default shall be entered by a court of the United States or of a state against a foreign state…unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *Roeder,* 333 F.3d at 232-33. In default judgment cases, plaintiffs may present such evidence in the form of affidavits. *Bodoff ,* 424 F. Supp. 2d at 82 (quoting *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003)). Upon evaluation, the court may accept any uncontroverted evidence presented by Plaintiffs as true. *Heiser*, 466 F. Supp. 2d at 255 (citing *Campuzano*, 281 F. Supp. 2d at 268). This Court accepts and credits the uncontested evidence and testimony submitted by Plaintiffs as true in light of the fact that the Defendants in this action have not objected to it or even appeared in this action to contest it.

## III.     Liability

### A.     *Proper Causes of Action Under the FSIA*

The FSIA does not itself provide a cause of action, but rather "acts as a 'pass-through' to substantive causes of action against private individuals that may exist in federal, state or international law." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40,

54 (D.D.C. 2006) (Lamberth, J.) (citing *Dammarell v. Islamic Republic of Iran*, 2005

WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32 (D.D.C. Mar. 29, 2005)

(Bates, J.) ("*Dammarell, I* ").

     In this case, state law provides a basis for liability.[5]   In order to determine the

state law applicable to each action,  the Court must look to the choice of law rules of the

forum, in this case, those of the District of Columbia.  *See Blais,* 459 F. Supp. 2d at 54.

**B.**    **Choice of Law As To The IIED Claim**

    ***Intentional Infliction of Emotional Distress Claims of the~~The~~ Estate of Helen Goldman, Ralph Goldman And Naomi Goldman***

    The applicable state substantive law which applies to the ~~Plaintiffs~~ intentional

infliction of emotional distress ("IIED") claims asserted by the Plaintiffs in this action is

(i) that of New York, as to the claims of U.S. citizens and New York domiciliaries Naomi

Goldman, Ralph Goldman and the late Helen Goldman and (ii) that of the District of

Columbia for all other Plaintiffs in this action.  As the forum state, the District of

Columbia's choice of law rules apply to determine which state's~~'s~~ law shall govern.

*Bodoff*, 424 F. Supp. 2d at 83.  District of Columbia courts apply a so-called "refined

government interest analysis", pursuant to which they "evaluate the government policies

underlying the applicable laws and determine which jurisdiction's policy would be most

advanced by having its law applied to the facts of the case under review."  *Bodoff*, 424 F.

Supp. 2d at 83 quoting, *Hercules & Co. v. Shama Rest. Corp.*, 566 A 2d 31, 41 (D.C.

1989); see also, *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 68-69 (D.D.C.

---

[5] Obviously, the law of the United States applies rather than the law of the place of the tort or any other foreign law because the United States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks on United States citizens. *See ~~Dammarell,~~Dammarell, I,* 2005 WL 756090, at *20, 2005 U.S. Dist. LEXIS 5343, at *63.

2006) (Lamberth, J.).  When this test is applied it "typically leads to the application of the

law of the plaintiff's domicile, as the state  with the greatest interest in providing redress

to its citizens." Id., 425 F. Supp. 2d at 69 citing *Dammarell, I.* 2005 U.S. Dist. LEXIS

5343 at *66-67.  In the  particular circumstances, of Naomi  and R. Goldman

(individually and as Executor of Helen Goldman's Estate) the substantive law which

governs what state law causes of action each  has is that of New York. *See, Peterson v.*

*Islamic Republic of Iran,* 2007 U.S. Dist. Lexis 65820 *15 (D.D.C. Sept. 7, 2007)

(Lamberth.).

### The IIED Claims Of The Other Plaintiffs

As to each of the other Plaintiffs, none has current United States domicile. Where,

as here, the victims of terrorism are United States citizens with no current domicile in the

United States, the District of Columbia has "the greatest interest" for choice of law

purposes and its law will be applied.  *See e.g. Bodoff*, 425 F. Supp. 2d at 83-84; *Haim*,

425 F. Supp. 2d at 69.  As to Elisa, Judith, Noa and Yonatan, District of Columbia law

shall apply as to the adjudication of their IIED claims.  The choice of law determination

as to the wrongful death claim asserted in the Complaint, is discussed hereafter under the

Wrongful Death Claim heading.  *See,* p. 33-37, infra.

C.    **Substantive Vicarious Liability For the Torts Committed by Hezbollah.**

The substantive basis of the Defendants' liability is that they at a minimum

engaged in the "provision of material support" to Hezbollah, which carried out the

Embassy Bombing.  The acts of another may render a party liable "under theories of

vicarious liability, such as conspiracy, aiding and abetting and inducement." *Haim*, 425

F. Supp. 2d at 69.  The Court will examine the applicability of each of these theories, as deemed necessary.[6]

### 1.    Vicarious Liability

The asserted basis of Defendants' liability is that they provided material and financial support and resources including, ~~most notably, deadly explosives to Hezbollah,~~ the organization whose members carried out the Embassy Bombing. Under a theory of vicarious liability, a party may be liable for the acts of another, under rubrics including conspiracy, aiding and abetting, and inducement.  Accordingly, this Court finds that at a minimum, civil conspiracy provides a basis of liability in this case against Defendants Iran and MOIS, provided such a theory exists under District of Columbia law.

### 2.    Civil Conspiracy

Civil conspiracy is recognized under District of Columbia law as a theory for imposition of vicarious liability for civil torts.  It exists when the following elements are present:(1) an agreement between two or more persons; (2) to participate in an unlawful act in an unlawful manner; (3) an injury or death caused by an unlawful overt act performed by one of the parties to the agreement and (4) pursuant to or in furtherance of the common scheme. *Griva v. Davison*, 637 A. 2d 830, 848 (D.C. 1994) (citing *Halbertstam v. Welch*, 705 F. 2d 472, 477 (D.C. Cir. 1983)).

It is axiomatic that the "agreement" element "may be inferred from conduct." *Bodoff*, 424 F. Supp. 2d at 84 citing, *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001); see also, *Haim*, 425 F. Supp. 2d at 69.  The Plaintiffs have established based on the evidence submitted to this Court, most notably  the Clawson Affidavit, that Iran,

---

[6] Where the facts found by the Court suffice to establish only one of these bases of vicarious liability, the Court need not go further. *See*, *Haim*, at 69.

