## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
|  | ) |
**ELISA NILI CIRILO PERES** | ) |
**BEN-RAFAEL,** *et al.*, | ) |
 | ) |
    **Plaintiffs,** | ) |
 | ) |
    **v.** | ) | **Civil Action No. 06-00721 (ESH)**
 | ) |
**ISLAMIC REPUBLIC OF IRAN,** *et al.*, | ) |
 | ) |
    **Defendants.** | ) |
———————————————————— )

### MEMORANDUM OPINION

On March 17, 1992,[1] a suicide bomber drove a truck filled with explosives into the Israeli embassy in Buenos Aires, Argentina, killing twenty-nine people and wounding over two hundred. Hezbollah[2] publicly accepted responsibility for the bombing. This action has been brought by the estate of one of the bombing's victims, David Ben-Rafael, and his immediate family members. Plaintiffs contend that Hezbollah's attack depended on material support from defendants the Islamic Republic of Iran ("Iran") and the Ministry of Information and Security of Iran ("MOIS"). Plaintiffs allege that this material support constituted a waiver of defendants' sovereign immunity under the "state sponsor of terrorism" exception to the Foreign Sovereign Immunity Act of 1976 (the "FSIA"), 28 U.S.C. § 1605(a)(7). Plaintiffs further argue that defendants, having been stripped of immunity, are vicariously liable for intentional infliction of

---

[1] Many of plaintiffs' documents contain the erroneous date of May 19, 1992. Plaintiffs have, however, sent a letter to the Court on January 22, 2008, clarifying that the correct date is March 17, 1992.

[2] This organization's name has several alternate spellings, including "Hizbollah" and "Hizballah."

emotional distress and wrongful death.

Plaintiffs initiated this action on April 21, 2006, and effected service on April 22, 2007, in accordance with 28 U.S.C. § 1608(a)(4). Defendants failed to respond, and the Clerk of Court entered a default judgment on July 6, 2007. The Court is nevertheless obliged to inquire further to determine if plaintiffs have established their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). In evaluating plaintiffs' claims, the Court "may accept [their] uncontroverted evidence as true and may rely on sworn affidavits." *Oveissi v. Islamic Republic of Iran*, 498 F.Supp. 2d 268, 272 (D.D.C. 2007) (internal citations omitted). The Court is not required to hold an evidentiary hearing. *See, e.g.*, *Bodoff v. Islamic Republic of Iran*, 424 F.Supp. 2d 74, 78 (D.D.C. 2006) (entering a default judgment based upon plaintiffs' submissions without an evidentiary hearing). And, it "may take judicial notice of related proceedings and records in cases before the same court." *Oveissi*, 498 F.Supp. 2d at 272 (internal citations omitted). Having considered the extensive record herein, as well as the findings of others in this district in related cases involving these same defendants, this Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. Historical Background

The 1979 revolution brought a theocratic ideology to Iran, and a chief goal of the new government was to establish itself as the "global leader of radical Islam." (Clawson Aff. ¶ 16.)[3]

---

[3]Patrick L. Clawson, Ph.D., is the Deputy Director for Research at the Washington Institute for Near East Policy. (Clawson Aff. ¶ 3.) Over the past twenty-five years he has advised the Central Intelligence Agency, National Security Agency, Department of Defense, and State Department on Iranian issues. (*Id*. ¶ 3.) He has given live or written testimony in at least ten prior cases before this Court. (*Id*. ¶ 10.) *See, e.g.*, *Valore v. Islamic Republic of Iran*, 478

One of the ways that Iran has pursued this goal is by opposing Israel, "whose very existence Iranian leaders found abhorrent as an insult to Islam." (*Id*.) In this vein, Iran reached out to like-minded members of Lebanon's Shiite community, who have long-standing historical and cultural ties to Iran, and encouraged them to form what became known as Hezbollah. (*Id*. ¶¶ 17, 19.) Iran played a "pre-eminent role in the creation of Hezbollah" by providing "political, material, and financial assistance," including the funding of Hezbollah since the mid-1980's, in annual amounts ranging from $25 million to $100 million.[4] (*Id*. ¶ 19.)

Iran exercised control over Hezbollah through its intelligence agency – MOIS. (*Id*. ¶¶ 28-29.) MOIS has 30,000 employees, making it the largest intelligence agency in the Middle East. (*Id*. ¶ 24.) MOIS has served as a conduit between Iran and Hezbollah since the 1980's by providing funds, technical expertise, and instructions from Iran to Hezbollah. (*Id*. ¶¶ 28-29.) In return, Hezbollah conducted terrorist acts around the world on Iran's behalf. (*Id*.)

The symbiotic relationship between Iran and Hezbollah has been thoroughly documented by several judges in this district. For instance, in *Dammarell v. Islamic Republic of Iran* ("*Dammarell I*"), 281 F.Supp. 2d 105 (D.D.C. 2003), Judge Bates examined claims against these

---

F.Supp. 2d 101, 105 (D.D.C. 2007) (finding that Dr. Clawson is a "renowned expert on Iranian affairs"); *Heiser v. Islamic Republic of Iran*, 466 F.Supp. 2d 229, 253 (D.D.C. 2006) (noting that "Dr. Patrick Clawson testified as an expert in three areas: (1) the government of Iran; (2) Iran's sponsorship of terrorism; and (3) the Iranian economy"); *Peterson v. Islamic Republic of Iran* ("*Peterson I*"), 264 F.Supp. 2d 46, 51 (D.D.C. 2003) (describing Dr. Clawson as "a widely-renowned expert on Iranian affairs over the past 25 years"). Therefore, the Court finds that Dr. Clawson is qualified as an expert on Iran's relationship with Hezbollah, and it has relied on his affidavit in reaching its findings as to jurisdiction and liability.

[4] For a fuller discussion of the formation of Hezbollah and its relationship to Iran and MOIS, *see* Judge Colleen Kollar-Kotelly's helpful analysis in *Holland v. Islamic Republic of Iran*, 496 F.Supp. 2d 1, 6-12 (D.D.C. 2005), and that of Judge Lamberth in *Oveissi*, 498 F.Supp. 2d at 273-74.

same defendants stemming from the April 18, 1983 bombing of the U.S. embassy in Beirut, Lebanon.  Also relying on testimony by Dr. Clawson, the Court found that Iran provided Hezbollah with "military arms, training, and other supplies."  *Id*. at 110.  The Court noted that "[Hezbollah] accomplished its terrorist acts not just with the support of the Iranian government generally, but with the specific assistance of MOIS."  *Id*.  In particular, Hezbollah was dependent upon Iran for financial support and political guidance at the time of this bombing.  *See id*. at 111. In fact, "Iran was quite directly ordering what targets to do, what not to do."  *Id*.  The Court therefore ruled that the evidence "leaves no doubt that Iran and MOIS are responsible for the bombing."  *Id.* at 192.