MOIS and Hezbollah acted in concert because they had agreed to commit high profile terrorism activities to promote Iran's brand of revolutionary Islamic ideology and to further the goal of damaging Israel and its citizens as well as United States interest whenever possible. Id. ¶ 16-30, p. 4-7. Such agreement may also be inferred from the substantial financial support and training that Iran and MOIS provided to Hezbollah. See, id., ¶ 20, p. 5. Judge Lamberth has also very succinctly and correctly opined that the very " "sponsorship of terrorist activities inherently involves conspiracy to commit terrorist acts'." *Bodoff*, 424 F. Supp. 2d at 84 quoting *Flatow,* 999 S. Supp. at 27.

The evidence also clearly establishes that Hezbollah carried out the Embassy Bombing which killed the Decedent. *See, Clawson Aff.* ¶ 5 sub. Par 1-3, p. 4. Dr. Clawson's affidavit also demonstrates to the satisfaction of this Court that the Embassy Bombing was carried out in "furtherance of the scheme" between Hezbollah, Iran and MOIS. For these reasons, each of the four elements of civil conspiracy is established under District of Columbia law, with regard to the Defendants and the Hezbollah perpetrators. *See also*, *Valore v. Islamic Republic of Iran,* 478 F. Supp. 2d 101, 108-109 (D.D.C. 2007) (Lamberth, J.) (civil conspiracy basis for vicarious liability established with respect to Iran and MOIS' provision of "material support and resources to Hezbollah" to bomb U.S. Marine barracks in Beirut).

The same evidence also suffices to establish vicarious liability under New York law based on the for civil conspiracy theory. *See, Valore*, 478 F. Supp. 2d at 108-109

(the Plaintiffs in *Valore*, included specifically individuals who were New York

domiciliaries domicilciares at the time of the Beirut bombing).[7]

### 3.    Other Bases of Vicarious Liability

————Nor is there any paucity of evidence here for adjudicating Iran and MOIS

as liable under vicarious liability theories which are separate and distinct from civil

conspiracy.  Iran has provided initiative, approval of and likely provided the deadly

explosive to carry out the terrorist attack at issue here.  *See, Clawson* Aff ¶ 39, p 10. As a

result of its action, through, its agent MOIS, these Defendants are also liable for aiding

and abetting as well as inducement of the deadly terrorist bombing.  See, 28 U.S.C. § 2

(a), b; *see also Bodoff* 424 F. Supp. 2d at 84.  In addition to conspiracy, aiding and

abetting and inducement are legal theories upon which a court may predicate vicarious

liability. *See, Halberstam,* 705 F.2d at 481-486.  Lastly, a common law agency

relationship between the terrorist perpetrators and the state sponsor Defendants may also

serve as a legal basis for imposition of liability on the Defendants.  *See, Kilburn v.*

*Socialist People's Libyan Arab Jamahiya,* 376 F. 3d 1123, 1129-31 (D.C. Cir. 2004) (for

§ 1605(a)(7) jurisdictional purposes, Libya "is responsible for the acts of its agent,

'within the scope of [its] agency'."); *see also, Foremost - McKesson v. Islamic Republic*

*of Iran,* 905 F. 2d 438, 445 (D.C. Cir. 1990). The record here contains ample evidence of

an agency relationship between Hezbollah, acting as agent within the scope of its agency,

on behalf of the Defendants.  *See* Clawson Aff. p. 4-8.

---

[7] Judge Lamberth expressly states in *Valore* that he had "examined the laws of each of the
domiciliary states to determine whether such a basis for a cause of action may be brought in each
state under a civil conspiracy theory of liability." 478 F. Supp. 2d at 108.

In conclusion, there exist multiple legal bases for the imposition of vicarious liability on Defendants Iran and MOIS for the torts of Hezbollah including extra judicial killing.

~~In conclusion, there exist multiple legal bases for the imposition of vicarious liability on Defendants Iran and MOIS for the torts of Hezbollah.~~

## D.    Intentional Infliction Of Emotional Distress

Except for Naomi Goldman and the IIED claims of R. Goldman in any individual and in a representative capacity as Executor of Helen Goodman's estate. ~~Goldman,~~ District of Columbia law governs as to the IIED claims asserted by each of the other Plaintiffs.  The elements of the IIED tort under District of Columbia law are "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the Plaintiff severe emotional distress. *Bodoff*, 424 F. Supp. 2d at 85 citing *Howard Univ. v. Best*., 484 A 2d 958, 985 (D.C. 1984).  Based on the evidence submitted in this case, these elements are satisfied here.  It is well established  that "a terrorist attack constitutes extreme and outrageous conduct." *Bodoff*, 424 F. Supp. 2d at 85; *see also Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (Jackson, J.) ("[A]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally terror.")  The second element of the IIED tort is also established here.  By its very nature a bombing of a civilian facility by use of high powered explosives is an act of extreme and outrageous conduct. *See, e.g., Dammarell* ~~v. Islamic Republic of Iran,~~ 404 F. Supp. 2d at ~~261,~~ 275 ~~(D.D.C. 2005)~~

(Bates, J.) (elements of District of Columbia IIED found to be satisfied in 1983 bombing of U.S. Embassy in Beirut); *see also Bodoff*, 424 F. Supp. at 85.

The third element of causing the plaintiff severe emotional distress is amply demonstrated here. Each of the Ddecedent's immediate relatives who are Plaintiffs in this action has established in detail the severe emotional distress that resulted from the Embassy Bombing and the murder of their loved one.

Finally, the Court notes that the District of Columbia's highest Court is among a number of state Supreme Courts which have yet to address the question of whether in a terrorist attack case, a plaintiff's physical presence is required to permit immediate family members to recover IIED changes. *See*, *Peterson* 2007 U.S. Dist. LEXIS 65820 at * 21-22. In *Heiser* the court held that even under the law of a jurisdiction which has not decided the presence issue in a terrorist attack context, presence is not required. *Id., 466 F. Supp. 2d* at 305; *see also Peterson* at 20-21, n. 11. *Heiser* reached this conclusion to dispense with a presence requirement "in light of the severity of [a terrorist attack] and the obvious range of potential grief and distress that directly results from such a heinous act" and because "a terrorist act" by its nature - is directed not only at the victims, but also the victims families." 466 F. Supp. 2d at 328-29. In conclusion, each Plaintiff whose IIED claim is governed by District of Columbia law is entitled to recovery of damages for IIED.