Just a few months after the 1983 bombing of the U.S. embassy in Beirut, Hezbollah also attacked a military installation in Beirut, killing 241 American serviceman.   In *Peterson I*, Judge Lamberth found that, during the period of the attack, Hezbollah was "essentially a tool of Iran." *Id*. at 51.  Hezbollah had no other major means of support.  *See id*.  According to a Defense Department consultant, who testified in March 2003, Iran "invented, created, funded, trained, and *runs to this day* Hezbollah, which is arguably the world's most dangerous terrorist organization."  *Id.* n.8 (emphasis added) Concluding that defendants were responsible for the attack, the Court found:

> [I]t is beyond question that Hezbollah and its agents received massive material and technical support from the Iranian government. . . . [I]t is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran.

*Id*. at 58.

Less than four months after the attack on the military barracks, a group called "Islamic

4

Jihad" claimed responsibility for an assassination in Paris.  *See Oveissi*, 498 F.Supp. 2d at 274.

An expert testified that Hezbollah uses the alias "Islamic Jihad" when committing terrorist acts

outside the Middle East.  *See id.* at 273; *see also Dammarell v. Islamic Republic of Iran*

("*Dammarell III*"), 404 F.Supp. 2d 261, 271-72 (D.D.C. 2005) ("The terrorist group Islamic

Jihad has been known by various names . . . [but] perhaps most commonly [as] Hizbollah.")

Again, Judge Lamberth concluded that the Paris assassins were "controlled by defendant Iran

through defendant MOIS."  *Oveissi*, 498 F.Supp. 2d. at 274.

　　　While these attacks occurred in the 1980's, defendants have also been found to be

responsible for Hezbollah's more recent terrorist acts.  For example, on June 25, 1996,

defendants orchestrated the bombing of a residential complex in Saudi Arabia, killing nineteen

U.S. Air Force personnel.  *See Heiser*, 466 F.Supp. 2d at 252.  After a "massive" investigation

involving over 250 agents, the FBI determined that "senior officials in the Iranian government

provided [Hezbollah] with funding, planning, training, sponsorship, and travel necessary to carry

out the attack."  *Id*. at 252-53.

　　　Defendants' sponsorship of Hezbollah has also been found to extend to at least 2002.  In

*Sisso v. Islamic Republic of Iran* ("*Sisso II*"), No. 05-CV-0394, 2007 WL 2007582, at **1-4

(D.D.C. July 5, 2007), Judge Bates examined defendants' role in a September 2002 bus bombing

in Tel Aviv.  While defendants employed Hamas in this bombing rather than Hezbollah, the

Court made findings regarding the latter.  It determined that, "[b]eginning in 1993, Iran has

funded training camps operated in Lebanon by Hizbollah, a terrorist organization controlled and

funded by Iran."  *Id*. at *5.  The Court also found that during 2002, "Iran provided Lebanese

Hizballah . . . with funding, safehaven, training, and weapons.  Tehran also encouraged

Hizballah and the Palestinian rejectionist groups to coordinate their planning and to escalate their terrorist activities against Israel." *Id*. at *6.

## II. The 1992 Bombing of the Israeli Embassy in Buenos Aires, Argentina

On March 17, 1992, a suicide bomber drove a pickup truck loaded with explosives into the front of the Israeli embassy in Buenos Aires, Argentina. (Clawson Aff. ¶ 32.) The embassy was under repair at the time. (*Id*.) The ensuing explosion destroyed the embassy and several nearby buildings, including a church and a school. (*Id*.) The bomb killed 29 people and injured 242; many of the victims were children. (*Id*.)

Islamic Jihad publicly claimed responsibility for the bombing. (Clawson Aff. ¶ 33.) As stated above, Hezbollah sometimes uses the alias "Islamic Jihad" when conducting terrorist activities outside the Middle East. *See* U.S. DEPT. OF STATE, PATTERNS OF GLOBAL TERRORISM 1 (1992) (hereinafter "PATTERNS OF GLOBAL TERRORISM") (noting that Islamic Jihad is a "covername for Hizballah"); *see also Oveissi*, 498 F.Supp. 2d at 273 n.3.

The initial investigation into the embassy attack was hampered by controversy. There are indications that corruption or anti-Semitism may explain why the initial investigation stalled.[5] It also appears that this attack was soon to be overshadowed by the 1994 bombing of the Asociación Mutual Israelita Argentina ("AMIA"), a Jewish community center in Buenos Aires. Eighty-five people were killed in this attack. (Clawson Aff. ¶ 36.) The community center was

---

[5]*See, e.g.*, Larry Rohter, *Iran Blew Up Jewish Center in Argentina, Defector Says*, N.Y. Times, July 22, 2002 (discussing allegation that Argentina's president, Carlos Menem, accepted a $10 million bribe from Iran); *see also* Clawson Aff. ¶ 40 (discussing allegation that important Argentine police officials leading the investigation were anti-Semitic).

undergoing repairs at the time of the bombing, just as the embassy had been two years earlier.[6]

Unfortunately, the AMIA investigation also stalled because of accusations of corruption.[7]

However, President Nestor Kirchner re-opened the AMIA investigation in 2003, bringing

in investigators who were untainted by the previous charges of corruption. (*Id.* ¶ 37.) The new

investigative team developed a highly detailed report, consisting of thousands of pages, that

explained how Iran had directed Hezbollah to bomb the community center. (*Id.*) A footnote to

this report confirmed that Iran and Hezbollah were also responsible for the 1992 bombing of the

Israeli embassy. (*Id.*) Prosecutors formally charged Iran for the AMIA bombing in October

2006. (*Id.*)

## III. Defendants' Role in the 1992 Embassy Bombing

There are two steps in establishing that defendants were responsible for the 1992

embassy bombing. First, the Court must determine that Hezbollah carried out the bombing.

Second, the Court must find that defendants provided material support to Hezbollah, and that this

support contributed to the terrorist act that resulted in Mr. Ben-Rafael's death.

There is overwhelming evidence that Hezbollah carried out the attack. First, Islamic

Jihad publicly claimed responsibility for the bombing. (Clawson Aff. ¶ 33.) Both the State

Department and this Court have concluded that "Islamic Jihad" is merely an alias for Hezbollah.

*See Oveissi*, 498 F.Supp. 2d at 273 (expert testified that "members of Hezbollah, under the

---

[6]*See* Rohter, *supra* note 5.

[7]*See* Rohter, *supra* note 5 (reporting that the judge overseeing the AMIA investigation
was filmed discussing a $400,000 payment to a car thief who was jailed shortly after the attack);
*see also* Clawson Aff. ¶ 36 (noting that this judge was removed from the case in 2003 and
removed from office altogether in 2005 because of his mishandling of the AMIA investigation).

direction of MOIS, engaged in terrorist activities outside the Middle East using the nom-de-guerre 'Islamic Jihad'").[8]  Second, as discussed above, Argentine authorities have attributed the bombing to Hezbollah.  Third, the embassy bombing was remarkably similar to the subsequent attack on the Jewish community center, for which Hezbollah has been formally charged.  In both attacks, "a car bomb was used, the targeted building was undergoing repairs and police officers on a security detail inexplicably vanished just before the explosion."[9]  Fourth, Hezbollah had a strong motive for attacking the Israeli embassy.  Just one month before the bombing, Israel had killed Hezbollah's secretary general.  (Clawson Aff. ¶ 30.)