Finally, there exists no material difference between New York law and District of Columbia law with respect to IIED. New York law recognizes IIED as a tort. *See*, *Howell v. New York Post Co.*, 81 N.Y. 2d 115, 612 N.E. 2d 699, 702 (N.Y. 1993). The elements of the tort under New York law are substantially similar to those of the District

of Columbia.  As in the District of Columbia, New York's highest court has not decided

the issue of whether physical presence is required by an immediate family member in

connection with a terrorist attack.  *See, Peterson*, 2007 U.S. Dist. LEXIS 65820 * 21, n.

12.  In *Peterson*, Judge Lamberth held that the presence element does not need  to be

proven in order to successfully bring  a cause of action for intentional infliction of

emotional distress under New York law" by victim's near  relatives who were not present

at the time of the attack.  *Id.* at 21, n. 12 citing. In *Heiser,* 466 F. Supp 2d at 345-46

(applying New York law).  This Court adopts the rationale of *Peterson*.  It is persuaded

that its analytical underpinnings are founded i.e., (i) that New York follows *The*

*Restatement (Second) of Torts* in recognizing IIED and (ii) that the Southern District of

New York has dispensed with a physical presence requirement in an action  brought by

victims of the September 11, 2001 terrorist attack on the World Trade Center and

Pentagon.  See, *In re Terrorist Attacks on September 11, 2001*, 349 F Supp. 2d 765, 829-

30 (S.D. N.Y. 2005).  Hence, Naomi Goldman and Ralph Goldman are s entitled to IIED

recovery under New York law.  R. Goldman is also entitled to recover in his capacity as

Executor of his late wife, in that her death does not abate her IIED claim arising out of

the Embassy Bombing.  *See* § 11-3.2(b), N.Y. Est. Powers & Trusts Law. ("No cause of

action for injury to person or property is lost because of the death of the person in whose

favor the cause of action existed.)  The claim which Helen had during her lifetime is

vested in her personal representative. *Id.*  R. Goldman as the holder of letters of

administration, albeit not from New York has the capacity to assert this claim. See,

*Gregory v. Monroe County Water Authority*, 795 F. Supp. 92, 94-95 (W.D. N.Y. (1992)

(applying New York law).

### E.    Choice Of Law As To The Wrongful Death Claim

The determination of which body of substantive law must be applied to the wrongful death claim asserted in this action requires its own analysis. That analysis and this Court's decision on choice of law inform the Court's decision as to whether it has subject matter jurisdiction over the wrongful death claim. In the post *Cicippio-Puleo* cases, different judges of this Court have applied separate and distinct rationales to this choice of law analysis. *Compare, Holland v. Islamic Republic of Iran,* 496 F. Supp. 2d 1, 24 (D.D.C. 2005) (Kollar Kotelly, J.) (the claims of a decedent's estate "are traditionally governed by the laws of the decedent's domicile") quoting *Dammarell II,* 2005 WL 756090, at *21[8] with *Dammarell IV,* 404 F. Supp. 2d. at 281 [9] (applying Georgia law to the wrongful death claim arising out of the death of decedent Janet Lee Stevens whose immediate family resided in Georgia, and whose estate was probated in Georgia). In *Dammarell IV,* however, Judge Bates did not specifically find or otherwise determine that the decedent's domicile was in fact in Georgia at the time of the fatal terrorist attack. *See,* 404 F. Supp. 2d at 281-82. Instead, the critical focus was on where the statutory beneficiaries, i.e., the immediate family members were domiciled. *Id.* A third approach to this choice of law issue was employed in *Bodoff,* where Judge Lamberth applied the wrongful death statute of the District of Columbia in a situation identical to the one in the instant action, i.e., the decedent there, who was a U.S. citizen, did not have a U.S.

---

[8]    See also *In re Air Crash Disaster,* 948 F. Supp. 747, 758 (N.D. Ill. 1996); *Datskow v. Teledyne Cont'l Motors Aircraft Prods.,* 807 F. Supp. 941, 944 (W.D. N.Y. 1992).

[9]    In *Dammarell IV,* Judge Bates expressly stated that his conclusions of law in that opinion "supersede any contrary conclusion contained in the Court's September 8, 2003 memorandum opinion [*Dammarell I*]" 404 F. Supp. 2d at 274.

domicile at the time of the fatal terrorist bombing and died in Israel. *See*, 424 F. Supp. 2d at 83, 85.

A fourth approach was used in the most recent decision in *Peterson v. Islamic Republic of Iran*, 2007 U.S. Dist. LEXIS 65820 at * 11. There, Judge Lamberth applied North Carolina wrongful death law as to a U.S. serviceman killed in Beirut, who had been born a Philippine citizen, never became a U.S. citizen but had a "closest and most substantial connection" with North Carolina because he had been stationed there last before being sent to Lebanon. Id. at *12.

With the exception of *Bodoff*, each of these prior decisions is distinguishable from the case *subjudice*. The Decedent here, while a United States citizen from birth, does not appear to have ever had a U.S. state domicile immediately prior to his death. Nor did Elisa, the Plaintiff Children and Judith, have such a domicile at the time of Decedent's death. Therefore, either the District of Columbia as the forum state, a la *Bodoff*, or Israel are the two (2) remaining jurisdictions from whose wrongful death laws this Court must choose.[10] This Court does not necessarily have to choose from any of these options, as they ultimately lead to these same results, whether District of Columbia law is applied or the law of Israel, where the Plaintiffs who are the wrongful death beneficiaries are domiciled. Unfortunately, choosing the District of Columbia's law is not entirely free of

---

[10] The third possibility of applying the law of Argentina must be discounted, insofar as an embassy although located outside a country's sovereign territory, can be regarded as a resident of the home country, since it is a part of the home country's State Department or Ministry of Foreign Affairs. *See*, *Gonzalez v. International de Elevadores*, 891 A.2d 227, 236, n.12 (D.C. 2006). Therefore, this Court deems the Israeli embassy in Argentina to have been territory of Israel for purposes of this action.

Another basis for the non-application of Argentinean law would exist, below, the interests of the State of Israel in the protecting of its citizens and their immediate families who serve in its official diplomatic missions outweighs the interests of Argentina as the mere place of the injury and resulting death. This Court so finds based upon the totality of the record evidence.

difficulty, insofar as its Wrongful Death Act is, by its terms, limited to a death producing injury which occurs within the District of Columbia. *See,* D.C. Code § 16-2701(2001) which begins: "When by an injury done or happening within the limits of the District …." (emphasis added).