Having concluded that Hezbollah carried out the bombing, the Court moves on to the more challenging question of defendants' connection to this specific attack.  There are several compelling reasons to credit Dr. Clawson's expert opinion that defendants were complicit in the bombing.  (Clawson Aff. ¶¶ 39-40)  First, the State Department has reported that defendants were most likely behind the attack.  *See* PATTERNS OF GLOBAL TERRORISM 1 ("There is mounting evidence of Iranian Government responsibility for this act of terrorism.")  Second, during the period leading up to the bombing, Iran hosted meetings with Hezbollah for "the stated goal of coordinating efforts against Israel and bringing the Arab-Israeli peace process to a halt." *Id.* at 21.  Third, Argentine authorities determined that Iran and Hezbollah were jointly responsible for the attack on the Israeli embassy.  (Clawson Aff. ¶ 37.)  And fourth, defendants' role in other similar terrorist acts is highly probative of their involvement in this bombing.  *See*

---

[8]Some initially questioned the authenticity of Hezbollah's admission.  In response, Hezbollah released a videotape of the group surveying the Israeli embassy in preparation for the attack.  *See* PATTERNS OF GLOBAL TERRORISM 9.

[9]Rohter, *supra* note 5.

Fed. R. Evid. 404(b).  Courts in this jurisdiction have consistently found that defendants directed

Hezbollah to commit terrorist acts during the 1980's and in 1996.  *See e.g.*, *Dammarell I*, 281

F.Supp. 2d at 110-11, 192; *Peterson I*, 264 F.Supp. 2d at 58; *Oveissi*, 498 F.Supp. 2d at 274;

*Heiser*, 466 F.Supp. 2d at 252-53.  Defendants have funded Hezbollah training camps since

1993, *see Sisso II*, 2007 WL 2007582 at *5, and they provided weapons to Hezbollah in 2002.

*See id.* at *6.  This evidence provides compelling support for the Court's finding that defendants

were in an ongoing terrorist conspiracy with Hezbollah in March 1992, when Hezbollah bombed

the Israeli embassy.

Therefore, the Court concludes that defendants provided material support to Hezbollah in

its attack on March 17, 1992, for as opined by Dr. Clawson, this bombing could not have

occurred without defendants' "material, financial and technical support."  (Clawson Aff. ¶ 40.)

While it is unclear whether defendants actually provided the bomb that was used in the attack,

they had knowledge of the plot and they provided the support that allowed Hezbollah to carry

out the embassy bombing.

## IV.  Effect of Decedent's Death on Plaintiffs

### A.  *David Ben-Rafael (Decedent)*

Mr. Ben-Rafael was a citizen of Israel when he was killed in the bombing of the Israeli

embassy in Buenos Aires on March 17, 1992.  (Exh. 12, Decedent's Death Certificate.)  He was

born as David Joel Goldman on September 30, 1948, in the United States.  (Weinstein Aff. 2.)

He earned his B.A. in international relations from George Washington University in 1971 and

immigrated to Israel on January 30, 1974.  (*Id.*)  He earned a B.A. in law from Hebrew

University in Israel, on May 18, 1976.  (Exh. 11, Translated Law Degree.)  Decedent changed

his name from Goldman to Ben-Rafael upon joining the Israeli Foreign Office on November 5, 1979. (Weinstein Aff. 2 n.1.)  He worked in Israel's foreign service until the time of his death. (*Id*. 2.)

Mr. Ben-Rafael had embarked on a promising career in foreign service.  In 1981, he was promoted to the Legal Advisor's Office of the Ministry of Foreign Affairs in Jerusalem. (Weinstein Aff., Aisen Attachment.)  From 1983 to 1988, he served as a political secretary in both London and Chicago.  (*Id*.)  In 1988, he returned to the Legal Advisor's Office, where he served until he was sent to Buenos Aires in 1990 as the Deputy Chief of Mission at the Israeli embassy. (*Id*.)  He was serving in this capacity when he was killed.  But for his premature death, it is more than likely that he would have continued to advance up the diplomatic ladder to the position of Head of Mission.  (*Id*.)

Furthermore, it is likely that Mr. Ben-Rafael would have obtained a much more lucrative position as a private attorney upon retirement.  Dr. Meir Rosenne, a partner at an Israeli law firm, was "well acquainted" with Mr. Ben-Rafael.  (Rosenne Aff. ¶¶ 1, 7.)  Dr. Rosenne served in Israel's foreign service for 41 years prior to entering private practice, and he believes that Mr. Ben-Rafael would have followed a similar path:

> [A]fter normal retirement, at the age 67, Mr. Ben-Rafael would have been employable by an Israeli law firms (*sic*) . . . . An individual with his credentials and work history is highly desirable for employment by a number of significant Israeli law firms.  I am personally aware of numerous situations where attorneys with Mr. Ben-Rafael's legal and diplomatic service in the Ministry have been successful in obtaining such post-retirement employment.

(*Id*.¶¶ 9-10.)  While there is no way to know for certain whether Mr. Ben-Rafael would have sought a private sector position after his retirement from foreign service, the Court credits Dr.

Rosenne's prediction given his experience and knowledge of Mr. Ben-Rafael.

Therefore, the Court finds that Mr. Ben-Rafael's untimely death cut short a promising career. If the terrorist act had not occurred, he was likely to advance in the diplomatic ranks, and upon retirement, he would have earned a substantially higher income as a practicing attorney.

### B. Elisa Nili Cirilo Peres Ben-Rafael (Decedent's Widow)

Elisa Nili Cirilo Peres Ben-Rafael, decedent's widow, is a United States citizen domiciled in Israel. (E. Ben-Rafael Aff. ¶ 2.) On February 2, 1988, she married decedent in Chicago, Illinois. (Id. ¶ 3.) Ms. Ben-Rafael is the mother of decedent's two children. (Id. ¶ 4.) She is a plaintiff in this action in her individual capacity as decedent's widow, in a representative capacity as executor of her husband's estate, and as the legal guardian of her minor son, Yonatan Mishael Ben-Rafael.[10] (Plaintiffs' Amended Proposed Findings of Fact and Conclusions of Law (hereinafter "Pls.' Prop. FF & CL") ¶ 2; E. Ben-Rafael Aff. ¶ 32.)

Ms. Ben-Rafael has been deeply affected by her husband's murder. After the bombing, she spent two agonizing days waiting for news. She described this time as "the most difficult waiting period of my life." (Id. ¶ 15.) After she learned that her husband was dead, Ms. Ben-Rafael experienced severe emotional trauma:

> I developed heightened senses of smell, an inability to deal with loud noises, a level of light sensitivity which required me to wear sunglasses anytime I went outside. I had difficulty eating proper meals and developed a tendency to snack. All of these issues

---

[10]Both of decedent's children were minors when plaintiffs filed their complaint on April 21, 2006, and consequently the interests of both children were represented by their mother at that time. However, Noa Ruth Ben-Rafael has reached the age of majority under District of Columbia law. See D.C. Code Ann. § 46-101 (2001). Therefore, the Court recognizes Noa Ruth Ben-Rafael as a separate plaintiff in this action, while the mother still represents the interests of her minor son, Yonatan Mishael Ben-Rafael.