Although not cited by any of the wrongful death choice of law decisions mentioned above in § 1605(a)(7) terrorism cases, the District of Columbia's choice of law determination as to wrongful death claims where the decedent died outside of the District of Columbia as a result of injuries which were inflicted outside of this forum is controlled by *Lewis v. Reconstruction Fin. Corp.,* 177 F.2d 654, 655-656 (D.C. Cir. 1949). *Lewis* continues to be good law and requires that the law of "the state where the fatal injuries occurred should govern, unless the public policy of the forum is clearly opposed." *Smith v. Hope Village, Inc.,* 481 F. Supp. 2d 172, 205-206 (D.D.C. 2007) (Walton, J.) quoting, *Lewis,* 177 F. 2d at 656. On the strength of *Lewis,* as explained by Judge Walton in *Smith,* where, as here, the fatal injuries were inflicted on the Decedent in Argentina, the substantive wrongful death law of Israel would seem to apply at first blush, unless it contravenes the public policy of the District of Columbia. *See also, Stewart v. Balt. and Ohio Railroad Company,* 168 U.S. 445, 450 (1897).

As in *Smith,* where Maryland's substantive law was applied to fatal injuries inflicted on the decedent in Maryland, here the interests of the District are substantially advanced by the application of Israeli law to the plaintiff's claim. *Smith,* 481 F. Supp 2d at 206. By its terms, the District of Columbia's wrongful death statute applies only to cases where by "an injury happening or done within the limits of the District," the death of a person is caused by the wrongful act, neglect or default of a person or corporation.

*Id.* at 206 quoting D.C. Code. § 16-2701 (emphasis added); *see also*, *Lewis*, 177 F. 2d at 656 ("[t]he District of Columbia] wrongful death statute and the limitations thereof [,] are confined to deaths resulting from injuries suffered within the District of Columbia").  The Supreme Court has construed the District of Columbia's predecessor to § 16-2701, which contained the same limitation to the District, as the place of the injury, in a fashion identical to *Smith*. *See, Stewart* 168 U.S. at 447; *Jones v. Prince George's County*, 202 F.R.D. 39, 40-41 (D.D.C. 2001), aff'd, 348 F. 3d 1014 (D.D.C. 2003).

By its very terms, the District of Columbia's wrongful death statute could not apply to the Plaintiffs' wrongful death claim.  *Stewart*,168 U.S. at 447.  But as the forum state, the District of Columbia has no interest whatsoever in the application of its law in such a way as to frustrate the public policy of either the United States or Israel of attempting to deter terrorism through awards of money damages against designated  state sponsors of terrorism like Iran.  *See, Smith*, 481 F. Supp. 2d at 206.  For these reasons, the wrongful death law of Israel cited below does not impinge upon, let alone controvert, any public policy of this forum.  In reality, the contrary is true, in that both the District of Columbia and Israel have a legitimate interest in compensation for the victims of terrorism, including the statutory beneficiaries of a decedent so as to deter terrorism-sponsoring sovereigns  through the force of appropriate and well deserved monetary judgments for compensatory damages.

Israel has a wrongful death statute ("Israeli Wrongful Death Act") whose terms and underlying compensatory policy and structure are consistent with District of Columbia law and public policy on this issue:

> Where death is caused by a civil wrong and such person would,
> had death not ensued, have been entitled at time of his death to

recover compensation in respect of bodily injury caused to him by
such civil wrong, the husband, wife, parent and child of such
deceased person may recover compensation from person
responsible for such civil wrong.

Martindale-Hubbell International Law Digest, Israel Law Digest, Estates And
Trusts, ISR-9 (Death);[11] see also, § 78 Israel Tort Ordinance (New Version), Plaintiffs'
Exhibit 15.

Where, as here, the foreign law on wrongful death is not inconsistent with or
contrary to the public policy of the District of Columbia, application of the Israeli law, as
a matter of comity is appropriate. *See Stewart*, 168 U.S. at 450. Based upon these
principles, the Court applies Israeli law as giving rise to the wrongful death claims by
reason of the fact that the Decedent was killed in Israel. His statutory wrongful death
beneficiaries under Israeli law are his parents, one of whom Esther is a United States
citizen and a Plaintiff in this action. The measure of damages or the remedial aspects of
the wrongful death claim are discussed hereafter in the Damages portion of the
Conclusions of Law.

### ~~E.~~F.    Jurisdiction Over The Wrongful Death Claim

Under the jurisdictional mandate of § 1605(a)(7), a district court "shall decline to
hear a claim under this paragraph of *inter alia* if "neither the claimant nor the victim was
a national of the United States when the act upon which the claim is based occurred." 28
U.S.C. § 1605(a)(7)(B)(ii) (parenthetical omitted). Here only the victim Decedent was

---

[11] In Beaty v. Republic of Iraq, 480 F. Supp. 2d 60, 91(D.D.C. 2007), Judge Bates recognized that
"even the law of a foreign state" can properly function, as the decisional law under which a
plaintiff's claim may in a § 28 U.C.S. § 1605(a)(7) terrorism case, after Cicippio-Puleo.

not a U.S. national, at the time of the Embassy Bombing. Every single one of the Plaintiffs family members was a U.S. citizen at that time and continues to be so.