> remain with me in some greater or lesser form even until today.  I
> still have difficulty sleeping, I travel poorly, never take public
> transportation for fear of terrorist attack, whenever I travel abroad
> I am continually stressed out and frightened.

(*Id.* ¶ 23.)

She returned to Israel after settling her affairs in Argentina.  (*Id.* ¶ 24.)  In the years

following the terrorist attack, Ms. Ben-Rafael was overwhelmed: "I had difficulty caring (*sic*)

out simple tasks such as going grocery shopping, doing laundry or even making sure that there

were enough diapers for my infant son." (*Id.* ¶ 25.)  The period between the Jewish holidays of

Tu Bishvat and Purim has been particularly difficult because it corresponds to the Hebrew date

of their marriage and her husband's death.  (*Id.* ¶ 30.)  "I generally retreat from happy activities

and have trouble spending any concentrated time with family, friends, or my children." (*Id.*)  In

the sixteen years since the attack, she has dated very infrequently.  (*Id.* ¶ 31.)  Only recently has

she started to date a widower who also lost his spouse as a result of a terrorist attack.  (*Id.*)

### C.  Noa Ruth Ben-Rafael (Decedent's Daughter)

Noa Ruth Ben-Rafael, decedent's natural daughter, is a United States citizen domiciled

in Israel.  (N. Ben-Rafael Aff. ¶ ¶ 2- 3.)  While her mother initially represented her interests in

this action, she became a separate plaintiff upon reaching the age of majority.[11]  She was born in

Jerusalem on November 20, 1988, and was three years old at the time of her father's death.  (*Id.*

¶ ¶ 2, 4.)  Even though Noa has only vague memories of her father (*id.*), she was still traumatized

by his death.  When Noa's mother told her that her father was dead, she replied in Spanish, "My

Daddy died in Spanish, I will never speak this language again!" (E. Ben-Rafael Aff. ¶ 17.)  She

---

[11]*Supra*, note 10.

also had dreams in which she saw her father enveloped in light, but was unable to hug him.  (*Id.*

¶ 22.)

Noa's childhood was deeply troubled by her father's death.  Her mother noted:

> Noa also developed an inability to sleep through the night.
> Throughout most of her childhood she would wake up at the
> slightest noise and walk through the house.  Throughout grade
> school her teachers described to me that she didn't stay focused in
> school. . . . When she was in fourth grade she briefly saw a
> therapist because of minor childhood "taking items that didn't
> belong to her."  I perceived this to be a call for help and I did my
> best to assist her.  Noa greatly misses her father, throughout her
> life she has been engaged in asking questions about him, keeping a
> photograph of him in her bedroom and keeping a stuffed toy that
> he gave her.

(*Id.* ¶ 28.)

Things did not get any easier for Noa during her teenage years.  She went through a "very

serious teenager maturity crisis" that prevented her from finishing the high school matriculation

exams.  (*Id.* ¶ 27.)  Events that should have been joyous occasions, such as birthdays, were

"colored by a bit of sadness and emptiness because [she] knew that [her] father should be there

and he wasn't."  (N. Ben-Rafael Aff. ¶ 5.)

### D.  *Yonatan Mishael Ben-Rafael (Decedent's Son)*

Yonatan Mishael Ben-Rafael, decedent's natural son, is a United States citizen domiciled

in Israel.  (Y. Ben-Rafael Aff. ¶¶ 2-3.)  As a minor, his interests in this action are represented by

his mother, Elisa Nili Cirilo Peres Ben-Rafael.[12] He was born in Jerusalem on June 16, 1991, and

was nine months old at the time of his father's death.  (*Id.* ¶¶ 2, 4.)  Yonatan does not have any

memories of his father.  Unlike his sister, he prefers not to talk about the loss of his father:

---

[12]*Supra*, note 10.

> All my life I grew up without a father. I don't really like talking
> about this. Sometimes I feel jealous of my friends because I know
> they have special talks and activities with their fathers and I don't
> have that because my father was killed.

(*Id*. ¶ 5.)

In addition to a general sense of loss, his father's murder has impeded Yonatan's plans for military service. Yonatan wishes to serve in the army like all of his friends, and he believes that this is an important part of Israeli citizenship. (*Id*. ¶ 8.) However, because his father was killed he must obtain permission from his mother before he can serve. (*Id*.) His mother seems to be unwilling to do this in light of the grief that she has already suffered. (*Id*.) Yonatan said, "I know that if my father were alive I wouldn't have this problem." (*Id*.)

### E. Ralph Goldman (Decedent's Father)

Ralph I. Goldman, decedent's father, is a naturalized United States citizen who was domiciled in New York during all times relevant to this action, although he currently resides in Israel. (R. Goldman Aff. ¶¶ 2-4.) Mr. Goldman was born in the Ukraine on September 1, 1914. (*Id.*) He is a plaintiff in this action both in his individual capacity and as the executor of the estate of Helen Goldman, his deceased wife. (Exh. 17, Translated Probate Order Regarding Helen Goldman's Estate.)

Upon learning of the bombing, Mr. Goldman was hopeful that his son was still alive: "I assumed that David was taking care of others, as was his nature, before trying to reach us or other family members." (R. Goldman Aff. ¶ 6.) When his son was declared missing, he immediately flew from New York to Buenos Aires: "I cried the entire flight, fearing the worst and hoping for the best." (*Id*. ¶ 7.) Upon arriving in Buenos Aires, he was overwhelmed by "fear, anger, and anxiety." (*Id*. ¶ 8.) He went to the site of the bombing where he learned that

14

his son was dead: "Within the pile lay my son whose body was recovered while Helen and I stood on the grounds of the collapsed building." (*Id*.)

Mr. Goldman was deeply wounded by his son's death:

> I had lost my only son with whom I enjoyed [a] strong and loving relationship. When David changed his name to an Israeli name, he chose Ben-Rafael, which translates as "as the son of Ralph." I missed our times together. I missed talking about his family and his work on the Israeli Foreign Ministry. And, having encouraged his career, both Helen and I shared a deep guilt in feeling responsible for having placed him in the line of fire as a Embassy employee.

(*Id*. ¶ 11.) Mr. Goldman is constantly reminded of his son; he recites Psalms for him daily. (*Id*. ¶ 13.) His son's death has "left a whole in the family." (*Id*. ¶ 17.) For a time he also had to seek medical treatment because of his sadness and depression. (*Id*. ¶ 12.)

### F. Helen Goldman (Decedent's Mother)

Helen Goldman, decedent's mother, was a United States citizen domiciled in New York during all times relevant to this action, although she moved to Israel in 2003, where she died two years later. (R. Goldman Aff. ¶¶ 3-4, 16.) Ms. Goldman's interests are represented by her husband, Ralph Goldman, who is executor of her estate.