Based on this undisputed showing of U.S. citizenship, the Court will consider whether Elisa and the two children of the Decedent~~Defendants~~ are eligible to obtain a wrongful death recovery under Israeli ~~District of Columbia~~ law. The starting point of the Court's analysis focuses on whether the Israel's wrongful death law ~~District of Columbia Wrongful Death~~ Act and to the extent necessary case law under it specifies who the real party in interest is as to any recovery under it~~.~~

~~§ 16-2701 D.C. Code (2001) provides as follows:~~

~~(a) "When, by injury done or happening within the limits of the District, the death of a person is caused by the wrongful act, neglect, or default of a person or corporation, and the act, neglect, or default is such as will, if death does not ensue, entitle the person injured, or if the person injured is married, or domestic partnered, entitle the spouse, or domestic partnered, either separately or by joining with the injured person, to maintain an action and recover damages, the person who or corporation that is liable if death does not ensue is liable to an action for damages for the death, notwithstanding the death of the person injured, even though the death is caused under circumstances that constitute a felony.~~

~~(b) The damages shall be assessed with reference to the injury resulting from the act, neglect, or default causing the death, to the spouse or domestic partner and the next of kin of the deceased person; and shall include the reasonable expenses of last illness and burial. Where there is a surviving spouse, or domestic partner, the jury shall allocate the portion its verdict payable to the spouse or domestic partner and next of kin, respectively, according to the finding of damage to the spouse or domestic partner and next of kin. If, in a particular case, the verdict is deemed excessive, the trial judge or the appellate court, on appeal of the cause, may order a reduction of the verdict. An action may not be maintained pursuant to this chapter if the party injured by the wrongful act, neglect, or default has recovered damages therefor during his life. (emphasis added)~~

Under the express term language of this foreign statute, the real parties in interest or ultimate economic beneficiaries are readily identifiable as Decedent's spouse~~, and~~

parents and children~~"next of kin." "Next of kin" include the Decedent's children. *See Lewis v. Lewis*, 708 A2d 249, 252 n.2. (D.D.C. 1998). The real party in interest status of these named Plaintiffs is further underscored by the jury verdict allocation language emphasized above, quoted language.~~ Clearly, Elisa is a nominal representative party under the statute as the spouse of the Decedent, but the real beneficiaries are Elisa as a widow ~~and~~ the Plaintiff children and Decedent's parents ~~Plaintiff's~~, each of whom is a United States citizen. *See,* Plaintiffs' Exhibit 15, § 79.

In light of this analysis for purposes of § 1605(a)(7)(B)(ii) the wrongful death "claimants" are Elisa the Plaintiffs, Noa and Yonatan and R. Goldman, as parent, as the direct statutory beneficiaries of a wrongful death recovery.~~these statutory beneficiary distributees in every sense of the statutory word "claimant". Nor is this interpretation of § 1605(a)(7)(b)(ii) unprecedented. *See*, *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 108 (D.D.C. 2000) (J.H. Green, J.) (The claimant who was awarded judgment, Darwish Elahi was a U.S. citizen and next of kin and personal representative of his murdered non-U.S. citizen brother).~~[12] In short, because the ultimate claimants are U.S. citizens, the wrongful death claim is within ~~the~~ original FSIA subject matter jurisdiction of this Court.

As an alternative basis to the real party in interest analysis , Elisa in her capacity as Executor of Decedent's estate asserts that this Court may exercise subject matter

---

[12] To the extent that *Oveissi* 498 F. Supp. 2d at 277-79 suggests otherwise it is clearly distinguishable from the facts of this case. In *Oveissi*, the Plaintiff was not a next to kin of the deceased non-U.S.citizen. He was a grandchild whose father was still alive. *See, id.* at 272. It is axiomatic that he would not be the "next of kin" when the Decedent had a living son. In addition to being factually distinguishable from this case, in *Oveissi* supplemental jurisdiction under 28 U.S. C. §1367 was apparently never raised and therefore not addressed by Judge Lamberth, as a basis for federal subject matter jurisdiction. He~~re~~nce, such basis exists, as an alternative to the statutory interpretation discussed above which is supported by *Elahi*.

jurisdiction over the wrongful death claim on the basis of supplemental jurisdiction, pursuant to 28 U.S.C. § 1367.  The Court undertakes to determine whether this alternative basis of jurisdiction is available here.

Preliminarily, the Court notes that the issue of whether § 1367 is available to a citizen spouse, child, parent or sibling of a non-U.S. citizen victim of ~~state sponsored~~ terrorism so as to confer jurisdiction over a claim which is derivative through the non-citizen victim is ~~a matter of first impression since the enactment  of § 1605(a)(7).  It is~~ no longer a~~also a somewhat unsettled~~ question of first impression under the ~~entire~~ FSIA scheme of waiver of sovereign immunity, as observed by a leading commentator on the FSIA. [13] *See, e.g., Jungquist v. Nahyan* 940 F. Supp. 2d 312, 320-21 (D.D.C. 1996) rev'd in part on other. grounds, 115 F.3d 1020 (D.C. Cir. 1997) (exercising pendent claim jurisdiction under § 1367 over the related state law claims in FSIA "commercial activity" exception case); *Burnett v. Al Baraka Inv. & Dev. Corp.,* 274 F. Supp. 2d 86, 98 (D.D.C. 2003), dismissed, 292 F. Supp. 2d 9 (D.D.C. 2003) (applying supplemental jurisdiction statute to the pendent claims of Plaintiffs whose terrorism claims were not within the original jurisdiction of the District Court); *Biton v. Palestinian Interim Self-Governing Authority,* 310 F. Supp. 2d 172, 183 (D.D.C. 2004) (exercising pendent party supplemental jurisdiction on behalf of non U.S. national Plaintiffs and citing *Al Baraka*); *Colgan v. Port Authority of New York and New Jersey,* 1991 WL 180384 (E.D.N.Y. Aug. 14, 1991) (Supp. § 1367 held to be sufficiently broad to extend to entire action in which a "foreign state" is a defendant, rather than only as to claims against the "foreign state").  ~~See, Dellapenna~~ Section 1367 (b) provides that.:

---

[13] *See,* Dellapenna Suing Foreign Governments And Their Corporations § 3.6 p. 145.

> " in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution" *Id.*

~~Suing Foreign Governments And Their Corporations § 3.6 p. 145.~~ [14] ~~Section 1367(b)~~

~~provides that:~~

> ~~" in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution" Id. (emphasis added).~~

Section 1367 "contains the doctrine of pendent jurisdiction and ancillary jurisdiction under a common heading of supplemental jurisdiction." *See City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 165 (1997). Claims within its scope are deemed part of the "same case or controversy" if they "derive from a common nucleus of operative fact." *Id.* at 165 (quoting *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

In order to exercise supplemental jurisdiction under § 1367 (a), a district court must first determine that it has original jurisdiction over the civil action within the meaning of § 1367 (a); in other words, it must have original jurisdiction over at least one claim in the complaint. *See Exxon Mobil Corp. v. Allapattah Services, Inc.* 545 U.S. 546 (2005).