Along with her husband, Ms. Goldman went through the horrific experience of being present amidst the ruins of the embassy while her son's body was being recovered. Ms. Goldman internalized her grief, which in turn affected her physical health. (R. Goldman Aff. ¶ 14.) She had a heart attack two months after the bombing, and her health steadily declined until her death in 2005. (*Id*. ¶¶ 14-16.)

G. *Judith Goldman Baumgold (Decedent's Older Sister)*

Judith Goldman Baumgold, decedent's sister, is a United States citizen domiciled in Israel. (Baumgold Aff. ¶ 2). She was born in East Orange, New Jersey, on October 15, 1944. (*Id.*) Ms. Baumgold was particularly close to her brother. As the oldest sibling, she served as a role mode for him. (*Id.* ¶ 3.) She had been living in Israel for several years when her brother arrived, and her house served as his "home base" while he was still a bachelor. (*Id.*) Her brother was a "partner," someone who always supported her. (*Id.* ¶ 4.) Ms. Baumgold's sister, Naomi, had serious problems that rendered her dysfunctional. (*Id.*) When her brother died, much of the burden fell upon Ms. Baumgold's shoulders:

> David's death has created a void. In the years after David's death,
> I have been the only child who could help my parents as they aged.
> After my mother became sick, and frail, I helped them move to
> Israel in August 2003. The stress and burden of being the only
> functioning, caretaking child is constantly with me. In this respect,
> David's death has been a source of ongoing emotional distress.

(*Id.* ¶ 8.) The stress of carrying this burden led to nightmares, insomnia and anxiety, causing her to continue in therapy until 1997. (*Id.* ¶¶ 9-10.)

H. *Naomi L. Goldman (Decedent's Younger Sister)*

Naomi L. Goldman, decedent's natural sister, is a United States citizen domiciled in New York. (R. Goldman Aff. ¶ 4; Pls.' Prop. FF & CL ¶ 8.) Ms. Goldman has had personal difficulties for much of her life and has been financially and emotionally dependent upon her family. (Baumgold Aff. ¶ 4.) Her brother's death made matters much worse. According to her sister, Ms. Goldman has been "emotionally paralyzed since David died." (*Id.* ¶ 10.) John R. Winegar, the family's therapist, agrees with Ms. Baumgold's assessment. He determined that Ms. Goldman has had a "highly inadequate emotional response to her brother's death." (R.

16

Goldman Aff., Winegar Attach.)

## CONCLUSIONS OF LAW

### I.  Jurisdiction under the FSIA

The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in U.S. courts.[13]  *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). "The 'interlocking provisions' of that statute compress subject-matter jurisdiction and personal jurisdiction into a single, two-pronged inquiry: (1) whether service of the foreign state was accomplished properly, and (2) whether one of the statutory exceptions to sovereign immunity applies."  *Sisso I*, 448 F.Supp. 2d at 81-82 (citing 28 U.S.C. §§ 1330(a)-(b), and *Mar. Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1099 (D.C. Cir. 1982)); *see also Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 89 (D.C. Cir. 2002) (observing that § 1330(b) provides that "[i]f service of process has been made under § 1608, personal jurisdiction over a foreign state exists for every claim over which the court has subject matter jurisdiction," and, in turn, § 1330(a) "automatically confers subject matter jurisdiction whenever the state loses its immunity pursuant to § 1605(a)(7)").  Here, the uncontested facts as found by the Court provide jurisdiction against these defendants under the FSIA.

*A. Service of Process*

The FSIA establishes the requirements for proper service upon a foreign state or a political subdivision of a foreign state.  *See* Fed. R. Civ. P. 4(j)(1).  The FSIA prescribes four

---

[13]"For jurisdictional purposes, Iran and MOIS are treated identically – as the state itself." *Sisso v. Islamic Republic of Iran* ("*Sisso I*"), 448 F.Supp. 2d 76, 81 n.6 (D.D.C. 2006) (citing *Dammarell I*, 281 F.Supp. 2d at 200-02).

methods of service, in descending order of preference. Plaintiffs must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on. *See* 28 U.S.C. § 1608(a).

The preferred method of service is delivery of the summons and complaint "in accordance with any special arrangement for service between the plaintiff and the foreign state." 28 U.S.C. § 1608(a)(1). If no such arrangement exists, then delivery is to be made "in accordance with an applicable international convention on service of judicial documents." *Id*. § 1608(a)(2). If neither of the first two methods is available, plaintiffs may send the summons, complaint, and a notice of suit (together with a translation of each into the official language of the foreign state) "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id*. § 1608(a)(3). Finally, if mailed service cannot be accomplished within thirty days, then the statute permits plaintiffs to request that the clerk of the court dispatch two copies of the summons, complaint, and notice of suit (together with a translation of each into the foreign state's official language) to the Secretary of State, who then "shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id*. § 1608(a)(4). "Strict adherence to the terms of 1608(a) is required." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994).

The first three methods were not possible here. Service under § 1608(a)(1) was unavailable because plaintiffs had no "special arrangement" for service with Iran. Likewise, because Iran is not party to an "international convention on service of judicial documents,"

service under § 1608(a)(2) was impossible.  Plaintiffs attempted service on August 18, 2006,

under § 1608(a)(3), but the recipients refused delivery on August 26, 2006, and the package was

returned.  (Hirsch Aff. ¶ 3.)

On January 23, 2007, plaintiffs initiated service under § 1608(a)(4) by sending a package

containing two copies of the pleadings (including a Farsi translation) through diplomatic

channels.  (Hirsch Aff. ¶ 4.)  On April 22, 2007, the Swiss foreign ministry served the documents

on the Iranian Ministry of Foreign Affairs.  (*Id.*)  The Iranian Ministry of Foreign Affairs

returned the documents to the Swiss foreign ministry without comment.  This service was proper

under § 1608(a)(4) despite the return of the documents.  *See Sisso I*, 448 F. Supp. 2d at 83

(approving service of process under § 1608(a)(4) when documents were delivered by the Swiss

embassy to the Iranian Ministry of Foreign Affairs).

*B. Terrorism Exception to Sovereign Immunity*

Sovereign entities are immune from suit in U.S. courts unless one of the FSIA's statutory

exceptions applies.  *See* 28 U.S.C. § 1604.  Plaintiffs contend that defendants' actions fall within

the "state sponsor of terrorism" exception to sovereign immunity, which removes sovereign

immunity in any civil action

> in which money damages are sought against a foreign state for
> personal injury or death that was caused by an act of torture,
> extrajudicial killing, aircraft sabotage, hostage taking, or the
> provision of material support or resources (as defined in section
> 2339A of title 18) for such an act if such act or provision of
> material support is engaged in by an official, employee, or agent of
> such foreign state while acting within the scope of his or her office,
> employment, or agency . . . .

28 U.S.C. § 1605(a)(7).

19

This exception applies only if the following three conditions are present: (1) the foreign state was designated as a state sponsor of terrorism at the time of the act or as a result of the act; (2) the foreign state was afforded a reasonable opportunity to arbitrate the claim if the act occurred in the foreign state; and (3) either the claimant or the victim was a national of the United States when the act occurred.  *See id.*

All three conditions are satisfied here.  First, Iran was designated a state sponsor of terrorism in 1984, and has been on the State Department's list of state sponsors of terrorism since that time.  *See Dammarell III*, 404 F. Supp. 2d at 273-74 (referring to 22 C.F.R. § 126.1(d) (2005); 31 C.F.R. § 596.201 (2005)).  The second requirement is inapplicable because the bombing did not occur in Iran.  Third, all of the plaintiffs were citizens of the United States at the time of the bombing, though decedent was not.