The application of these principles to the facts of this case leads this Court to conclude that it may exercise ancillary jurisdiction pursuant to § 1367 over the wrongful

---

[14] Judge Lamberth's recent decision in *Oveissi* does not decide this issue, as it was apparently not raised by the Plaintiff.

death claim and any other claim derivative through the Decedent. It is beyond any

serious dispute that this Court has original jurisdiction by virtue of 28 U.S.C.

§ 1605(a)(7) over at least one tort claim of each Plaintiff, i.e., intentional infliction of

emotional distress, which has been discussed previously. Such claim is vested in each

Plaintiff, in their own right as an immediate family member of the Decedent. The

existence of this baseline claim establishes the foundation for the exercise of

supplemental jurisdiction by this Court over any other claims asserted by any of the other

Plaintiffs which "derive from a common nucleus of operative fact." See *City of Chicago*,

522 U.S. at 165. There is only a single and hence common nucleus of operative fact

giving rise not only to Plaintiff's claims in their own right but also to those derivative

through the Decedent, i.e., the Embassy Bombing and its facilitation through the material

assistance provided by the Defendants to the Hezbollah perpetrators. In short, the

operative nexus between the Decedent's direct claims and those of his family members in

their own right could not be stronger. It is this identical nucleus which underlies both

sets of claims. *See, e.g., Biton*, 310 F. Supp. 2d at 183; *Al Baraka* 274 F. Supp. 2d at 98.

Most significantly, as already pointed out here, the ultimate beneficiaries or real parties in

interest with respect to the wrongful death claims are Elisa and the Decedent's children.

Each beneficiary is a U.S. citizen. Therefore, under the particular circumstances

"presented" here, where the exercise of supplemental jurisdiction is for the singular

benefit of statutory wrongful death beneficiaries who are U.S. citizens such exercise is

most appropriate, as it also clearly advances the Congressional policy underlying

§ 1605(a)(7) i.e., to open the doors of federal courts to aggrieved U.S. citizen, victims of

terrorism, most notably widows and orphans. Hence, this Court will exercise

supplemental jurisdiction over the wrongful death claim made under the Israeli Wrongful Death Act~~District of Columbia statute~~.

### ~~A.~~ ~~**Merits of the Wrongful Death Claim**~~

~~Elisa asserts that the Defendants are also vicariously liable for the wrongful death of the Decedent. The District of Columbia's wrongful death statute gives rise to a claim when the death of a person is caused by the wrongful act of a defendant. D.C. Code § 16-2701 (2001). A personal representative is permitted to recover "damages measured as the economic loss caused by the death of a person wrongfully killed." *Bodoff*, 424 F. Supp.2d at 85 quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n. 11 (D.D.C. 2001) (Jackson, J.). (the District of Columbia wrongful death statute was applied). The ultimate beneficiaries of a wrongful death recovery under District of Columbia law are the widowed spouse and "next of kin" which includes biological children.~~

~~The Defendants are liable to Elisa as Executor for the wrongful death of the Decedent in that they engaged in the wrongful acts of conspiring with and providing material support to Hezbollah in furtherance of terrorist activities which proximately caused the Embassy Bombing and the extrajudicial killing of the Decedent.~~

### ~~F.~~G.   **Damages**

Tragically, since the enactment of § 1605(a)(7), this District has been the venue of for numerous actions including the survivors of U.S. and non-U.S. nationals killed in heinous terrorist attacks ranging from suicide bombings, involving civilians, the bombings of United States embassies in Tanzania, Kenya and Lebanon, the vehicular

bombings of U.S. military facilities in Lebanon and Saudi Arabia, to U.S. servicemen
and civilians killed during the course of the hijacking of an airplane.  The Embassy
Bombing here is only the latest in this gruesome saga of devastated or significantly
damaged lives of victims of international terrorism.  Every Plaintiff here is a United
States citizen for whose protection Congress enacted § 1605(a)(7) by vesting United
States courts with subject matter jurisdiction over claims brought by such aggrieved
United Stated citizens.

  Due to the multiplicity of such cases in this District, this Court is by no means
writing on a proverbial "clean slate" in fashioning a damages remedy for each Plaintiff.
To the contrary, this Court is guided by remedial approaches and formulas , utilized in
similar cases.  *See, e.g. Bodoff,* 424 F. Supp. 2d at 86-88 (awarding IIED damages
$2,500.000.00 to each sibling of a suicide bombing fatality and $5,000.000.00 to each
surviving parent); *Eisenfeld v. Islamic Republic of Iran* 172 F. Supp. 2d 1, 8 (D.D.C.
2000) (Lamberth, J.). (same suicide bus bombing as in *Bodoff* resulted in the same
$2,500.000.00 per sibling award and $5,000.000.00 for each parent); *Surette v. Islamic
Republic of Iran,* 231 F. Supp. 2d 260, 270-71 (D.D.C. 2002) (Friedman, J.) ($10 million
awarded as damages to a common-law-wife); *Greenbaum v. IslamicIslamic Republic of
Iran,* 451 F. Supp. 2d 90, 107-09 (D.D.C. 2006) (Lamberth, J.) (surviving spouse
awarded $9,000.000.00 in his personal capacity); *Kerr v. Islamic Republic of Iran,* 245
F. Supp. 2d 59, 64 (D.D.C. 2003) (Jackson J.) (award of $10 million to the widow of a
torture and hostage taking victim); *Salazar v. Islamic Republic of Iran,* 370 F. Supp 2d
105, 116 (D.D.C. 2005)(Bates, J.) ($10 million awarded to the widow of a bombing
victim).

As to the minor children of a victim killed in a terrorist attack, awards have typically been $5 million per child. *See e.g. Peterson,* 2007 U.S. Dist. LEXIS 65820 at 45; *Heiser,* 466 F. Supp. 2d at 271-356 (award of $5 million per plaintiff for a child and parent of a decedent).

### A.1.    Individual IIED Damage Awards

Based upon the wealth of cases involving immediate family members of civilians and service personnel killed in terrorist attacks, this Court awards IIED damages of $2.5 million to each of the two siblings of the Decedent, Naomi and Judith, and 10 million to Elisa, $5 million to Ralph Goldman in his individual personal capacity as the father of the Decedent.  In his capacity as Executor of the late Helen Goldman's estate, in addition, this Court awards Ralph Goldman and identical sum of $5 million dollars. Plaintiffs Noa and Yonatan Ben-Rafael are each awarded $5 million dollars, as IIED damages caused by the trauma of their father's death. , $5 million in his representative on behalf of Helen's estate, $5 million to each of the Decedent's children and $2.5 each to Naomi and Judith.