The only remaining question is whether defendants' actions fall within the scope of the exception.  Two terms are important for this inquiry – "extrajudicial killing" and "material support or resources."  The FSIA defines an "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  28 U.S.C. § 1605(e)(1)(referring to the Torture Victim Protection Act of 1991, codified at 28 U.S.C. § 1350).  In this case, Hezbollah claimed responsibility for the bomb that killed twenty-nine people, including Mr. Ben-Rafael.  Obviously, this deliberate and unauthorized act was an extrajudicial killing.  *See*, *e.g.*, *Sisso II*, 2007 WL 2007582, at *7 (finding that a "bombing qualifies as an act of extrajudicial killing").

Iran's backing of Hezbollah, as found by the Court herein, constitutes "material support

or resources." The FSIA defines "material support or resources" as

> any property, tangible or intangible, or service, including currency
> or monetary instruments or financial securities, financial services,
> lodging, training, expert advice or assistance, safehouses, false
> documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel . . . ,
> and transportation, except medicine or religious materials . . . .

18 U.S.C. § 2339A(b); *see also* 28 U.S.C. § 1605(a)(7). The Court has already concluded that

Hezbollah would not have succeeded without defendants' money, training and technical

expertise. This support is unambiguously prohibited by § 2339A, so defendants' conduct

constitutes "material support or resources" within the meaning of the FSIA.

Finally, the Court must determine whether the material support or resources provided by

defendants to Hezbollah caused plaintiffs' injuries. *See* 28 U.S.C. § 1601(a)(7). The FSIA's

causation requirement is satisfied by a showing of proximate cause. *See Kilburn v. Socialist

People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128-29 (D.C. Cir. 2004). Proximate cause

exists so long as there is "some reasonable connection between the act or omission of the

defendant and the damages which the plaintiff has suffered." *Id.* (citations omitted). Obviously,

it is foreseeable that innocent people would be killed if one drives a truck filled with explosives

into a building. The very purpose of terrorist acts is to cause such injuries. Therefore, the

proximate cause test in *Kilburn* is easily met here.

Thus, the Court has subject matter jurisdiction over this action.

## II. Liability

Now that the Court has determined that jurisdiction is proper, and that the FSIA strips

defendants of immunity, the next step is to examine the issue of liability. The FSIA provides

that "the foreign state shall be liable in the same manner and to the same extent as a private

individual under like circumstances."  28 U.S.C. § 1606.  In other words, the FSIA does not

create a cause of action, so plaintiffs must rely upon other sources of law in order to establish

liability.  *See Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004)

("Section 1605(a)(7) merely waives immunity of a foreign state without creating a cause of

action against it.")

      The Court must therefore determine which sources of law are available to plaintiffs.  In

cases such as this, the law of the United States applies rather than the law of the foreign land

where the tort occurred.  *See Dammarell v. Islamic Republic of Iran* ("*Dammarell II*"), No. 01-

CV-2224, 2005 WL 756090, at *20 (D.D.C. Dec. 14, 2005) ("The United States has a unique

interest in its domestic law, rather than the law of a foreign nation, determining damages in a suit

involving such an attack.")

      To determine which state's law governs, the Court looks to the District of Columbia's

choice of law rules because it is the forum state.  *See Bucheit v. P.L.O.*, No. 00-CV-01455, 2003

WL 24011414, at *5 (D.D.C. Aug. 18, 2003).  In the FSIA context, the District's choice of law

test "typically leads to the application of the law of the plaintiff's domicile, as the state with the

greatest interest in providing redress to its citizens."  *Haim v. Islamic Republic of Iran*, 425

F.Supp. 2d 56, 69 (D.D.C. 2006).  Therefore, plaintiffs in this case who have U.S. domiciles

(decedent's father on his own behalf and on behalf of his wife's estate, and decedent's sister,

Naomi Goldman) shall be subject to the law of his or her domicile at the time of the terrorist act

(*i.e.*, New York).  For plaintiffs without a U.S. domicile (decedent's widow on her own behalf

and on behalf of her husband's estate; decedent's two children; and decedent's sister, Judith

Baumgold), courts have determined that the forum state has the greatest interest.  *See id.*

("[S]ince plaintiffs have no United States domicile, the forum is the state with the greatest interest, and thus the application of its law is proper.")  Consequently, plaintiffs without a U.S. domicile shall be governed by District of Columbia law.

After determining the appropriate sources of law, the next step is to apply these sources to plaintiffs' claims.  *See Haim*, 425 F.Supp. 2d at 29.  Because defendants have not made an appearance in this case, the Court is bound by 28 U.S.C. § 1608(e):  "No judgment by default shall be entered by a court of the United States . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  This means that "a FSIA plaintiff must prove that the projected consequences [of defendants' conduct] are 'reasonably certain' (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate.'"  *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) (internal citations omitted).  Therefore, in evaluating plaintiffs' claims, the Court will consider whether the harms alleged by plaintiffs are reasonably certain.

A.  *Threshold Question of Vicarious Liability*

Plaintiffs' claims of intentional infliction of emotional distress and wrongful death depend upon a showing of vicarious liability.  (Pls.' Prop. FF & CL 27.)  Plaintiffs argue that defendants are vicariously liable for Hezbollah's actions because they provided material support to the terrorist organization.  (*Id.* 26.)  Based upon the above choice of law analysis, this Court examines the question of vicarious liability under both the laws of the District of Columbia and New York.

There are several theories of vicarious liability "such as conspiracy, aiding and abetting and inducement."  *Valore*, 478 F.Supp. 2d at 108.  One theory is sufficient to establish vicarious

liability, and once a court finds liability under one theory, it need not consider the others. *See id.*
at 109 n.8. Defendants are liable under the civil conspiracy theory of vicarious liability if there
was "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a
lawful act in an unlawful manner; and (3) an injury or death caused by an unlawful overt act
performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the
common scheme." *Bodoff*, 424 F.Supp. 2d at 84 (internal citations omitted).

The evidence in this case establishes a civil conspiracy between defendants and
Hezbollah under District of Columbia law. "[S]ponsorship of terrorist activities inherently
involves a conspiracy to commit terrorist attacks." *Bodoff*, 424 F.Supp. 2d at 84 (internal
citations omitted). Furthermore, each of the four elements of a civil conspiracy is present here.
First, an agreement between defendants and Hezbollah can be inferred from their conduct. *See*
*id.* Defendants were instrumental in Hezbollah's founding. *See Valore*, 478 F.Supp. 2d at 105
("The formation and emergence of Hezbollah as a major terrorist organization is due to the
government of Iran.") Defendants provided at least $25 million annually to Hezbollah over a
twenty year period. (Clawson Aff. ¶ 19.) During the months leading up to the attack, defendants
invited Hezbollah to Iran for "the stated goal of coordinating efforts against Israel and bringing
the Arab-Israeli peace process to a halt." PATTERNS OF GLOBAL TERRORISM 21. This conduct is
proof of an agreement between defendants and Hezbollah. Second, the agreement was to
commit unlawful terrorist acts. Third, Hezbollah claimed responsibility for the March 17, 1992
bombing that killed the decedent. (Clawson Aff. ¶ 33.) Finally, this bombing furthered a
common scheme – *i.e.*, the opposition of Israel and the establishment of Iran as the global leader
of radical Islam. (*Id.* ¶ 16.)