### B.2.    Wrongful Death Damages Award

Israel's Supreme Court held in *Estate of the late Michael Ettinger,* CC 4/95 (decided on March 15, 2004) ("Ettinger")that in an Israeli wrongful death action, the estate is entitled to compensatory damages for the loss of the Decedent's earning capacity in the "lost years" which his death caused.   A copy of Ettinger is attached to the Amended Record Index as Exhibit 16.  Here, Plaintiffs have submitted a report from forensic expert Dov Weinstein ("Weinstein Report").  The Weinstein Report bases its

calculations on reasonable and well founded assumptions about the likely government and post-government service career track of the Decedent had he survived. *Id.*, Exhibit 10. It utilizes the legally required present value calculation of Decedent's anticipated future earnings. Accordingly, based upon this forensic evidence, judgment for so-called "loss of accretions" to Decedent's estate is awarded in the sum of $3,731,839, in the name of Elisa, as Executor.

~~Under the District of Columbia Wrongful Death Act, the allowed recovery is based on pecuniary damages which "might reasonably be expected to have received from the deceased had he lived." *Lewis*, 708 A2d at 251-252; *see also*, *Wagner*, 172 F. Supp. 2d at 135 n. 11 Here, Plaintiff's have submitted a report from forensic expert Dov Weinstein ("Weinstein Report"). The Weinstein Report bases its calculations on reasonable and well founded assumptions about the diplomatic career track of the Decedent had he survived. Id. p_____ 2. It also makes conservative assumptions about the post-retirement from government service earnings capacity of the Decedent as a highly educated and experienced professional whose nature language was English. See, id., p _____. Accordingly, based upon this forensic evidence, judgment for so-called "loss of accretions" to the Decedent's estate are $_____, allocable $_____, to Elisa and the remainder to be divided equally among the two Plaintiffs Yonatan and Noa Ben-Rafael.~~

Decedent's untimely death also gives rise to an additional element of compensatory damages under Israeli law. This element of damage is referenced to in *Ettinger* as "non-pecuniary loss for personal injury." *Id.* Exhibit, 16 p. 43. It compensates two (2) items "pain and suffering and reduction of life expectancy or loss of

life expectancy." *Id.* The non-pecuniary loss of loss life expectancy damage element is separate and distinct from the economic damages in the form of "lost accretions" awardable by reason of the loss of earnings capacity during the lost years." *See, id,* p. 5-45. The measurement of the former is by no means formulaic. The *Ettinger* court opined "that this head of damage will not to be determined by weights and measures of logic but by morality and emotions since no money is equal to the loss of life nor will it compensate for deprivation of the pleasures of life." *Id* at 45. Thus, the discretion to fix the amount of such award lies with the trier of facts. It is therefore not unreasonable to place a value of $5 million dollars on the reduction of life expectancy of the Decedent. This claim belongs to the Decedent's estate. *See* Ettinger, ¶ 52, p.30. [15]

For all of these reasons an in addition to the economic pecuniary loss of $3,731,839.00 calculated by Dov Weinstein, Elisa as the Executor of Decedent's estate is awarded an additional sum of $5,000,000.00 for a total of $8,731,839.00.

### ~~C.Punitive Damages~~

~~Punitive damages are no longer awardable against Iran and MOSI by virtue of 28 U.S.C. § 1606.~~

### ~~C.3.~~   Punitive Damages

Punitive damages are no longer awardable against Iran and MOIS by virtue of 28 U.S.C. § 1606. *See, e.g., Bodoff,* 424 F. Supp. 2d at 88, n.5.; *Prevatt,* 421 F. Supp. 2d at 162; *Salazar,* 370 F. Supp. 2d at 116; *Campuzano,* 281 F. Supp. 2d at 277; *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 200-202 (D.D.C. 2003) ("Dammarell I").

---

[15] In *Ettinger,* the Supreme Court of Israel expressly discussed how the rights of action of the deceased injured person against the tortfeasor - both for pecuniary loss and for non-pecuniary loss - 'survive' his death and pass to his estate." Id ¶ 52, p. 30.

### ~~D.4.~~    **Prejudgment Interest**

It is axiomatic that when a complaint filed after Ciccipio-Puleo~~Ciccippio Publeo~~ presents state law causes of action, the issue of whether any Plaintiff may recover prejudgment interest is one of state law. *Compare, Ungar, Ex. Rel Strachman v. Palestinian Authority,* 304 F. Supp. 2d 232, 237-240 (D.R.I. 2004) (prejudgment interest disallowed as to federal law as to federal claims brought under the Anti-Terrorism Act of 1990 which provides for treble damages). Under District of Columbia law, the decision whether to award prejudgment interest even in cases where there is no underlying contractual relationship rests in the discretion of the trial court. *See e.g., House of Wines, Inc. v. Sumter* 510 A2d 492, 499 (D.C. 1986); *Blake Const. Co., Inc. v. C.J. Coakley Co., Inc.* 431 A2d 569, 580 (D.C.1981). The rate of interest and date from which it runs are also within the sound discretion of the trial court. *Id.* The allowance of prejudgment interest is compensatory in nature. *See Suiter v. Mitchell Motor Coach Sales Inc.* 151 F3d 1275, 1289 (10th Cir. 1998). It this goal by compensating a plaintiff "for being deprived of the monetary value of his [or her] loss from the time of the loss  to the payment of [the] judgment." *Id.* at 1288; *see also Paper Converting Mach. Co. v. Magna Graphics Corp.* 745 F 2d 11, 23   (Fed. Cir. 1984). In *Ostenreck v. Ernst & Whinney,* 489 U.S. 169, (1989) the Supreme Court opined that prejudgment interest has been traditionally considered part of the compensatory award to the Plaintiff. *Id.* at 175. District of Columbia law also clearly  affords the trier of facts the ability to award prejudgment interest where it is necessary to compensate the Plaintiff. -*House of Wines*, 510 A2d at 499.