24

There is also a civil conspiracy between defendants and Hezbollah under New York law. In *Valore*, the Court determined that the essential elements of civil conspiracy were the same under the laws of the District of Columbia and New York. *See* 478 F.Supp. 2d at 108. Therefore, the same analysis applies to plaintiffs' claims under New York law.

Having found that defendants engaged in a civil conspiracy with Hezbollah under the laws of both the District of Columbia and New York, the Court now turns to the question of whether defendants are vicariously liable for intentional infliction of emotional distress and wrongful death.

### B. *Intentional Infliction of Emotional Distress*

There are three elements of intentional infliction of emotional distress ("IIED") under District of Columbia law: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Bodoff*, 424 F.Supp. 2d at 85 (internal citations omitted). All three elements are satisfied here. First, a terrorist bombing is *per se* extreme and outrageous conduct. *See id.* ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror.") (internal citations omitted). Second, the bombing was clearly intended to cause emotional distress. *See id.* ("The intent or recklessness can be inferred from the outrageousness of the acts.") (internal citations omitted).

The final element is a showing of severe emotional distress. The District of Columbia's standard for severe emotional distress is less demanding than in many other jurisdictions. It does not require physical injury. *See Bodoff*, 424 F.Supp. 2d at 85. And while the Court of Appeals for the District of Columbia has not yet ruled on whether physical presence is required, federal

courts have interpreted this silence as meaning that presence is not needed.  *See Peterson v.*

*Islamic Republic of Iran* ("*Peterson II*"), 515 F.Supp. 2d 25, 43-44 (D.D.C. 2007).

The analysis under New York law is indistinguishable from that under District of

Columbia law.  Under New York law, an IIED claim must satisfy four elements: "(i) extreme

and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing,

severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv)

severe emotional distress."  *Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993).

While the New York formulation has an additional element – a causal connection – the tests are

effectively identical because the District of Columbia's version also requires causation.  *See*

*Bodoff*, 424 F.Supp. 2d at 85 (the conduct must "*cause*[] the plaintiff severe emotional distress")

(emphasis added) (internal citations omitted).  Furthermore, neither New York nor the District of

Columbia requires presence.  *See Peterson II*, 515 F.Supp. 2d at 43-44.  Therefore, because New

York law is effectively the same as District of Columbia law, the IIED inquiry is the same for all

plaintiffs.

There is evidence that each of the plaintiffs experienced severe emotional distress

because of this terrorist act.  Decedent's father said that "[t]he fear, anger, and anxiety we all felt

was overwhelming."  (R. Goldman Aff. ¶ 8.)  Decedent's widow noted that "I still have

difficulty sleeping, I travel poorly, never take public transportation for fear of terrorist attack,

whenever I travel abroad I am continually stressed out and frightened."  (E. Ben-Rafael Aff. ¶

23.)  Both sisters have been deeply affected.  Ms. Baumgold recalled that "David's death has

been a source of ongoing emotional distress."  (Baumgold Aff. ¶ 8.)  Ms. Baumgold is also

aware of her sister's plight: "My sister, Naomi, has been emotionally paralyzed since David

26

died." (*Id*. ¶ 9.) The children have suffered a great loss as well. Yonatan has attested to the difficulty of having to "grow[] up not really knowing who my father was." (Y. Ben-Rafael Aff. ¶ 7.) Noa has problems enjoying life: "Throughout my life any happy event was always colored by a bit of sadness and emptiness because I knew that my father should be there and he wasn't." (N. Ben-Rafael ¶ 5.)

While there is support for all of plaintiffs' IIED claims, the claims of Naomi Goldman and the two children warrant additional discussion. The Court considered the fact that Naomi Goldman had serious emotional problems prior to her brother's death. It is fair to say that not all of her emotional issues are attributable to her brother's death. Plus, the Court is hindered by not having an affidavit from Ms. Goldman; instead, it had to rely on her sister's and father's statements about her emotional problems. However, the law recognizes recovery for aggravation of preexisting injuries. *See Bushong v. Park*, 837 A.2d 49, 55 (D.C. 2003) (holding that "a tortfeasor takes his victim as he finds him"); *Bartolone v. Jeckovich*, 481 N.Y.S.2d 545, 547 (N.Y. App. Div. 1984) (ruling that "a defendant must take a plaintiff as he finds him and hence may be held liable in damages for aggravation of a pre-existing illness"). While Ms. Goldman was troubled prior to this incident, there is sufficient evidence that her problems were greatly exacerbated by her brother's death, since she has been unable to deal with the severe emotional trauma caused by his murder. (R. Goldman Aff., Winegar Attach.)

With respect to decedent's two children, both were very young at the time of their father's death. The daughter, Noa, was three years old and has only vague memories of her father. (N. Ben-Rafael Aff. ¶ 4.) The son, Yonatan, was only nine months old and has no memories of his father. (Y. Ben-Rafael ¶¶ 4-5.) The distress suffered by the children, while

very real, was markedly different from that of the older plaintiffs, who vividly remember the

events of March 17, 1992.  However, this distinction does not preclude the children's IIED

claims.  Because the District of Columbia does not require physical injury or presence, the

children's loss can constitute severe emotional distress.  *Cf. Heiser*, 466 F.Supp. 2d at 323-24

(D.D.C. 2006) (in light of "the strict construction Louisiana courts place on the presence

requirement in intentional infliction of emotional distress claims," the court denied a claim by a

plaintiff who was two months old at the time of the incident because he "was not physically

present to witness the harm done to his father").

        *C.  Wrongful Death*

        Before addressing the substance of the wrongful death claim, this Court must first

consider plaintiffs' arguments regarding the applicable choice of law.  In Plaintiffs' Amended

Proposed Findings of Fact and Conclusions of Law, they contend that a separate choice of law

analysis is required for the wrongful death claim.  (Pls.' Prop. FF & CL  33.)  Plaintiffs'

reasoning is difficult to follow, but it seems to consist of three steps.  First, plaintiffs correctly

note that courts in this jurisdiction have taken different approaches on choice of law questions in

FSIA cases.  (*Id.* 33-34.)  Second, plaintiffs appear to reject several recent FSIA cases in favor of

a 1949 decision holding that "the law of the state where the fatal injuries occurred should

govern, unless the public policy of the forum is clearly opposed."  (*Id.* 35, *citing Lewis v.