An award of prejudgment interest is also appropriate where, as here, punitive damages are as a mater of law unavailable to Plaintiff. Nor are the Plaintiffs here, entitled to any treble or multiple damages. *Compare Ungar* 304 F. Supp. 2d at 239-40. Unlike punitive damages and treble damages which are intended to punish and thus deter, prejudgment interest is purely compensatory in nature. Moreover, the non-availability of punitive and multiple damages to the Plaintiffs eliminates the situation presented in *Ungar* where superimposing prejudgment interest, in light of the statutory treble damages, would have overcompensated plaintiffs there to the point of giving them an underserved windfall. No such situation exists here. Indeed, here an award of prejudgment interest is necessary to compensate Plaintiffs, as the following discussion will point out.

The application of these principles convinces the Court to exercise its discretion to award prejudgment interest on the IIED claims computed on a simple interest basis at a percentage rate of 6% per annum which is eminently reasonable. *See, Blake Construction*, 431 A2d at 580. The rationale for compensating all of the Plaintiffs here is compelling in that (i) almost sixteen (16) years will have elapsed from the time of the fatal Embassy Bombing through the date this Court renders final judgment (ii) Plaintiffs' purchasing power had they been compensated in 1992 with 1992 dollars would have been significantly greater than their much diminished purchasing power using the cheaper dollars as of the date of judgment, let alone further diminution or devaluation by the time a final judgment satisfied in whole or in part. This significant economic erosion most notably for the widow and children of the Decedent, who depended upon his support through his considerable earning capacity can only be adequately redressed by an award

of prejudgment interest. Hence, such award truly serves the goal of adequate compensation for a family left without its bread winner.

Whether the IIED claims of R. Goldman and Naomi which this Court decided under New York law are appropriate for a damages award which includes prejudgment interest is a matter of substantive New York law. *See, e.g., Schwimmer v. Allstate Ins. Co.,* 176 F.3d 648 (2d Cir. 1999); *Aniero Concrete Company, Inc. v. Aetna Casual & Surety Co.,* 301 F. Supp. 2d 302 (S.D. N.Y. 2004). Like District of Columbia law, New York applicable prejudgment interest law is compensatory in purpose as opposed to being punitive in nature. *See, U.S. v. Seaboard Surety Co.,* 817 F.2d 956, (2d Cir. 1987), cert. denied, 484 U.S. 855 1987. A trial court has broad discretion under New York law to determine whether an award of prejudgment interest is appropriate and if so, to set the appropriate rate. *Endico Potatoes v. CIT Group Factoring, Inc.,* 67 F.3d 1063 (2d. Cir. 1995). Consistent with what District of Columbia law provides, prejudgment interest may be awarded on a tort claim including an IIED award. *See, e.g., Quintel Corp. N.V. v. Citibank,* 606 F. Supp. 898 (S.D.N.Y. 1985) (award of prejudgment interest allowed on legal malpractice judgment); *Orshan v. Macchiarola,* 629 F. Supp. 1014 (E.D. N.Y. 1986) (prejudgment interest awarded in connection with IIED jury verdict).

For all of these reasons, this Court shall award prejudgment interest on or at 6% per annum on the IIED claims under New York law.

## E.5.    Other Causes Of Action Asserted In The Complaint

In light of these Findings of Fact And Conclusions of Law, it is not necessary for the Court to address the other causes of action asserted by the Plaintiffs under Israeli law

and under customary international law.  ~~As to the claims under the New York and District of Columbia survival statutes, no evidence of record has been presented to date as to any conscious pain or suffering endured by the Decedent before he died.  Accordingly, no award for survival action damages is made.~~

**F.**   **Conclusion**

A judgment in accordance with these findings and conclusions shall issue this date of _____, 2007.

_____
Ellen Segal Huvelle,
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELISA NILI CIRILO PERES BEN-RAFAEL, et al.,** | |
| Plaintiffs, | |
| v. | **Case No. 1:06-CV-00721 (ESH)** |
| **ISLAMIC REPUBLIC OF IRAN, *et al.*,** | |
| Defendants. | |

## AMENDED RECORD INDEX

| DOCUMENTS<br>AFFIDAVIT, REPORT OR CERTIFICATES | EXHIBIT NUMBER |
|---|---|
| 1.  Affidavit of Dr. Patrick Clawson (Terrorism Expert) | 1 |
| 2.  Affidavit of Plaintiff Ralph Goldman | 2 |
| 3.  Affidavit of Plaintiff Elisa Ben-Rafael | 3 |
| 4.  Affidavit of Plaintiff Judith Baumgold | 4 |
| 5.  Affidavit of Plaintiff Yonatan Ben-Rafael | 5 |
| 6.  Affidavit of Plaintiff Noa Ben Rafael | 6 |
| 7. Biographical Certificates (Documents Pertaining to Decedent David Ben Rafael)<br> ▪ David Ben-Rafael's University Degree in Law from the Hebrew University in Jerusalem<br> ▪ Death Certificate for David Ben-Rafael | 7 |
| 8.  Hospital records of the late Helen Goldman | 8 |
| 9.  Biographical Certificates (Documents Pertaining to Elisa Ben-Rafael)<br><br> ▪ U.S. Passport for Elisa Ben-Rafael<br> ▪ Marriage License for David Ben-Rafael and Isabel Cirilo-Peres<br> ▪ Marriage License showing the certified section of the document<br> ▪ Letter from Israel Ministry of Foreign Affairs regarding the | 9 |

| DOCUMENTS<br>**AFFIDAVIT, REPORT OR CERTIFICATES** | **EXHIBIT<br>NUMBER** |
|---|---|
| U.S. passports of Elisa, Noa and Yonatan Ben-Rafael | |
| 10. Forensic Expert Report of Dov Weinstein (New Exhibit~~To Be Supplied~~) | 10 |
| 11. Translated Law Degree/Diploma of The Decedent (New Exhibit) | 11 |
| 12. Translated Death Certificate of The Decedent (New Exhibit) | 12 |
| 13. Translated Probate Order of the Israeli Court Regarding Decedent's Estate (New Exhibit) | 13 |
| 14. The Last Will and Testament of The Decedent (New Exhibit) | 14 |
| 15. The Relevant Portions of Israel's New Tort Ordinance (New Exhibit | 15 |
| 16. The Israeli Supreme Court's Opinion in the Matter of M. Ettinger (New Exhibit) | 16 |
| 17. Translated Probate Order of the Israeli Court Regarding Helen Goldman's Estate (New Exhibit) | 17 |
| 18. Translated and Original Versions of Helen Goldman's Last Will and Testament (New Exhibit) | 18 |
| 19. | |
| 20. | |