Reconstruction Fin. Corp.*, 177 F.2d 654, 656 (D.C. Cir. 1949)).  Third, relying on *Lewis*, they

argue that Israeli law should govern the wrongful death claim because the embassy was a

"territory of Israel for purposes of this action," even though it was physically located in Argentina.[14]  (Pls.' Prop. FF & CL 34 n.10.)

Plaintiffs' reasoning is flawed in several respects.  First, plaintiffs fail to explain why the choice of law analysis should depend upon the nature of the substantive claim.  This Court has not made this distinction in prior cases.  *See, e.g.*, *Bodoff*, 424 F.Supp. 2d at 83-86 (in a FSIA case, the Court utilized the same choice of law analysis for claims of vicarious liability, wrongful death, and IIED).  Second, plaintiffs' reliance on *Lewis* is misplaced.  While it is still good law, it was not decided under the FSIA and is contrary to more recent opinions decided under that law.[15]  As plaintiffs note, this Court has not relied upon *Lewis* when making choice of law determinations with respect to wrongful death claims in FSIA cases.  (Pls.' Prop. FF & CL 35.) Consistent with the more recent decisions decided under the FSIA, this Court applies the same choice of law rule to all of the claims, including wrongful death.  Therefore, the Court examines the wrongful death claim under District of Columbia law.[16]

---

[14]In the alternative, plaintiffs argue that Israeli law should apply over Argentinean law because Israel's interests in "the protecting of its citizens and their immediate families who serve in its official diplomatic missions outweighs the interests of Argentina as the mere place of the injury and resulting death."  (Pls.' Prop. FF & CL 34 n.10.)

[15]This Court realizes that a recent case, *Smith v. Hope Village, Inc.*, 481 F.Supp. 2d 172 (D.D.C. 2007), relies upon *Lewis*, but *Smith* was not decided under the FSIA.  Furthermore, no FSIA case has relied upon *Lewis*.

[16]The wrongful death statutes in the District of Columbia and Israel both look to decedent's lost earning capacity.  *Compare* Pls.' Prop. FF & CL 45 (description of Israeli statute) *with Runyon v. District of Columbia*, 463 F.2d 1319 (D.C. Cir. 1972) (interpretation of D.C.'s statute).  However, there is an important difference between the two.  Israeli law provides for a "non-pecuniary loss for personal injury" that incorporates pain and suffering.  (Pls.' Prop. FF & CL 45.)  These damages are not available under District of Columbia law.  *See Runyon*, 463 F.2d at 1322.

This Court has awarded damages under the District of Columbia's wrongful death statute even though a literal reading of the text may arguably bar recovery for injuries occurring outside of the District. *See* D.C. Code Ann. § 16-2701 (2001) ( "[w]hen, by an injury done or happening *within the limits of the District . . .*") (emphasis added). However, notwithstanding this language, this Court has awarded damages under § 16-2701. *See Bodoff*, 424 F.Supp. 2d at 85 (awarding damages of nearly $2 million under § 16-2701 for a bus bombing in Jerusalem); *see also Beecham v. Socialist People's Libyan Arab Jamahiriya*, 2007 WL 1020810, at * 2-4 (D.D.C. Mar. 31, 2007) (while the geographic limitation of § 16-2701 was not specifically addressed, the Court denied defendants' motion to dismiss for failure to state a claim in a case relying on § 16-2701). Therefore, the Court finds § 16-2701 to be a valid basis for the wrongful death claim in plaintiffs' complaint.

Plaintiffs have introduced sufficient evidence to demonstrate liability under § 16-2701. This statute "authorizes a personal representative of the deceased to claim damages measured as the economic loss caused by the death of a person wrongfully killed." *Bodoff*, 424 F.Supp. 2d at 85 (citing *Wagner v. Islamic Republic of Iran*, 172 F.Supp. 2d 128, 135 n.11 (D.D.C. 2001)). The evidence shows that Hezbollah was directly responsible for the March 17, 1992 bombing that killed decedent, and that defendants provided the material support that made this attack possible. This brings defendants conduct within § 16-2701.

## III. Damages

Plaintiffs request damages for severe emotional distress, decedent's loss of earning capacity, and prejudgment interest. (Pls.' Prop. FF & CL 43-50.) The Court addresses each request *seriatim*.

A. *Severe Emotional Distress*

As requested by plaintiffs, the Court awards $10 million to decedent's widow, Elisa Nili Cirilo Peres Ben-Rafael: $5 million in her individual capacity and $5 million as the guardian of her minor son, Yonatan Mishael Ben-Rafael.  A total of $10 million is awarded to decedent's father, Ralph I. Goldman: $5 million in his individual capacity and $5 million in his capacity as executor of his wife's estate.  Five million dollars is awarded to decedent's daughter, Noa Ruth Ben-Rafael; and $2.5 million to each of decedent's two sisters, Judith Baumgold and Naomi Goldman.  Consequently, the total award for emotional distress is $30 million.

These damages are similar to the awards in other cases.  *See, e.g.*, *Bodoff*, 424 F.Supp. 2d at 86 (in awarding damages for severe emotional distress in a FSIA suit, the Court noted "parents of the decedent are typically awarded $5,000,000 each, while siblings usually receive awards of $2,5000,000").

B. *Wrongful Death*

The Court awards decedent's widow, Elisa Nili Cirilo Peres Ben-Rafael, $3,731,839 in her capacity as executor of decedent's estate.  This is consistent with Mr. Weinstein's estimate of decedent's lost income.  (Weinstein Aff. 7.)   Relying on data provided by Israel's Ministry of Foreign Affairs, Mr. Weinstein projected decedent's salary until retirement.  (*Id*. 5-6.)  After retirement, he assumed that decedent would have become an attorney at a large law firm.  (*Id*. 6.)  As discussed in the Court's Findings of Fact, Dr. Rosenne has provided a reliable basis to support this assumption.  Mr. Weinstein has adjusted the salary figures using reasonable interest rates in order to arrive at the present value.  (*Id*. 4-5.)  The Court finds this methodology to be sound and bases its award on Mr. Weinstein's analysis.

*C. Prejudgment Interest*

Plaintiffs request prejudgment interest for their IIED claims.  "It is within this court's discretion to award plaintiffs prejudgment interest from the date of the bombing . . . until the date of final judgment."  *Pugh v. Socialist People's Libyan Arab Jamahiriya*, No. 02-cv-02026, 2008 WL 134220, at *49 (D.D.C. Jan. 15, 2008).  "[C]ourts in this Circuit have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries–including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants."  *Id.* (relying on *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) and *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996)).  Therefore, the Court awards plaintiffs prejudgment interest computed at a rate of six percent per annum on a simple interest basis.[17]

## CONCLUSION

For the foregoing reasons, the Court enters judgment for plaintiffs in the amounts specified above.  A Default Judgment accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: February 25, 2008

---

[17]The length of time from the date of the bombing, on March 17, 1992, to the judgment date, February 25, 2008, is 15.95 years.  Multiplying this figure by the 6% rate of interest equals 0.957.  Therefore, the Court calculates prejudgment interest by multiplying all of the IIED award amounts by 0.957.  The Default Judgment accompanying this Memorandum Opinion contains the prejudgment interest amounts for each plaintiff.